## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-CR-117(KBJ)** |
| | : | |
| | : | |
| **ALEX HARKRIDER** | : | |

### DEFENDANT'S MOTION TO REVOKE ORDER OF DETENTION OF TEXAS U.S. MAGISTRATE JUDGE AND TO MODIFY BOND CONDITIONS

The Defendant, Mr. Alex Harkrider, by and through his attorney Kira Anne West, files

this appeal of his detention pursuant to 18 U.S.C. § 3145 (b)  and respectfully requests that he be

released with certain conditions and supervision through the High Intensity Supervision Program

(HISP) with GPS monitoring by Tyler, Texas Pretrial Services. Mr. Harkrider would also be

amenable to conditions of house arrest if the Court deemed it necessary. In support of this

motion, the Defendant  asks for a hearing and submits the following:

### BACKGROUND

The Defendant, Mr. Harkrider, is thirty four years old and a Texan, a father,  a brother, an

uncle, and a son.  He has one brother and one sister.  He is a graduate of Carthage High School.

He also did one semester at St. Phillips in San Antonio, Texas.  At the time of his arrest on

January 18, 2021, he was a full time volunteer serving as  a search and rescue volunteer for a

non-profit started by his co-defendant, Mr. Nichols.  See Ex. 4, photos of volunteer rescues.  A

veteran,  having served  twice in both Iraq and Afghanistan for four years, he is 100% disabled

from the Marine Corps.  He was honorably  discharged.  He lives on his military disability check.

Mr. Harkrider is also a father to Alex, Jr. , who is currently a sophomore in High School.  Mr.

Harkrider pays child support to his son's mother each and every month and provides more than

what is required of him.

Mr. Harkrider's  mental health was affected by certain medical issues suffered as a result

of the service to our country but his conditions have been controlled through the use of

medication and his volunteer work which he uses as therapy.  He has minimal criminal history; a

DWI charge from more than ten years ago.  *See*  Ex. 1, Pretrial Services Report, filed under seal.

As such, Pretrial Services recommended his release. *Id.*

## PROCEDURAL HISTORY

On January 17th,  Mr. Harkrider and Mr. Nichols were charged by criminal complaint

with "Conspiracy and unlawful entry with dangerous weapon" pursuant to 18 U.S.C. §§ 1752(a),

b(1)(a); Violent Entry and Disorderly Conduct on Capitol Grounds pursuant to 18 U.S.C. §§

5104(e)(2)(D) and (e)(2)(G); and aiding and abetting in violation of 18 U.S.C. § 2(a).

On January 18th, 2021, at about 6:00 o'clock a.m., Mr. Harkrider was arrested at his

small home in Carthage, Texas by a large contingent of police officers.  Mr. Harkrider estimates

at least 15 officers were present. He was awakened by a crash, banging on the door (police

kicked it in), and two flash bangs were set off. He was in a daze and instantly  had flashbacks of

his time as a Marine where he saw daily combat which included shooting and killing.  With tears

in his eyes, he begged the officers not to shoot his dog, Opie.  They had a search warrant.  They

took several items from Mr. Harkrider's home. They also questioned Mr. Harkrider first without

giving him his Miranda warning. He was "in custody." Mr. Harkrider cooperated with the

officers.

At Mr. Harkrider's  initial appearance, the Government argued for detention pursuant to

18 U.S.C. § 3142(f).  A detention hearing was held jointly with his co-defendant, Nichols, on

January 22, 2021, wherein Mr. Harkrider was represented by a defense attorney in Texas.

Although Pretrial Services recommended conditions that would assure his presence at trial and

the safety of the community,1 the Magistrate Judge ultimately granted the detention motion. *See*

Ex. 1, Pretrial Services Report; Ex. 2, transcript of detention hearing.

On February 12, 2021,  Mr. Harkrider and his co-defendant were  charged by indictment

with multiple counts arising out of his alleged participation in the events that occurred at the

United States Capital on January 6, 2021.

## STATEMENT OF FACTS

### A.  Storming of the Capitol on January 6, 2021

On January 5, 2021, Mr. Harkrider was a passenger in a truck driven by his co-defendant

Nichols.2  They drove from Texas to Virginia where they stayed overnight in a hotel. The

following day,  January 6, 2021, Mr. Harkrider and Mr. Nichols took an uber to the "Save

America" rally at the Ellipse in President's Park to listen to various speakers, including former

President Donald Trump. During his speech, President Trump encouraged attendees to march to

the Capitol to protest the Electoral College certification of the results of the 2020 Presidential

Election. Like so many, Mr. Harkrider was unaware of any march on the Capital until the

President of the United States told his supporters to " peacefully and patriotically make your

voices heard" and "we are going to the capital."  Sam Cabral, *Capitol riots: Did Trump's words

at rally incite violence?*, BBC NEWS (Feb. 14, 2021), https://www.bbc.com/news/world-us-

canada-55640437.  There was talk amongst the crowd of a "big reveal" by the President, but

---

1 Pretrial initially recommended a $25,000 unsecured bond. This initial report was signed by a  veteran  services officer and two supervisory probation officers.  However, the next day, an addendum to that initial report was issued recommending location monitoring.  His mother agreed to be a 3rd party custodian if needed.
2 Mr. Harkrider's statements in this motion in no way waive the government's burden of proving his identification.

there was none.  There were also reports in the weeks leading up to this event that Antifa and

BLM protesters would be present. Therefore, Mr. Harkrider had a tomahawk for self-defense and

no other reason.

Mr. Harkrider was at the Ellipse to protest an election which Trump claimed had been

fraudulently  stolen.  He wore  what in Texas would be considered street clothes, with the

addition of a protective vest. He did not wear any clothing with political slogans or symbols.

Following Trump's long speech, and plea to march to the Capitol,  Mr. Harkrider marched with

the crowd to the perimeter of the Capitol.  The Capitol was first breached at around 1:00 p.m.,

long  before Mr. Harkrider allegedly arrived on the scene. *See* Laurel Wamsley, *What We Know*

*So Far: A Timeline of Security Response At The Capitol On Jan. 6*, NPR (Jan. 15, 2021, 5:00

AM), https://www.npr.org/2021/01/15/956842958/what-we-know-so-far-a-timeline-of-security-

at-the-capitol-on-january-6.

When Mr. Harkrider arrived at the Capitol, guards out front  (presumably Capitol Police)

were waiving people in on the sides and in the front of the building. There were guards standing

up on the steps in front of the Capitol  in riot gear. People were taking selfies with the police

officers. It was peaceful in the beginning. Then, tear gas cannisters were being set off but it is

unknown if it was the police, the protesters or both. People were hanging from the scaffolding

that was set up for the Inauguration.  Somebody broke a window,  and people behind Mr.

Harkrider were  yelling "get in." People were pushing him forward and he could not navigate.

People started crawling through the broken window.  People continued  going in and out of the

window. At one point, Mr. Harkrider stepped  into the window to flee the tear gas.  It was hard to

breathe. No one told Mr. Harkrider to leave, but  after a few minutes, Mr. Harkrider and Mr.

Nichols decided to leave the Capitol. They walked to the uber pick up zone and went back to

their hotel. There was a great deal of confusion that day.

### B. Investigation following the arrest and detention of Mr. Harkrider

From January 7th, 2021, to the date of his arrest, January 18th, 2021, the defendant went about living his life as he had always done, in and around Carthage, Texas. Mr. Harkrider is alleged to have taken a table leg from the capital. Pursuant to the search warrant,[3] officers took a table leg from his home which Mr. Harkrider described and explained to them how it came into his possession. He did not break any furniture, or initially take anything from the Capitol. Mr. Harkrider allegedly sent text messages to a friend, Pauly Bartel. Mocking the recent press reports, he jokingly stated "who is yall's favorite domestic terrorist." This term was widely used by all news media outlets after January 6, 2021.

Detective Gregory Harry testified for the government at the detention hearing. He testified about a snapchat photo depicting Mr. Harkrider, yet said "I'm not sure exactly which place we got this from." Ex 2 @ 8. He went on to describe another photo offered as exhibit 9 and when asked about a title typed on the screenshot, he said "I actually think we recovered this from another source, as well, but I am not sure as I sit here." *Id*. at 9. When asked about a piece of wood he said "well, the testimony ended up being that it was taken from the Capitol, but I'm not sure exactly where it came from." *Id.* at 13.

Mr. Harkrider is alleged to have carried a Tomahawk with him and pictures of a tomahawk were admitted at the detention hearing to show Mr. Harkrider was in possession of same. There was no testimony or evidence that the tomahawk ever was out of its sheath, flaunted nor was it ever used in any way. *Id* at 14-15. There were firearms found at his residence and in his vehicle. *Id.* at 15. There was a picture of Mr. Harkrider allegedly passing an OC cannister

---

3 Defense counsel has asked but not received a copy of the search warrant for Mr. Harkrider's home.

but again, the detective testified that he didn't "know for sure that it is the same canister" used by

Mr. Nichols. *Id.* at 65.

### ARGUMENT

**A. Pretrial Release Is Proper In This Case Because Conditions Are Available Which Will Reasonably Assure Mr. Harkrider's Presence At Trial And The Safety Of The Community.**

1. The Bail Reform Act and the D.C. Circuit's *Munchel* opinion

The Bail Reform Act, 18 U.S.C. § 3142 et.seq., authorizes the detention of defendants

awaiting trial on a federal offense only under certain, limited circumstances. 18 U.S.C. § 3142.

Under the Act, a judicial officer may issue order that, pending trial for a federal offense, a

defendant be: (1) released on personal recognizance or upon an execution of an unsecured bond;

(2) released on a condition or combination of conditions, (3) temporarily detained; or (4)

detained. The Act mandates pretrial release on personal recognizance or unsecured bond ("shall

order the pretrial release. . . .", 18 U.S.C. § 3142(b)) unless the court determines that no

condition or combination of conditions will reasonably assure the person's appearance or the

safety of any other person and the community. 18 U.S.C. § 3142(e). When personal recognizance

or an unsecured bond is determined to be inadequate to guarantee appearance or safety, the Act

still mandates release ("shall order the pretrial release. . . .", 18 U.S.C. § 3142(c)) subject to

specified conditions. The conditions must be the least restrictive conditions necessary to

reasonably assure the  defendant's appearance and the community's safety. *United States v.*

*Fortna*, 769 F.2d 243 (5th Cir. 1985), cert. denied, 479 U.S. 950 (1986).

In *United States v. Salerno*, 481 U.S. 739, 755 (1987), the Supreme Court stated  "[i]n

our society liberty is the norm, and detention prior to trial or without trial is the carefully limited

exception." Courts have held that a finding that defendant is a danger to the community or a serious flight risk is a basis of detention. *See United States v. Anderson*, 177 F. Supp. 3d 458, 461 (D.D.C. 2016) (*citing United States v. Salerno*, 481 U.S. 739, 755 (1987). The finding must be based on clear and convincing evidence that the defendant poses a danger to the community or a preponderance of the evidence to support the defendant's likelihood to flee. *See id.*; *see also United States v. Xulam*, 318 U.S. App. D.C. 1, 84 F.3d 441, 442 (1996) (citing *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987)).

Indeed, the Act expressly provides that "[n]othing in this section shall be construed as modifying or limiting the presumption of innocence." 18 U.S. Code § 3142(j). To the contrary, the passage of the pretrial detention provision of the 1984 Act bespeaks a recognition that "there is a small but identifiable group of particularly dangerous [persons] as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group ... that the courts must be given the power to deny release pending trial." S. Rep. No. 225, 98th Cong., 1st Sess. 6-7, reprinted in U.S. Code Cong. & Ad. News 3189 (emphasis supplied).

Notwithstanding the charges at issue, Mr. Harkrider should not be considered to be within that limited group for whom pretrial detention is appropriate. It is apparent from the Act's legislative history, as well as the statutorily mandated consideration of the least restrictive alternatives to detention, that Congress contemplated pretrial detention of only a small percentage of the individuals awaiting trial. Mr. Harkrider is among that majority for whom a combination of conditions short of detention without bond can be fashioned to "reasonably assure" the safety of the community and his appearance for trial. *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985); *see also* 18 U.S.C. §3142(c)(1)(B) (judicial officer shall order the pretrial

7

release of an accused "subject to the least restrictive further condition or combination of conditions, that such judicial officer shall determines will reasonably assure the appearance of the person as required and the safety of any other person and the community") (emphasis supplied)). In the instant case Defendant's continued detention without bond is not the least restrictive alternative case; there are conditions available that will assure the community's safety and his return for future court dates. *See U.S. v. Xulam*, 84 F.3d 441 (D.C. Cir. 1996) (holding that the pretrial detention provisions of the 1984 Bail Reform Act were not intended to apply to "first-time offender accused of a nonviolent crime with strong community ties and respected members of that community willing to supervise his release"); *United States v. Munchel,* No. 21-3010, 2021 WL 1149196 (D.C. Cir. Mar. 26, 2021)(court must consider whether defendants present an "identified and articulable threat" to the community).

1.  Considerations by the Court

To determine whether the conditions of release will reasonably assure a defendant's future presence in court, the following factors are considered: "(1) the nature and circumstances of the offense charged… (2) the weight of the evidence against the person; (3) the history and characteristics of the person… (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)-(4).[4] Mr.

---

[4] 18 U.S.C. § 3145(b) does not specify the standard of review to be applied by a district court reviewing a magistrate judge's detention order. The Circuit in *Munchel* did consider it and essentially considered a *de novo* review based on additional evidence presented to the District Court that the Magistrate Judge did not have. That said, both the BRA and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order de novo. *See United States v. Chrestman*, 21-mj-218 (BAH), 2021 WL 765662, at *5–6 (D.D.C. Feb. 26, 2021). And courts in this District routinely apply that standard. *See id.* at *6; *United States v. Hunt*, 240 F. Supp. 3d 128, 32–33 (D.D.C. 2017).

Harkrider  submits that when considering these four factors, the order of detention should be

vacated and this Court should set conditions of release in this case. There are several factors in

the instant case which demonstrates there are conditions of release that would both guarantee Mr.

Harkrider's appearance and assure the safety of the community.

    A.  The nature and circumstances of the offense charged….

       This Court must consider the seriousness of the offense.  *See* 18 U.S.C. § 3142(g)(1).

Because of the unique nature of the alleged crime, the particular conduct of each defendant for

purposes of pretrial detention is considered under many factors. *See, e.g., Chrestman,* 2021 WL

765662, at *7–9. Those factors include whether a defendant (1) has been charged with felony or

misdemeanor offenses; (2) engaged in prior planning before arriving at the Capitol; (3) carried or

used a dangerous weapon during the riot; (4) coordinated with other participants before, during,

or after the riot; or (5) assumed a formal or informal leadership role in the assault by encouraging

other rioters' misconduct; and (6) the nature of the defendant's words and movements during the

riot, including whether the defendant damaged federal property, threatened or confronted law

enforcement, or celebrated efforts to disrupt the certification of the Electoral College vote. *Id.*

Here, those circumstances weigh in favor of release.  Although Mr. Harkrider is charged with

both misdemeanor and felonies just like Munchel,  Munchel, *see supra,* carried with him a taser

which he actively showed the crowd, he actively communicated with Oath Keepers, both

defendants took zip ties from the Capitol, and both were seen inside the Senate Gallery.  The

Circuit gave great weight to the fact that  defendants in *Munchel* turned themselves in (*See*

Katsas, J., dissenting). However in the present case, Mr. Harkrider had no idea that there was

even a warrant for his arrest or he would have turned himself in.  What the Circuit found most

troubling by the District Court was that although the government has  the burden to present "an

identified and articulable threat to the community," there was none presented nor found by the

District Court. *See Munchel v. United States*,  p. 16-17, No. 21-3010 2021 WL 1149196 (D.C.

Cir. Mar. 26, 2021).   The Circuit further held that the threat must be considered in context *Id.* at

p. 17, and that the defendants did not engage in any act of violence and did not enter the capitol

by force. *Id.*

    Here, as previously argued by the defendant, there is no threat of future violence (*See* Katsas,

J., dissenting, p. 4), no history of violence, no criminal history and no affiliation with any group

such as the Oath Keepers or Proud Boys. Thus when considering Mr. Harkrider's behavior in the

context of what happened on January 6th-Trump's empty assurance of "I'll be with you," it is not

remarkable that several non-violent protesters found themselves in the Capitol alongside the few

that were violent.

    Mr. Harkrider did not engage in prior planning, did not use a dangerous weapon during the

riot, did not coordinate with anyone other than his co-defendant, had no leadership role in the

assault by encouraging other rioters and he did not damage federal property, nor confront law

enforcement officers.

        Mr. Harkrider  has not been positively identified in any of the videotapes or photographs.

Assuming the government can identify him,  he never damaged anything. He never caused any

damage to the Capitol area and never committed any act of violence. Although Mr. Harkrider is

charged with both misdemeanors and felonies, at no time did he use or encourage violence

against anyone.[5] He is charged primarily with offenses that relate to being on restricted Capitol

---

[5] The Bail Reform Act defines "crime of violence" as (A) "an offense that has as an element of
the offense the use, attempted use, or threatened use of physical force against the person or
property of another, " (B) "any other offense that is a felony and that, by its nature, involves a
substantial risk that physical force against the person or property of another may be used in the

grounds. These are non-violent offenses and the video sequences show his actions to be non-violent. Importantly, he went to the Capitol at the invitation of his co-defendant, had no leadership role, did not engage in prior planning, was not part of any conspiracy, did not coordinate with anyone, and was not aligned with any group before or after January 6, 2021. Unlike others, he did not use or flaunt any weapon; he did not have handcuffs, flex cuffs, or promote their use.  He simply went to hear the speeches and exercise his constitutional right to protest. He never encouraged misconduct by others.   He never damaged federal property, never threatened law enforcement and had nothing to say about the Electoral College.  The evidence submitted by the government is full of misrepresentations and assumptions.

The Weight Of The Evidence Against The Person

The affidavit filed by the FBI  lays out the fact that Mr. Nichols was clearly the driving force behind this trip. Strangely, the affidavit mentions "W-1" as a person who they first received information from even though "W-1 does not know either Nichols or Harkrider personally but identified both as friends of someone known to W-1." See Ex. 3 @ 6.  This "identification" will not hold up in Court, nor will the affidavit when challenged because neither W-1 nor W-2 were even investigated by the FBI so that they could be found "reliable and credible" as the law requires in an affidavit.  *See Illinois v. Gates* 462 U.S. 213 (1983). The government may argue this case  has already been indicted so this point is moot. What's important for the Court here to see is how the investigation was done by the FBI-sloppily. [6]  And

___

course of committing the offense," or (C) "any felony under chapter 77, 109A, 110, or 117." 18 U.S.C. § 3156(a)(4).

[6] The FBI getting the facts wrong in affidavits is nothing new. Describing what happened to Carter Page, a revered judge of this Court stated the following:  "The frequency with which representations made by FBI personnel turned out to be unsupported or contradicted by information in their possession, and which they withheld information detrimental to their case,

11

Mr. Harkrider is not 32 years old as the affiant states, but 34.  Ex. 3 @ 6.   A minor mistake, but

if you can't get that right, what else could go wrong? Plenty. The government relied heavily at

the detention hearing on the fact that Mr. Harkrider allegedly had a "baton" (Affidavit p. 2) or

"tomahawk" as was later discovered at the search of his home. Importantly, Mr. Harkrider led

agents to the place in his home where he kept the tomahawk. Mr. Harkrider did not believe he'd

done anything wrong as he had googled whether it was legal to have such a tomahawk in the

District and it was legal.7 Finally, the detective testifying could not name one instance of

violence by Mr. Harkrider. Ex. 2 @ 53.

Finally, the snapchat could be easily doctored. The detective had no idea how the writing got

on the photo.  The evidence is not as the government has alleged against Mr. Harkrider. So far,

what the government has provided to the Court regarding January 6, 2021 are still shots and

short videos.  They are taken out of context.  When this Court  watches the video footage the

Court will see that Mr. Harkrider  was peaceful.  Although he is seen motioning to the crowd, it

is not as the government has described it.   What the government describes as a slashing gesture,

the defense describes as pointing to the crowd. Other than perhaps a common law trespass, the

other charges will not hold up at trial. The weight of the evidence leans in favor of release.

There is no evidence that Mr. Harkrider was part of a violent mob. Rather, he found

himself surrounded by thousands of people protesting and at that time, he still believed he was

engaged in a peaceful protest.   Mr. Harkrider has not yet been properly identified and the

_____

calls into question whether information contained in other FBI applications is reliable." *In re Accuracy concerns regarding FBI matters submitted to the FISC*, 411 F. Supp. 3d 333 (D.D.C. 2019)(J. Collyer).

7 The government took Mr. Harkrider's phone when  so the defense is unable to submit proof to the Court that Mr. Harkrider googled legal tomahawks in DC from his phone. However, a knife with a blade less than 3 inches is legal to possess in D.C. *See* D.C. Code Section 22-4514. Defense counsel believes without seeing the phone that this must be the statute Mr. Harkrider googled.

arguments put forth here are not a waiver of his identification.

C. History And Characteristics Of The Person, Including…The Person's Character, Physical And Mental Condition, Family Ties, Employment, Financial Resources, Length Of Residence In The Community, Community Ties, Past Conduct, History Relating To Drug Or Alcohol Abuse, Criminal History And Record Concerning Appearance At Court Proceedings.

Mr. Harkrider is a man who loves his country so much that he left his family and the comfort and beauty of Texas to fight for his country.  These facts heavily favor release.  The only violence he has ever done was in defense of his country.  As a combat veteran, Mr. Harkrider was given medication for his PTSD. He has successfully treated his condition and he is a valued member of his community. *See* Ex. 5, letters.  He spends his spare time as a volunteer who rescues people when unforeseen weather strikes.  He cooperated with police from the minute he was flash banged.  He has negligible criminal history. After January 6, Mr. Harkrider stayed in the area of his home.  His behavior between January 7, 2021 and January 18,  2021 did not change. His actions do not indicate an intent to flee or any danger. There is nothing in his history nor in the history of his actions in this case that show an inclination to flee or towards danger to the community. He has meager financial resources.  All of Mr. Harkrider's familial, professional, and social ties are in Carthage, Texas, where he currently resides. Since his ties to the community are substantial, there is no reason to think that he would flee or not return to court when given notice to do so. His mother also agreed to be third party custodian.

The assumption by law enforcement that Mr. Harkrider expressed a suicidal ideation is preposterous. Mr. Harkrider simply made a joke and said it in a joking manner, which BWC footage, when finally turned over,  will reveal. Mr. Harkrider has had no mental health issues for the last couple of years and those he did have previously were a direct result of his service to our country. Even the detective that testified at the detention hearing acknowledged that "he tried to

13

play it off as a joke." Ex. 2 @ 19.

Notwithstanding that others find the Defendant's political  beliefs to be irrationally based, it is clear that the he was not acting out of criminal intent. In the heat of the moment, after you've "heard the call" from your President,  you  may forgo reason and listen to those around you.

<u>The Nature And Seriousness Of The Danger To Any Person Or The Community That Would Be Posed By The Person's Release.</u>

Again, Mr. Harkrider is a nonviolent person and this does not apply. However, the *Munchel* dissent summarily dismisses the later news reports of other possible future protests because there was no evidence that the individual defendant had anything to do with them.(*Munchel*, Katsas, J., dissenting).

**2. The Defendant Should Be Released Because The Proffer Made By The Government At The Pretrial Detention Hearing Was Not Based On Facts.**

Mr. Harkrider is innocent until proven guilty, but the government has painted every person arrested in the January 6, 2021 storming of the capital as a domestic terrorist which is not only incorrect, but unconstitutional. There is absolutely no evidence that Mr. Harkrider was associated in any way with any violent or far right group at the Capitol or at any time.  Mr. Harkrider  never assaulted any police officers or caused any injury to any officer. And he is not suicidal.

**Conclusion**

Mr. Harkrider sought no personal or pecuniary gain from his actions. Rather, he acted out of the sincere belief that he was a "patriot" protesting for his country. Like thousands of others, Mr. Harkrider was responding to the entreaties of the then Commander-in-Chief, former President Donald Trump. The President maintained that the election had been "stolen" and it was the duty of loyal citizens to "stop the steal." Defendant did not act out of criminal intent but out of sense of duty.  His solitary action in this case, measured against his history of being a law-abiding

14

citizen, safely predicts that he is more likely to resume behaving as a law abiding citizen if

released pending trial. His history does not suggest that he is likely to resume the type of alleged

behavior that brings him before this Court. Notwithstanding that Mr. Harkrider has been indicted

he is still presumed innocent. His ability to prepare a defense will be hampered by his pretrial

incarceration and currently it is nearly impossible to speak to Mr. Harkrider more than once a

week because the jail staff are overwhelmed with requests for video calls. Reviewing the

evidence alongside a client during the COVID-19 pandemic is a near impossibility because

undersigned counsel cannot travel to the jail  and because of the protective order in place.

   **WHEREFORE** for the foregoing reasons, and any others which may appear at a full hearing

on this matter, and any others this Court deems just and proper, Defendant through counsel,

respectfully requests that he be released on personal recognizance. If that request is denied

Defendant requests as an alternative that he be released on Third Party Custody and placed into

the High Intensive Supervision Program of the Pretrial Services Agency conditioned on

reasonable conditions.

<div style="margin-left:40%">

Respectfully submitted,

KIRA ANNE WEST

</div>

By:      _____/s/_____

Kira Anne West
DC Bar No. 993523
712  H Street N.E., Unit  509
Washington, D.C.  20002
Phone:  202-236-2042
kiraannewest@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify on the 1ˢᵗ day of April, 2021, a copy of same was delivered to the parties

of record, by email  pursuant to the Covid standing order and the  rules of the Clerk of Court.

<p style="text-align:center">/S/</p>

<p style="text-align:center">Kira Anne West</p>