UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : No. 21-cr-117 (KBJ) |
| | : |
| ALEX HARKRIDER, | : |
|     Defendant. | : |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO REVOKE ORDER OF DETENTION**

The United States of America respectfully submits this memorandum in opposition to Defendant Alex Harkrider's request for pretrial release. Defendant Harkrider has been indicted on eight counts arising from his participation in the violent attack on the United States Capitol on January 6, 2021. The factors outlined in 18 U.S.C. § 3142(g) strongly favor detention, and there is no condition or combination of conditions that will adequately protect the community and ensure the defendant's future presence in court. Accordingly, Defendant Harkrider should be detained pending trial.

**I.**      **FACTUAL BACKGROUND**

     **A.**      **Procedural History**

On February 12, 2021, Defendant Harkrider was indicted by a federal grand jury for his role in the attack on the United States Capitol on January 6, 2021. The indictment charged five felonies and three misdemeanors arising from Defendant Harkrider's actions in the Capitol on January 6, 2021, including violations of 18 U.S.C. §§ 231(a)(3) and 1512(c)(2). Counts Six and Eight of the indictment allege that Defendant Harkrider entered and remained, and engaged in disorderly and disruptive conduct, in a restricted building or grounds while carrying a deadly and

dangerous weapon, namely a tomahawk axe, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) and 18 U.S.C. § 1752(a)(2) and (b)(1)(A). Count Ten, alleges that Defendant Harkrider "did carry and have readily accessible, a dangerous weapon, that is a tomahawk axe, on the United States Capitol Grounds" in violation of 40 U.S.C. § 5104(e)(1)(A)(i).

On January 22, 2021, the government presented evidence and argued for the defendant's detention before a U.S. Magistrate Judge in the Eastern District of Texas. The government argued that detention was authorized in this case because, as explained below, Defendant Harkrider had committed felonies that involve a dangerous and deadly weapon (a tomahawk axe), and there are serious risks that he will flee and obstruct or attempt to obstruct justice. The government further argued that the defendant poses an ongoing danger to the community that no conditions of pretrial release can mitigate. *See* 18 U.S.C. § 1342(f)(E), (f)(2)(A), (f)(2)(B), (g)(4). The Magistrate Judge agreed and ordered that Defendant Harkrider be detained, finding there were no conditions

> that would reasonably assure the safety of the community or Mr. Harkrider's appearance. Specifically, as to this Defendant, there are text communications discussing bringing firearms to the Capitol. Mr. Harkrider did, in fact, bring a weapon into the Capitol, although not a firearm. There is video evidence showing him trying to and successfully getting into the Capitol. In addition to the instant offense, I am concerned about his mental health history and his past issues with alcohol consumption. . . . But for all of these reasons, Mr. Harkrider is going to be detained pending trial.

*See* Transcript of Detention Hearing at 74-75.

### B.  Factual Background

Defendant Harkrider's travel to Washington, D.C., was part of a pre-planned, coordinated act, in which he and his co-defendant, Ryan Nichols, prepared for violence, transported and carried weapons, and discussed going to the Capitol on January 6, 2021. As set forth below, the evidence demonstrates that Defendant Harkrider's actions were not those of a mere follower nor a peaceful

2

protestor.

Although the defense claims that Defendant Harkrider "did not engage in prior planning," (Mot. at 10), in fact, Defendant Harkrider and Co-defendant Ryan Nichols exchanged text messages leading up to January 6, 2021, discussing their excitement at engaging in an "actual battle" in D.C. and preparing their weapons for the trip. For example, on January 3, 2021, Co-Defendant Nichols and Defendant Harkrider texted:

> Nichols: I've got goodies for the trip.[1]
> Nichols: Goodies you've requested before but never got..
> Harkrider: [GIF file that says "Take acid and see reality."]
> Harkrider: Could it be?! Haha
> Nichols: Still some other stuff we have to talk about before we leave
> Nichols: The Line in the sand
> Nichols: Dad and I are building a gun container in the truck today
> Nichols: Just know I have intel that Washington will be a warzone
> **Nichols: Big possibility that actual battle goes down**
> **Harkrider: I'm looking forward to it**
> Nichols: I know how to get guns legally into DC now
> Nichols: It's called transporting
> **Harkrider: I'll bring every freedom blaster I own then**
> **Harkrider: We're stopping in Kentucky on the way for those plate carrier too right?**
> Nichols: Do you have any 10 round mags for an AR?

(emphasis added). As testified to at the preliminary hearing, "freedom blaster" is a slang term for firearms.

Defendant Harkrider and Co-defendant Nichols then traveled together to Washington, D.C.

---

[1] The government's review of Defendant Harkrider and Co-defendant Nichols' cellular telephones remains ongoing. On December 31, 2020, Co-defendant Nichols sent Defendant Harkrider a photograph of body armor and pricing, stating that the body armor would protect against various bullets. Likewise, on January 1, 2021, Co-defendant Nichols sent Defendant Harkrider several messages including "We're going to need first aid kits and tourniquets,"; "I need to speak with you in person"; "Everything is ok. Just need to gameplan lol"; "We need to speak in person lol"; "what I'm about to relay can't be done over the phone." Defendant Harkrider did not eschew or reject these messages nor did he inquire as to why a "peaceful protest" would require first aid kits, tourniquets, body armor, or the transportation of firearms.

As discussed in the text thread detailed above and at the preliminary hearing, Co-defendant Nichols and his father had prepared a gun container for the truck that Co-defendant Nichols and Defendant Harkrider traveled to D.C. in, and the weapons box was not empty. Rather, as Defendant Harkrider admitted to law enforcement, Defendant Harkrider brought a 9 millimeter CZ pistol and a lever-action .30-30 rifle with him on the trip, although he claimed to have left them in the truck when he went to the Capitol because he knew that he should not take firearms to the Capitol area.

Having arrived in Arlington, Virginia by January 5, 2021, Defendant Harkrider and Co-defendant Nichols did not settle in for the evening to rest up for a "peaceful protest" the next day. Rather, they headed into downtown Washington, D.C., looking for a confrontation. In videos captured by Co-defendant Nichols and others, Co-defendant Nichols and Defendant Harkrider are walking through Washington, D.C. with a group of people. At one point, Co-defendant Nichols yells out, "Those people in fucking Capitol building are our enemy." In another video, Defendant Harkrider, wearing a sweatshirt that says "Marine. Noun. A person who kills shit you can't," is observed walking with Co-defendant Nichols and the group of people. A voice, believed to be Defendant Harkrider's, is heard saying "there's gonna be a fucking war tomorrow."

Later in the evening, Co-defendant Nichols and Defendant Harkrider are observed walking with a group of individuals confronting Metropolitan Police Department ("MPD") officers near Black Lives Matter Plaza. At one point, Co-defendant Nichols begins screaming at MPD officers that:

> We had your fucking back but we ain't got your back no more! We're the business owners! We're the veterans! We're the veterans and business owners! We had your back! But we ain't got your back no more! We don't got your back no more! Because you don't got our back! So we had your back until you didn't have ours! And so now you don't have ours! So now, I'm a marine and we got other marines around here! We ain't got your back no more! You better

4

> have our back and you better have our back or we're gonna fucking show you! Heads will fucking roll! We will not be told 'no' any longer!

Defendant Harkrider did not disavow Co-defendant's Nichols words. Rather, on the day of January 6, 2021, Defendant Harkrider and Co-defendant Nichols prepared for a violent confrontation. Defendant Harkrider dressed in tactical gear, wearing a plate carrier equipped with one ballistic plate inserted into the carrier, as alluded to in the earlier text messages, and armed himself with a tomahawk axe. Co-defendant Nichols, too, armed himself for battle at the Capitol, wearing a ballistic plate carrier and carrying a crowbar.

As they had discussed previously, Defendant Harkrider was looking forward to a battle and had prepared for what Co-defendant Nichols characterized as a war zone. His actions that day were documented throughout social media, which captured Defendant Harkrider pushing his way into the Capitol and out on to a balcony above the rioters. Some of the social media shots were from others, some were from Defendant Harkrider and Co-defendant Nichols themselves, boasting of their attack on the Capitol and the democratic process.

In a video of January 6, 2021, that was introduced at the preliminary hearing, Defendant Harkrider can be seen pushing his way to the front of the crowd at an entrance to the Capitol where rioters are fighting with law enforcement officers. Contrary to the defense argument, Defendant Harkrider is not merely standing toward the back of the crowd or getting pushed around, rather Defendant Harkrider marches decidedly forward through the crowd, with Co-defendant Nichols behind him, to the front lines at an entrance of the Capitol.

Defendant Harkrider is an active participant in assisting with the push to get in the Capitol and to breach the law enforcement lines and at one point, appears to wave the rest of the crowd forward in their efforts to heave their masses against the police line. Later in the video, a

screenshot of which is depicted below, Defendant Harkrider can be seen in the center of the shot with a blue hat, khaki coat and holding a canister of OC or pepper spray above his head. Defendant Harkrider is with a large crowd of people toward the front line, pushing into the Capitol on the lower West Terrace where law enforcement is trying to maintain a line to prevent entry into the Capitol. In the moments preceding Defendant Harkrider's passing of the OC canister to those in front of him who are directly engaging with law enforcement, other individuals can be seen throwing projectiles, shoving riot shields, and striking, swinging, and kicking at law enforcement. Defendant Harkrider makes no effort to retreat or descend down the stairs away from the Capitol entrance and the assaults on law enforcement.



In another screenshot, Defendant Harkrider can be seen with his co-defendant standing on a window ledge on the lower West Terrace as his co-defendant incites the crowd with a bullhorn, calling for rioters to get their weapons. A smashed Capitol window is behind them and it is possible to see the tomahawk axe visible from Defendant Harkrider's jacket. Defendant Harkrider

admitted he had climbed through a broken window to get into the Capitol and was therefore clearly aware that his presence in the building not only unlawful but the result of violent, hostile action. Again, this shows that Defendant Harkrider was ready and willing to not only assist the other individuals storming the Capitol, but to take a visible and active role in leading the charge.



Later on, Defendant Harkrider actually enters the Capitol building through that same window. As the violence rages, Defendant Harkrider can be seen in the window encouraging the violent rioters as he pumps his fists in the air. He can be seen here making a throat slashing gesture

to the cheering crowd:



A snapchat image believed to have been posted by Defendant Harkrider shows him inside the Capitol and continuing his violent rhetoric:



    The evidence shows a man who was confident in his decisions and was not dismayed or deterred by the scenes of violence and destruction around him.  The evidence does not show a confused follower, but an active participant ready for violence.  Indeed, the photographs show a

man who was encouraging and inciting further violence and insurrections.

On January 7, 2021, Defendant Harkrider returned to Texas. From January 6, 2021, through January 18, 2021, Defendant Harkrider did not express any remorse for his actions or the events at the Capitol. Instead, he made light of his actions and intimated he knew he was being sought by law enforcement. For example, on January 7, 2021, Defendant Harkrider engaged in the following text message exchange with another individual:

> [Individual 1]:  Alex, you all good bud?
> Harkride: Yeah
> [Individual 1]: Glad to hear it.
> Harkrider: Who's y'alls favorite domestic terrorists [laughing face emoji].

On January 9, 2021, Defendant Harkrider and another contact exchanged messages:

> [Individual 2]: You make it back home?
> Harkrider: Yeah I'm back. Been in Shreveport with my mom hiding out haha.

Also on January 9, 2021, Defendant Harkrider, using his Facebook account, made the following comments using his Facebook account: "treasonous piece of shit, pedo pence," and, "The American people's freedom of speech has been compromised. This is only the beginning. Fuck the Democratic Party and fuck the Republican Party. I stand with the constitutional party."

A search warrant on Defendant Harkrider's residence and arrest warrant were executed on January 18, 2021. A search of the house revealed the tomahawk axe, which appears to be same axe as he carried with him on January 6th, as pictured below. Also collected was a table leg that Defendant Harkrider admitted to taking from the Capitol.



Once Defendant Harkrider was arrested on January 18, 2021, he gave a statement to the Federal Bureau of Investigation ("FBI"). In it, he admitted to travelling to the Capitol, entering the building through a broken window, transporting firearms, and carrying a weapon on Capitol grounds. While he ultimately admitted to several transgressions after initial denials, throughout the interview he attempted to minimize his actions. For example, he claimed that he never touched or handled an OC canister, despite clear photo evidence to the contrary.

# ARGUMENT

**A. Basis for Review and Legal Standard**

The Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community? As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .

*See* S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[2]

Defendant is subject to detention pursuant to 18 U.S.C. § 3142(f)(1)(E) because he possessed

---

[2] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

*See* S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487(emphasis added).

11

a dangerous weapon when he committed his crimes at the Capitol on January 6, 2021.[3] In determining whether the defendant should be detained, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). In this case, there are no condition or combination of conditions that will reasonably assure the safety of the community if the defendant is released, and the government argues he must be held pending disposition in this matter.

### B. The Bail Reform Act Factors Strongly Support Detention

As the Government argued at the detention hearing, and as the Magistrate Judge held, there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community should the defendant be released, nor any assurance that the defendant will not flee from prosecution or obstruct judicial proceedings if released. An analysis of the § 3142(g) factors supports that argument.

#### 1. <u>The Nature and Circumstances of the Offense Charged</u>

A key factor to be considered when assessing the adequacy of release conditions is "the

---

[3] The tomahawk axe carried by the defendant clearly qualifies as an inherently "dangerous weapon" for purposes of 18 U.S.C. § 3142(f)(1)(E). *See United States v. Chansley*, No. 21-CR-3, mem. op. at 13-14 (D.D.C. Mar. 8, 2021) (adopting definition of "dangerous weapon" under 18 U.S.C. §§ 111 and 113 in bond-review ruling, and holding a dangerous weapon is "an object that is either inherently dangerous or is used in a way that is likely to endanger life or to inflict great bodily harm" and that knives are inherently dangerous); *see also* U.S. Sentencing Guidelines Manual § 1B1.1, appl. n. 1.E (2018) (defining "dangerous weapon," in part, as "(i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but . . . closely resembles such an instrument"). Further, the defendant's claim that he carried the tomahawk knife because of a perceived threat by Antifa or Black Lives Matter protesters, shows he was prepared to "use[] [it] in a way that was likely to endanger life or inflict great bodily harm" if he needed to defend himself at or inside the Capitol.

nature and circumstances of the crime charged." In evaluating this prong, Defendant Harkrider cites the factors as outlined in *United States v. Chrestman*, 21-mj-218 (BAH), 2021 WL 765662, at 7-9 (D.D.C. Feb. 26, 2021), which consider whether the defendant (1) has been charged with felony or misdemeanor offenses; (2) engaged in prior planning before arriving at the Capitol; (3) carried or used a dangerous weapon during the riot; (4) coordinated with other participants before, during, or after the riot; or (5) assumed a formal or informal leadership role in the assault by encouraging other rioters' misconduct; and (6) the nature of the defendant's words and movements during the riot, including whether the defendant damaged federal property, threatened or confronted law enforcement, or celebrated efforts to disrupt the certification of the Electoral College vote. *Id.* In this case, the defendant has been charged with multiple felony offenses, and every other factor is met.

Indeed, the five felony offenses and three misdemeanor crimes charged in the indictment involve the Defendant's active, purposeful, and armed participation in an insurrection attempting to stop the historically peaceful transition of power and regular functioning of the United States Government. In *United States v. Munchel*, the D.C. Circuit addressed various factual considerations around the events of January 6th as they relate to pretrial detention. One consideration the Court focused on was whether the defendant was "involved in planning or coordinating the activities." No. 21-3010, 2021 WL 1149196, at *8 (D.C. Cir. Mar. 26, 2021). Here, the defendant and his co-defendant coordinated and planned to come to Washington, D.C., with firearms, a crowbar, and a tomahawk axe, apparently stopping along the way to secure ballistic vests. In advance of their travel, Defendant Harkrider expressed excitement at preparing for an "actual battle" and a "warzone" and bringing every "freedom blaster" that he owned. After arriving in the Washington, D.C., area, the defendant did not merely stay overnight in a hotel in Virginia; rather, he and his co-defendant set

out toward Black Lives Matter Plaza in Washington, D.C., where they joined a roaming group that began antagonizing and physically confronting law enforcement.

The next day, as described above, Defendant Harkrider, wearing a ballistic vest and carrying a tomahawk axe, marched through the crowd up to an entrance of the Capitol and pushed with others in the crowd against the law enforcement protecting the capitol. Amidst the violence surrounding him, the defendant did not retreat or walk away, rather, with the intent to interfere with the Electoral Vote certification,[4] he violently defied law enforcement officers, passed an OC spray container, climbed through a broken window, incited the crowd of fellow rioters, entered the Capitol, and took an item that did not belong to him as a trophy of his criminal activity. The nature and circumstances of the charged offenses strongly favors his detention.

2. **The Weight of the Evidence Against the Defendant**

The evidence against the defendant is overwhelming. The defendant's violent confrontation with law enforcement and entry into the Capitol is well-documented and jarring to watch. In addition to the video described in this opposition, Defendant Harkrider and his co-defendant posed for numerous photographs together atop the Capitol, celebrating their entry into the Capitol and boasting on social media. A review of Defendant Harkrider's text messages also provides evidence of his intent to engage in violence when traveling to Washington, D.C., and he admitted to law enforcement that he had transported firearms to Washington, D.C., had carried a tomahawk axe with him throughout the day, and that he entered the Capitol. Moreover, a piece of furniture from the Capitol was recovered on his nightstand.

---

[4] Notably, "the threat [to an individual or the community] need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'" *Munchel*, 2021 WL 1149196, at *7 (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)).

3. **The History and Characteristics of the Defendant**

The offenses committed by the defendant illuminate characteristics inconsistent with a person who could follow orders given by this Court, or indeed, any branch of the federal government, and wholly inconsistent with the oath he took as a member of the U.S. military. The defendant has espoused disbelief in the outcome of the 2020 Presidential election and violently acted on that belief. There is no indication that his views have changed or that he would not resort to violence again in furtherance of his beliefs. The defendant clearly defied the orders of law enforcement officers who were trying to restore order at the Capitol, and indeed escalated the chaos and danger those members of law enforcement. When faced with the decision whether or not to obey law enforcement, the defendant chose to defy them, pressing ahead into the Capitol, and cannot be trusted to follow orders of this Court as a result. Given his participation in the obstruction of the normal functioning of the government, and his disbelief in the legitimacy of the current United States government, there is no guarantee that the defendant will obey any pretrial release conditions. In addition, the defendant suffers from PTSD, has expressed suicidal ideations not only to law enforcement but to others in the past, and based on his text messages and other information, appears that are concerns about abusive substances.

4. **The Nature and Seriousness of the Danger to Any Person or the Community**

Finally, the fourth factor, the nature and seriousness of any danger to the community, strongly favors detention. The defendant was an active participant in the violent storming of the Capitol. He engaged in pre-planning and armed himself with a tomahawk axe in advance of the riot. He also at some point possessed OC spray, which he passed on for other members of the mob around him to use. Moreover, by his own words, he has access to firearms and has expressed willingness to use them. Employment conditions, travel restrictions, and a reporting requirement

15

will not mitigate the future danger that he poses.

Finally, Defendant Harkrider made additional posts on Facebook after January 6 indicating that "this is only the beginning," intimating intent of future threats and violence. In the Circuit's view, "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 2021 WL 1149196, at *8. The defendant's conduct reflects the Circuit's articulated category of dangerousness that weighs in favor of pretrial detention.

An analysis of the factors under 18 U.S.C. § 3142(g) demonstrates that Defendant Harkrider should remain detained pending trial. As a result, the government respectfully opposes the defendant's motion to revoke the order of detention.

Respectfully submitted,

CHANNING PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar Number 415793


 /s/Brittany Keil
BRITTANY KEIL
Assistant United States Attorney
D.C. Bar Number 500054
U.S. Attorney's Office
555 4th Street NW, Room 11-824D
Washington, D.C. 20530
202-252-7763
Brittany.Keil@usdoj.gov


/s/ Danielle Rosborough
DANIELLE ROSBOROUGH
D.C. Bar No. 1016234
Trial Attorney, National Security Division
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20004
202-514-0073
Danielle.Rosborough@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing opposition to the motion for release has been served upon defense counsel, Kira West, by email and ECF/PACER notification, on this day, April 9, 2021.

                                                          */s/Brittany Keil*
                                                          BRITTANY KEIL
                                                          Assistant United States Attorney