```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2      - - - - - - - - - - - - - - - x
        THE UNITED STATES OF AMERICA,
 3                                          Criminal Action No.
                        Plaintiff,          1:21-cr-00117-TFH
 4                                          Friday, June 10, 2022
        vs.                                 11:08 a.m.
 5
        RYAN TAYLOR NICHOLS and
 6      ALEX KIRK HARKRIDER,
                     Defendant(s).
 7      - - - - - - - - - - - - - - - x
        _____
 8
                        TRANSCRIPT OF STATUS HEARING
 9          HELD BEFORE THE HONORABLE THOMAS F. HOGAN
                      UNITED STATES DISTRICT JUDGE
10      _____
        APPEARANCES:
11      For the United States:       DOUGLAS BURTON BRASHER, ESQ.
                                     DOJ-USAO
12                                   Northern District of Texas
                                     1100 Commerce Street
13                                   Third Floor
                                     Dallas, TX 75242
14                                   (214) 659-8604
                                     douglas.brasher@usdoj.gov
15
        For Defendant Nichols:       JOSEPH DANIEL MCBRIDE, ESQ.
16                                   THE MCBRIDE LAW FIRM, PLLC
                                     99 Park Avenue, 25th Floor
17                                   New York, NY 10016
                                     (917) 757-9537
18                                   jmcbride@mcbridelawnyc.com

19      For Defendant Harkrider:     KIRA ANNE WEST, ESQ.
                                     LAW OFFICE OF KIRA WEST
20                                   712 H Street, NE, Unit 509
                                     Washington, DC 20002
21                                   (202) 236-2042
                                     kiraannewest@gmail.com
22
        Court Reporter:              Lisa A. Moreira, RDR, CRR
23                                   Official Court Reporter
                                     U.S. Courthouse, Room 6718
24                                   333 Constitution Avenue, NW
                                     Washington, DC  20001
25                                   (202) 354-3187
```

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  This is Criminal Case No.

3    21-117, United States of America vs. Ryan Taylor Nichols as

4    Defendant 1 and Alex Kirk Harkrider as Defendant 2.

5              We have, on behalf of Pretrial Services, Ms. Shay

6    Holman, and on behalf of courtesy supervision in the Eastern

7    District of Texas, Ms. Howard.

8              Counsel, please identify yourselves for the

9    record, beginning with the government.

10             MR. BRASHER:  Good morning, Your Honor; Doug

11   Brasher for the government.

12             THE COURT:  Thank you, Mr. Brasher.

13             MR. McBRIDE:  Good morning, Your Honor; Joseph

14   McBride for Mr. Nichols.

15             THE COURT:  Thank you, Mr. McBride.

16             MS. WEST:  Good morning, Your Honor; Kira Anne

17   West for Mr. Alex Harkrider, who is present via video WebEx

18   Zoom, and we waive our right for an in-person hearing.

19             THE COURT:  All right.  Thank you.

20             This is a Zoom conference because of the pandemic

21   and because of the distances that counsel and Mr. Harkrider

22   are from the Court rather than being in person.  Mr. Nichols

23   is still in confinement, and, because of the somewhat

24   resumption of the pandemic, we're going to continue this

25   hearing by Zoom with no objection of the parties.

1          I wanted to get together today -- and I appreciate

2     the few minutes of waiting for me.  I really wanted to get

3     together to talk about a few things and hear from counsel

4     as well, the concerns they have for Mr. Harkrider's and

5     Mr. Nichols's positions in these matters.

6          The first is obviously we have our schedule

7     now.  We changed our trial date at counsel's request by

8     Mr. Nichols, and we have the original pretrial motions to

9     suppress and in limine motions due in approximately no more

10    than a month, July 18th; to make sure we're ready to go on

11    those.

12         Additionally I want to talk a little bit with

13    Mr. Harkrider, when we totally finish, and with his

14    supervisor in Texas as well as here as to any confusions

15    over the bond requirements.

16         And as to Mr. Nichols, I wanted to check with

17    Mr. McBride and the same thing of Ms. West and Mr. Brasher,

18    who I think was not originally in this case, as to what plea

19    offers there have been, whether there's anything in written

20    format given to each defendant or counsel for them to review

21    with their clients.  Because I have found in the past at

22    times we don't have it on the record, and an individual

23    chooses to go to trial, they get convicted, then they raise

24    questions why they weren't offered a chance to plea because

25    they will represent they never heard about a plea offer from

1     the government.  So I want to make sure that's on the record

2     and done properly and also, in light of the various trials

3     I've had, that counsel on both sides are reviewing their

4     options as we go towards trial.

5              So with that, I'll start with the government.  Are

6     there any other concerns that have arisen, discovery issues

7     that we have and as to whether or not you have made any

8     written plea offers to both defendants' counsel?

9              MR. BRASHER:  I have not, yet.  So I am not aware

10    of any -- I am not aware of any other discovery issues or

11    any issues that have arisen.  There have been a couple of

12    requests that I have received from defense counsel, and I

13    responded to them.

14             There's one that I'm still trying to respond to.

15    There was a question about some body-worn camera that

16    appears to capture the officer sending and/or receiving a

17    text message, and we're looking into that still.  But there

18    were some other questions about body-worn camera footage and

19    who it belongs to, and I believe we've answered and resolved

20    all those questions.

21             I do have one question about the pretrial order in

22    the schedule, if the Court would indulge me, and that is I

23    see that the motions in limine and motions to suppress would

24    be due July 18th, and then as part of our joint pretrial

25    statement, which would not be due until October 17th, would

1     be when we would exchange exhibits and make objections to

2     each side's exhibits, proposed exhibits.  And I just want to

3     make sure that -- you know, we'll do our best to anticipate

4     any issues that may come up where we feel we need to move in

5     limine on, but I would just -- I would ask if we would still

6     then be permitted, you know, when we get to defense

7     exhibits, and there's a particular exhibit that we think

8     should be addressed before trial, whether that's -- whether

9     the Court wants us to do that in those objections or whether

10    we can still file a motion in limine at that point.

11            THE COURT:  All right.  We'll talk with counsel

12    and take care of that.  I agree that if something new comes

13    up that was unknown before on either side, and it presents a

14    problem, we would have to do a review of it.  I would hope

15    to take those up at the final pretrial conference, but, if

16    necessary, we can take it earlier than that, as soon as it

17    becomes evident that there is such a problem that exists

18    between the parties as to plea offers.

19            MR. BRASHER:  As to plea offers, my records show

20    that written plea offers were made.  I'm trying to pull them

21    up now.

22            MS. WEST:  June 23rd of 2021.

23            MR. BRASHER:  Yes.  And one was made -- and it was

24    made to your predecessor; is that correct?

25            Let's see.  No, I have it --

1          MS. WEST:  I've never had a predecessor.

2          MR. BRASHER:  That's right.  So June 23rd I have

3    an email with a written plea offer for Mr. Harkrider, and

4    similar, June 23, 2021, I have an email with a written plea

5    offer for Mr. Nichols.

6          THE COURT:  Okay.

7          MR. BRASHER:  Those have both expired without

8    being accepted.

9          THE COURT:  All right.  And there have been no

10   other conversations?  You've initiated no other

11   conversations about it since then?

12         MR. BRASHER:  I have not initiated any.  If the

13   defendants were to come to me, I would always listen.

14         THE COURT:  All right.  Thank you.

15         All right.  Just for the record, those are the

16   outstanding plea offers.  There have been no other plea

17   offers made, and, by no response, apparently they've been

18   rejected.

19         All right.  So let me go, then, with counsel, and

20   we'll start with Mr. Nichols's counsel, Mr. McBride, as to

21   where you are in getting ready for trial and issues you may

22   have that need the Court's consideration.

23         MR. McBRIDE:  Thank you, Your Honor.  I just want

24   to make a brief record about a few things.

25         First and foremost, I'm receiving communication

1    here as we speak from Mr. Nichols's family that the public

2    line doesn't appear to be working.  They obviously want to

3    be able to listen to the proceeding today.  I know that --

4              THE COURT:  Let me hold on that for a minute then.

5    Let me ask Ms. Hill to check on that.

6              THE COURTROOM DEPUTY:  Your Honor, I can reconnect

7    the public line right now.

8              THE COURT:  Okay.  It shows on my screen that the

9    public line is there, but I can't tell if it's connected up

10   or not.

11             THE COURTROOM DEPUTY:  It will take me a few

12   moments.

13             THE COURT:  All right.

14             (Pause)

15             THE COURT:  While we're waiting, Mr. Nichols, it

16   looks like you've gotten a haircut or a beard cut.

17             DEFENDANT NICHOLS:  Yes, sir, I have.  Yes, Your

18   Honor.  We got one this last Friday again, so they're doing

19   it monthly now.

20             THE COURT:  That's good.

21             DEFENDANT NICHOLS:  Yes, sir.

22             (Pause)

23             MS. WEST:  Judge, Kira West here for Alex

24   Harkrider.  I'd like to add one thing with regard to the

25   plea offers, and Mr. Brasher can say whether or not that's

1    correct, but the offer that I received is known as a wired

2    offer.

3              THE COURT:  All right.  I don't know if that still

4    counts or not.  I'd be disappointed if it is still a wired

5    offer.

6              I think we'll have Mr. Brasher look at the record

7    and see as well as he may want to consult about that.

8              MR. BRASHER:  That was -- I will tell the Court

9    that was a new concept that I learned when I joined the

10   detail so I will look into that.

11             THE COURT:  Yes.  I think it's -- the Court

12   doesn't like them.  Obviously the government has their

13   prerogatives, but we can see what would be best in that

14   situation in this case.

15             THE COURTROOM DEPUTY:  Your Honor, I have

16   reconnected the public line.

17             THE COURT:  All right.  Mr. McBride, can we get

18   back together again?

19             MR. McBRIDE:  Yes.  Good morning, Your Honor, and

20   thank you for the opportunity to speak here today.

21             So regarding preparation for trial, we are still

22   on track at this point.

23             Regarding our being in possession of any new

24   offer, we are not.  The last offer that was made was in June

25   of 2021, also a wired offer at that time.  We maintain the

1    position where we're open to plea negotiations up until the

2    moment of trial, and that is, you know, something that we

3    are willing to discuss within reason.

4            Outside of that, we are still currently on track

5    for trial for November 1st at this time.

6            Judge, I do want to make a record about a few

7    concerns that I have.

8            THE COURT:  All right.

9            MR. McBRIDE:  So last night, on prime time

10   television, we saw the January 6th Committee present a one-

11   sided narrative to the public about what happened that day.

12   We have concerns that this is a deep -- that this is

13   poisoning the jury pool; that this is going to remove

14   our ability to select any jury that hasn't been

15   indoctrinated to the Committee's way of thinking by the time

16   that Mr. Nichols's case goes to trial or any other January

17   6th defendant's case goes to trial.

18           We're talking about a prime time presentation.

19   It's a one-sided narrative.  It's consistently hammering

20   home the narrative of insurrection, domestic terrorism, you

21   name it.  These are the talking points for the Department of

22   Justice's prosecution.

23           There was a video presented by a journalist at the

24   presentation last night, Nick Quested.  The video is 17

25   minutes and -- 17 minutes and 20 seconds long,

1    approximately, in it's unedited form.  The video has footage

2    that is arguably favorable to the prosecution in these cases

3    and the Committee's narrative; and it clearly has footage

4    that is exculpatory, that would support a counter narrative

5    about some of the things that we have been talking about

6    that day, in particular self-defense, defense of a third

7    person, what happened to Ashli Babbitt, Roseanne Boyland,

8    and how that worked through the public consciousness of the

9    members of the crowd.  The exculpatory parts of the footage

10   last night were purposefully edited out while the parts that

11   make all January 6ers look bad were included and were

12   drilled down upon.

13          We feel that this is very unfair.  There is a

14   protective order in this case that we are subject to and we

15   are hamstrung by.  We are not allowed to just share

16   information in video with the public to launch a captive

17   offensive in the public sphere -- this is the world we live

18   in now, social media -- in order to counter balance what is

19   happening.

20          But the government -- well, I should say the

21   Congress last night, there were multiple times where body

22   cam footage that's subject to the protective order in this

23   case was used, audio was used, CCT footage was used.  And I

24   say this because these are all the reasons for the

25   government's justification.  This is the material backbone

1    as to why the protective order is necessary.

2            The government has said, in its papers and in the

3    protective order that we all signed off on, that national

4    security is at risk; that, you know, certain parts of the

5    Capitol are at risk.  Policing procedures are at risk.  We

6    can't let the public have access to all these things;

7    therefore, the protective orders are necessary.

8            But Congress last night just published all that

9    information to the world, so I would submit that the

10   protective orders in these cases are no longer relevant

11   because the federal government has, in purpose and in

12   effect, essentially waived the reasons for the protective

13   order by publishing these documents, these videos, these

14   pictures to the public.

15           We are deeply concerned, and this is, you know,

16   not -- this is not directed toward the U.S. attorney in this

17   case, of course, but we are deeply concerned about an

18   improper collusion between the Department of Justice and

19   Congress where Congress feels to be prosecuting the case.

20   It's one thing to say we have a legitimate interest in

21   investigating the events of that day.  It's another thing to

22   present a one-sided narrative where you are selecting and

23   editing footage that is damning and that is casting the

24   people who were there that day in the worst light possible.

25           This is very prejudicial, and it's damaging to our

1    ability for a fair and reasonable trial.

2            THE COURT:  Let me ask where are you going with

3    this?  Do you want to file motions because of the

4    legislators' actions -- I don't see any evidence that

5    Justice did it, but the legislative actions in holding these

6    public hearings and putting forth this narrative that you

7    say is only one-sided?

8            It does concern the Court certainly as potential

9    jury prejudice.  We'll have to take care of that as time

10   goes on.  The trial has been delayed.  If the trial was next

11   week, I'd be very concerned.  I would delay the trial

12   frankly.  But we have a November trial date.

13           But I am worried about -- I agree with you on any

14   kind of retained prejudice the public may get from this

15   presentation over the next few weeks that will occur.  And

16   that is unfortunate, when Congress decides to do their

17   public hearings.  They have a right to do hearings.  They

18   have a right to broadcast them.

19           We ran into this in the Watergate era.  There are

20   some cases on it in the Watergate era.  One is a case where

21   Colonel North was convicted by a jury of this court after a

22   long trial before Judge Gesell, one of the finest judges.

23   At the same time, Congress had propelled his testimony on

24   the Hill, and despite all the warnings of Justice and his

25   own counsel, he was forced to testify; and, therefore, they

1  held his trial conviction had to be thrown out because of

2  what they caused.  The legislative process caused damages to

3  his opportunity to defend himself.

4          But in any event, I don't see that at this extent

5  yet, but I think it is a concern you've highlighted.

6          As to the protective order, I think that obviously

7  this will have to be considered by the Court after filings,

8  whatever, you make on it and whatever the government's

9  response is.  I suspect we'll be hearing this in the other

10  cases as well, and I hope there will be a response by the

11  government as to whether this moots the issue in the

12  protective order or not because Congress, according to your

13  allegations, has played certain videos from certain cameras

14  that the government held it's necessary to keep secret as to

15  the location of the use.

16          So I think you have a legitimate concern.  That

17  does concern the Court, but I think we'll have to have a

18  normal court process to bring that up.

19          All I can do is suggest to you that I have

20  concerns, and I think that it remains to be seen where we go

21  with them and as to whatever motions you feel are

22  appropriate to vitiate the protective order.  And the

23  government can respond to that, and we will at that point

24  see where we go.

25          But it is a concern, that Congress has decided to

1   publicize their approach of the Committee to this time when

2   we have multiple cases pending here in this court.

3   Legislature is independent from the Judiciary and Executive,

4   and they follow their own needs and requirements.

5            So I think we'll have to await further

6   development, but I appreciate your bringing that up because

7   I think that is a concern.

8            All right.

9            MR. McBRIDE:  Thank you, Your Honor.  At a

10  minimum, we will certainly be filing a motion with regard to

11  the protective order to have the protective order, in

12  essence, repealed.  I'm not sure if a writ of mandamus is

13  necessary.  We will do the research here in the next few

14  days, and we will certainly file something.  And I thank

15  Your Honor for sharing our concern objectively on the

16  matter.

17           I just -- I do want to make a brief record of one

18  other thing.  Back in December I've been on record during

19  Mr. Nichols's bail hearing about some of the treatment that

20  he had been enduring.  We are in the final stages of a

21  habeas petition, which will assert that he is being punished

22  in violation of his due process rights.

23           You know, Mr. Nichols is a military veteran,

24  honorable discharge, who has PTSD.  It is a serious

25  underlying medical condition.  Recently, for completely

1    unjustifiable reasons, he was held in prolonged solitary

2    confinement for upwards of three weeks.  At some point he

3    actually ended up on suicide watch.

4         It's very concerning the way that he continues to

5    be treated in there.  We have First Amendment rights

6    concerns.  When we're talking about his case and when we're,

7    you know, having different discussions, he seems to be

8    retaliated against on a regular basis.  You can kind of map

9    these things out, trace them to each other.

10         And also, at the last status hearing I made

11   arguments before Your Honor about Mr. Nichols's access to

12   his discovery with regard to the Evidence.com database and

13   Relativity.com database.  Mr. Nichols went almost two months

14   without any access to -- I mean, it's almost been the entire

15   time since the last adjournment, since the last status

16   conference, where Mr. Nichols has not had regular access.

17         There were several weeks where he had no access

18   whatsoever, and he still has not been given access to the

19   Relativity.com database despite Your Honor's instruction on

20   it at the last status hearing.

21         So I just wanted to make a record about that as

22   well and to raise the point of the forthcoming habeas

23   petition which will speak about right to counsel violations,

24   due process violations, and, of course, his illegal

25   punishment, which we will lay out in our papers.

1      Thank you, Judge, for hearing me today.

2      THE COURT:  That's all right.  What about -- are

3   you talking about his limited access?  He's not on the

4   regular rotation to receive a laptop every so often on the

5   list they have when they circulate them to all of the

6   prisoners?  They are not providing that to him on the normal

7   rotational basis?

8      MR. McBRIDE:  No, they certainly are not.  And the

9   court -- the jail, D.C. Jail, has moved to sort of a hybrid

10  system where defendants are allowed to use laptops in

11  certain sets of circumstances, and then, when they're not

12  able to have the laptop, they usually have a tablet, and on

13  that tablet they have access to the Relativity.com database.

14      They're not given -- I mean, the Evidence.com

15  database.

16      They're not given access to Relativity yet, which

17  we don't know why, but in Mr. Nichols's case in particular,

18  his access to any of those things has been regularly removed

19  from him for extended periods of time which appear to be for

20  purely punitive reasons.  That is the only reasonable

21  explanation that we have because Mr. Nichols has -- you

22  know, he's a model citizen there at the prison.  He's never

23  been really accused of doing anything wrong.  There has

24  never been a meritorious claim against him for misconduct

25  ever since he's been there, so there's no reason under the

1   sun why he shouldn't have regular access to these things.

2          So we submit to the Court that -- and we will lay

3   that out in our motion -- that it is for punitive reasons.

4          THE COURT:  All right.  Mr. Brasher's in Texas.

5   He does not have direct access to the jail.  I assume that

6   our local Assistant U.S. Attorney might have.  He may have

7   to inquire about that because that has concerned the Court

8   before, about Mr. Nichols's access, and, you know, it's a

9   serious matter.  I think we have to make some arrangements

10  that are -- for his accessibility, but also I'll have to

11  have a response from the jail people.

12          The general counsel over there generally follows

13  up with me.  Hopefully we can get some explanation as to

14  what goes on.  Sometimes there are two sides to the story

15  that I don't know of yet.

16          But I think I'm going to have the government

17  inquire as to Mr. Nichols's situation.  I don't know why he

18  was in solitary confinement unless there was exposure to the

19  variant, the COVID variant that's around that has risen high

20  in the jail in the last couple of weeks and recent month or

21  two and has calmed somewhat down now, I hope.  But they did

22  have a lockdown in the jail for a while because of the

23  reoccurrence of the pandemic situation.

24          But I will look into that.  I will ask the

25  government to look into that and then file a report as to

1  the access for Mr. Nichols to have his discovery as allowed

2  by the Court.  We were assured that would happen the last

3  time we discussed this.

4         All right.  I'll turn to Ms. West as to where you

5  are in getting ready for the trial.  Any materials or

6  concerns you have?

7         MS. WEST:  Good morning still, Your Honor; Kira

8  West for Alex Harkrider.

9         I first want to say that I am not going to file a

10  writ of mandamus in this case.  That's for sure.  But I'm

11  happy to work with Mr. McBride on his issue so a motion for

12  change of venue, I'm sure, is forthcoming.

13         The only other fact I'd like to add to that,

14  because the Court has expressed his concern, is the first

15  thing I got on my Apple watch this morning was my Apple

16  News, and it was all about the January 6th program last

17  night, and I think that, you know, this is a problem.  I'm

18  going to read the Watergate cases.  I appreciate the Court

19  letting me know about that.

20         With regard to what Mr. McBride said about the

21  protective order, how I've handled this in my other cases

22  is -- because it's almost impossible to keep track of what's

23  highly sensitive and what's not and so on and so forth -- I

24  just send an email to the AUSA saying, "Look, I think this

25  is out in the public sphere.  I'm bound by the protective

1    order, but do you mind if I share this with so and so?"  And

2    nobody's ever said no, you can't do that.

3           So what's happening, as I think the Court knows,

4    is that many of the videos that are subject to this

5    protective order are out in the public sphere.  So I think

6    that probably there are some things that still need to be in

7    the protective order, and I think trying to parse out what

8    those are is going to be a pretty big job.

9           I am preparing for trial.  The limine and motion

10   to suppress date of July 18th, I may -- I don't know at this

11   time.  I may ask for an extension, and here's why.  That's

12   still three months before trial.  I think there -- I might,

13   in my trial preparation, find that there are other things as

14   far as discovery, motions in limine, that would need to be

15   added.  And I just wanted to let the Court know that if I do

16   file my motion in a timely fashion, that I would most likely

17   supplement it as I get closer to trial.

18           THE COURT:  We're trying to put this in a place so

19   everybody knows where we're going when we get to trial.  I

20   really don't want to have a lot of late motions coming in

21   except, as the government suggested, on both sides.  If

22   there's some problem that comes up after the pretrial

23   statement that no one knew about, that's understandable.

24   But I'd like you to keep working and trying to get all the

25   motions in as soon as possible, and then we'll see.

1          On, again, the protective order issues, I think,

2     as these hearings, which are going in seriatim for the next

3     three or four weeks apparently, that will cause issues, and

4     we'll have a more developed record on that.

5          I appreciate Ms. West's approach.  If there's a

6     particular matter in a protective order that you think needs

7     to be reviewed with others, whether they're other lawyers in

8     your office or other investigators or your counsel -- your

9     client or his family so you can understand the issues

10    better, you can ask the government -- or because the video

11    has been made public, as some of those last night were, if

12    the Court agrees that those can be released from the

13    protective order and used as appropriate, I don't see a

14    problem with that on an informal basis of counsel as long as

15    they have a clear understanding of what's being discussed.

16         And obviously you can come to me to ask for

17    relief, partial relief from the protective order, and I will

18    have an opportunity to consider that.

19         On the pleas, I do want counsel to take a look at

20    that on both sides and -- on the wire nature and on, as the

21    record has developed, whether the positions have changed on

22    either side at all.  We have had trials go forward here, and

23    the results are public, what the jury verdicts are.  Some of

24    the similar defenses may have been raised, so I think it's

25    something for the parties to consider.  That's all.

1        Mr. Nichols has been incarcerated for a very long

2    time.  I'm bothered by that because people have the right to

3    a speedy trial.  We've run into the pandemic.  We've run

4    into over 800 of these cases now pending and causing delays,

5    and the discovery is massive.  There's thousands of hours of

6    videos to review so that you can find exculpatory or

7    inculpatory information, whatever it may be, and that's the

8    time that's been spent necessarily, unfortunately.

9        I don't want to push this matter off any further,

10    and I hope that Congress will finish their legislative

11    investigation and reports as soon as possible so that can

12    get well beyond us and behind us by the time we reach the

13    trial.  But it certainly will be part of any voir dire

14    process that we do.

15        Let's see, we'll continue obviously the next --

16    whether it's three or four weeks that they're going to

17    continue with this report that Congress is doing, which

18    Congress has a right to do.  It's their legislative process.

19    We'll have to see what the outcome of all that is, if it

20    goes with the change of venue issues, et cetera.

21        The Zogby Report, I guess you call it, that we got

22    earlier -- I have it in another case that has been filed,

23    that a change of venue can be based upon this survey done in

24    the District of Columbia.  It has been questioned highly by

25    various people and the weight it can be given.  There are

1     some judges that have it under advisement right now.  There

2     are two of them who are considering it.  The motions have

3     been arguing the right, but I expect there to be a decision

4     on that certainly.  I have one that's under advisement right

5     now on whether to change venue and using that as the basis.

6              The generic rule, obviously, is despite

7     publicity -- and as I said the Watergate cases are the

8     quintessential example.  They were raised in other cases in

9     the Watergate series, and I would hear the judge through it

10    all.  But it was considered the general rule that it's not

11    enough to have just a general political climate that's

12    antithetical to the defendant's position, and we have to be

13    more focused on that.

14             But it's up to you all to take a look at those

15    issues and see and take a look at the survey that was done

16    to see if it's appropriately done.  That will be -- I think

17    before your motions get in I suspect some other judge may

18    have decided, and I may have decided in another case.

19             But I would like to see where you all come from on

20    that, if there's something new that hasn't been considered

21    yet, if you're intending on filing one.  You have the

22    additional factor of the congressional hearing, which was

23    not part of the earlier agreement, and the publicity

24    generated by that.  It's regretful that the Congress put

25    that in now right in the middle of our handling of these

1     cases.

2              All right.  What we'll do, then, is we're going to

3     go with our schedule.  Our next operative date is the

4     October 18th motions date, and we'll see about, Ms. West,

5     whatever motion you have in mind and any opposition or

6     replies.  We've set forth for the government two days in

7     post -- pretrial motions hearings.

8              I would still like to do -- it's now June 10th.  I

9     think about the middle of July towards the -- maybe after

10    the July 18th date, certainly thereafter, if there's any

11    concerns or delays we should probably go ahead and set a

12    status call so we have a date that you can all focus on if

13    you need to come back rather than waiting until August to

14    raise some new issue.  So let's look at the calendars for a

15    minute in the latter part of July.

16              (Pause)

17          THE COURT:  I have time on July 21st and time in

18    the afternoon on July 22nd, if counsel are available those

19    days.

20          MS. WEST:  The afternoon of July 21st is best for

21    me, Your Honor.

22          THE COURT:  Let me hear from other counsel.

23          MR. BRASHER:  The 21st works for me as well, and I

24    could likely do that in person or virtually.

25          THE COURT:  All right.  We'll see about that in a

```
 1    minute.

 2              How about Mr. McBride?

 3              MR. McBRIDE:  Yes, Your Honor, the 21st works

 4    well.

 5              THE COURT:  All right.  And, Ms. West, you said

 6    the afternoon is better for you on the 21st?

 7              MS. WEST:  Yes, Your Honor.

 8              THE COURT:  All right.  I think right now,

 9    Mr. Brasher, unless you want to travel to D.C. for some

10    reason, we can still do these status calls by Zoom.  There

11    will be a point, because these are felony cases, where the

12    substantive motions are going to have to be heard in person.

13              MR. BRASHER:  I just raise that because I will be

14    in person on a hearing on Friday, the 22nd, so I can just --

15              THE COURT:  Oh, you're going to be here anyway.

16              MR. BRASHER:  I will be there anyway.

17    Mr. Harkrider wouldn't be, unless he came out for it.

18              THE COURT:  Right, Mr. Harkrider wouldn't be.

19              Well, I'm going to put it on by Zoom.  I'd rather

20    not have you be the only one here in person.  I wouldn't do

21    that unless all the other lawyers are here and counsel are

22    here.  I'll leave it on for Zoom at this time, and hopefully

23    wherever you are here you can communicate by Zoom all right

24    with the case.

25              We'll put it on at 2:00 p.m. on Thursday, July
```

1    21st, a status call to make sure the opening motions have

2    been filed and that we're all in line to move forward on

3    this.  And if there are other problems that come up --

4    Mr. McBride has a motion pending I haven't ruled upon yet,

5    but he can do it.  He filed something very recently now -- I

6    mean, very shortly now.  I'll try to hear that in advance of

7    that time.  And with respect to this case, I won't have to

8    resolve anything else, but we'll try to take care of that.

9           And I think the government certainly should be

10   on notice, and we do want to have some understanding of

11   Mr. Nichols's access to discovery that has been an ongoing

12   problem.  Sometimes there have been some misunderstanding of

13   whether it's available or not.  Sometimes there's not a good

14   explanation for it.  And we can take it up whenever that

15   particular issue is ripe for this matter.

16          And, again, I'm going to ask the government to

17   review the status of pleas and the wired nature of the

18   pleas, and if the government wants to reopen any

19   consideration of the plea with the defendants and

20   defendants' counsel, they will be open to discussions as

21   well.

22          All right.  If that's it, I'm going to talk to

23   Mr. Harkrider's Pretrial Services officer.  Mr. Nichols can

24   stay on, and Mr. McBride, if they wish, or if they leave.

25   It's just going to be making sure that the Pretrial Services

1    understands the orders that have been put out on what

2    Mr. Harkrider is going to be doing or not doing.

3              MR. BRASHER:  Your Honor, I have one issue that I

4    think involves everyone before we do that.  Speedy trial.  I

5    believe the Court had tolled it until today.

6              THE COURT:  Right.

7              MR. BRASHER:  My preference, obviously, would be

8    to toll it until November 1st, but if the Court wants to do

9    it until July 21st, we would not be opposed to that either.

10             THE COURT:  All right.  Thank you.  I was going to

11   do that at the end, but I realize that if Mr. Nichols leaves

12   he wouldn't hear that so I want to make sure that both

13   defense counsel may have their clients' consent to extend

14   the speedy trial.  I'm going to make it through the next

15   status call, and if motions are filed, that would extend it

16   in any event, but I'll make it until the next status call on

17   July 21st, if counsel for the defense agree with me.

18             MS. WEST:  Ms. West for Mr. Harkrider, we agree.

19             MR. McBRIDE:  Mr. McBride for Mr. Nichols, we

20   agree.

21             THE COURT:  All right.  Thank you.  I'll make a

22   finding that the interests of justice outweigh the interests

23   of the defendant and the public in an immediate speedy trial

24   and the need to prepare the case for trial to make sure the

25   parties have access to the discovery and can proceed with

1    the motions they need to file before we can get to the trial

2    date, so I'm going to exclude today's time through the July

3    21st date from the next status call.

4         All right.  So as I said, Mr. Nichols, you're

5    welcome to stay.  I'm going to talk to Mr. Harkrider in

6    Texas as well as the D.C. Pretrial Services officer on

7    Mr. Harkrider's bond issues.  That's all.  There are no

8    serious issues.  It's a matter of clarifying whether he's

9    supposed to be leaving or not, the house, et cetera.

10        DEFENDANT NICHOLS:  Thank you, Your Honor.  I'm

11   going to go ahead and leave now.  You all have a good day,

12   and I'll see you back in court in July.

13        THE COURT:  Thank you, Mr. Nichols.

14        DEFENDANT NICHOLS:  Thank you.

15        THE COURT:  Mr. McBride, you're free to go, if you

16   wish.

17        MR. McBRIDE:  Thank you, Your Honor.  Have a nice

18   day, everyone.

19        THE COURT:  All right.  Let me talk with Pretrial

20   for a minute on this matter and any concerns they've got.  I

21   understand there may be concerns about his conditions of his

22   release as to the Court having ruled, since there was no

23   access for location monitoring, that we had changed those

24   conditions but left them as basically home detention, and

25   which I concluded that he was going to continue to report

1    and have Pretrial Services be notified when he was traveling

2    outside of his home there in Texas, not only outside the

3    state and his needs for his volunteer work, but my thought

4    was reporting when he'd have to leave the house for any

5    particular reasons beyond the normal ones with medical care

6    that he gets and related-type matters.

7           But let me just hear what the concern is of

8    Pretrial, what we need to do to make sure we're on the same

9    page.

10          PRETRIAL OFFICER HOLMAN:  Good morning, Your

11   Honor; Shay Holman, Pretrial Services.  As you are aware,

12   Pretrial contacted the Court last week with clarification in

13   reference to this matter, and you and I had a conference

14   call earlier this week.

15          On July of 2021 the Court lifted the location

16   monitoring condition for Mr. Harkrider, and Pretrial

17   Services in D.C. interpreted that, as we always do when the

18   LM is lifted, that that means whatever posture he's on,

19   whether it's home confinement or curfew, that that is lifted

20   as well.  However, it wasn't stated specifically in the

21   minute order "remain on home confinement."  It just stated,

22   as Your Honor just said, "requests permission from Pretrial

23   for his travel."

24          So Mr. Harkrider has a new case manager in Texas,

25   and she was going through the file and asked for

1     clarification.  That's how it was brought to our attention.

2          So we just need clarification, but I also will

3     point out at this time Mr. Harkrider has been under pretrial

4     supervision for over a year now and has been compliant.  If

5     he -- if the Court thinks that the order should state still

6     "home confinement," Pretrial would note that after a year in

7     total compliance we do ask for a step down.

8          So at this time we don't feel that there's a need

9     to continue -- he's not on -- he doesn't have a GPS device

10    around his ankle.  We don't feel that there's a need to

11    continue any type of home confinement.  The Court has been

12    granting him extensive travel because of his volunteer work

13    over the last year that he does, and he has been compliant

14    in keeping up with Texas and informing them of his travel

15    and reporting back, and the Court just granted an order for

16    him to travel from May 18, 2022, to August 31st for his

17    volunteer work.

18          So at this time Pretrial feels that there's no

19    need to continue any type of home confinement requirement.

20          THE COURT:  Well --

21          MS. WEST:  Your Honor, I'm sorry to interrupt, but

22    I notice that Mr. Harkrider dropped off the screen.

23          THE COURT:  I was just trying to say that.

24          MS. WEST:  And I called him, and he is -- the

25    electric meter man is there and cut off his power so...

1    This could only happen to him, poor kid.

2              So he's going to try to reconnect with his phone.

3              THE COURT:  All right.

4              MS. WEST:  I apologize.

5              THE COURT:  Well, that's not your fault.  It's no

6    one's fault at all.

7              I'm sure Ms. Hill can get him back on on the

8    phone, if he calls in.

9              THE COURTROOM DEPUTY:  Your Honor, I'll let you

10   know.  Once I see him in the waiting room, I can go ahead

11   and admit him.

12             PRETRIAL OFFICER HOLMAN:  Ms. West, does he have

13   just the number to call in and not the videoconference

14   number, but just the phone number?

15             MS. WEST:  I don't think he even has the phone

16   number, but if somebody puts it in the chat for me, I will

17   get it to him.

18             THE COURTROOM DEPUTY:  I'll go ahead and send that

19   to you now, Ms. West.

20             MS. WEST:  Thanks so much.

21             (Pause)

22             (Discussion off the record)

23             THE COURT:  You gave him the information so he

24   should be trying to get on now?

25             MS. WEST:  Yes, Your Honor.  I texted him the

1    phone number.  He has to put the --

2              THE COURTROOM DEPUTY:  Your Honor, I have him in

3    the waiting room now.  I just admitted him.

4              THE COURT:  Good, thank you.

5              THE COURTROOM DEPUTY:  Mr. Harkrider, can you hear

6    me?

7              THE DEFENDANT:  Yes, ma'am, I can hear you.  I

8    apologize.  Someone from the electric company cut my power

9    so I lost WiFi.

10             THE COURT:  All right.  Mr. Harkrider, Judge

11   Hogan.  You're back on.  We were just discussing the

12   conditions, bond conditions, and some confusion on

13   continuing on lockdown in the house, which really has not

14   been working in any event.

15             Ms. Holman, do you want any particular language

16   change in the pretrial order?  I've been reading -- it's

17   Ms. Holman -- the order I got in here on June 8th concerning

18   the general supervision, the third-party custodian, that his

19   other conditions he needs to follow, and is there any other

20   confusions I need to clear up or to change that order for

21   you?

22             PRETRIAL OFFICER HOLMAN:  Your Honor, the

23   recommendation that I've put in my report dated June 8th --

24             THE COURT:  Right.

25             PRETRIAL OFFICER HOLMAN:  -- states "removal of

1    home confinement."

2              THE COURT:  Right.

3              PRETRIAL OFFICER HOLMAN:  "The defendant will be

4    required to notify Eastern District of Texas regarding

5    travel within the state of Texas.  Court approval is needed

6    for all travel outside the state of Texas and travel outside

7    the continental U.S."

8              And I worded it like that based on our phone

9    conversation.  I thought that you had indicated you liked

10   being kept aware of the travel outside of Texas for any of

11   his volunteer work, but I will defer to the Court on that.

12             And, Your Honor, Ms. Howard in Texas is also on

13   the phone, if she wants to add anything.

14             THE COURT:  All right.  Okay.  Fine.

15             Ms. Howard, anything else you'd like?

16             PRETRIAL OFFICER HOWARD:  No, that's fine.  I

17   don't have any issues with Mr. Harkrider.  He keeps me very

18   informed of his whereabouts even if it is in Texas, so I

19   have no issues with any of the suggestions Ms. Holman has

20   given.

21             THE COURT:  The only condition -- the only thing I

22   would add to that is one of the special conditions is he's

23   allowed to travel to the VA Hospital in Shreveport,

24   Louisiana, for medical appointments that are needed provided

25   he advises you of his appointment and time and date, so that

1    restrictions about the Court approval needed for travel

2    outside of Texas would not apply to that medical treatment

3    that he's been getting in Shreveport.

4              PRETRIAL OFFICER HOWARD:  And that's fine with me.

5              PRETRIAL OFFICER HOLMAN:  And the order can say,

6    Your Honor, "with the exception to travel to Louisiana to

7    the VA hospital."

8              THE COURT:  Right.  All right.  We'll do that.

9    I'm going to strike the requirement for home confinement, if

10   that was considered to still be in there, and that he's

11   required to notify the Eastern District of Texas regarding

12   travel within the state of Texas and Court approval to

13   travel outside the state and outside of the United States

14   with the exception that he can certainly travel to the VA

15   hospital in Shreveport, Louisiana, for medical appointments

16   as needed and advise the Pretrial Services for travel.

17             PRETRIAL OFFICER HOLMAN:  And, Your Honor, one

18   additional reference you just brought up.  In reference to

19   the third-party custodian, I don't know if the Court and the

20   government still feel that's necessary since he's being

21   removed off of home confinement, and I don't know if that's

22   still necessary, but I'll defer to the Court and the

23   government.

24             THE COURT:  I'll ask if the government has any

25   concerns about that.

1      MR. BRASHER:  Your Honor, we would ask that that

2   condition remain.  I think it's not asking a whole lot more,

3   and it just adds one more layer of protection, especially

4   since we're dealing with remote attorneys and remote Court,

5   just to have one more person right there in the home.

6      THE COURT:  She is nearby, and I don't think it

7   requires -- does it require any reporting by her to the

8   Pretrial Services?

9      PRETRIAL OFFICER HOLMAN:  Only if there is a

10   violation, Your Honor.

11      But I'll have to ask Ms. West.  I don't believe

12   she lives in the home.

13      THE COURT:  I don't think so either.

14      MS. WEST:  She does not.  She lives very close by.

15      PRETRIAL OFFICER HOLMAN:  Right.  So I just wanted

16   to make sure that the AUSA was aware of that.  She does not

17   live in the home with Mr. Harkrider.

18      I was not aware of that, so I appreciate that.

19   But I think that position -- our position would stay the

20   same.

21      THE COURT:  All right.  Well, as long as it's not

22   a burden and it's unfair to her, I'm going to leave it in

23   just to make sure.

24      Mr. Harkrider, if something happens, she has to

25   let us know.

1          All right.  So, Mr. Harkrider, you're going to be

2    released on the general terms of supervision we had before.

3    I'm striking, however, that you should be in home

4    confinement as that was the concern.  Obviously we're

5    stepping down to that requirement.  And the travel

6    notifications are as we've indicated except you can travel

7    to Shreveport for medical treatment as needed, and I see no

8    other problems with that.

9          All right.  Thank you, Counsel, for working that

10   out, and we'll continue that Pretrial Services order as I

11   just indicated.

12         And Ms. Holman and Ms. Howard, if there's any

13   issues, you let me know, but I think Mr. Harkrider has shown

14   that he can be relied upon.

15         PRETRIAL OFFICER HOLMAN:  Yes, Your Honor, and

16   I'll wait for the Court to issue the minute order.

17         THE COURT:  All right.

18         PRETRIAL OFFICER HOLMAN:  Thank you.

19         THE COURT:  All right.  Thank you, Counsel.  I

20   appreciate you getting on.

21         All right.  Mr. Harkrider, we're going to conclude

22   this hearing at this time.

23         DEFENDANT HARKRIDER:  All right.  Thank you very

24   much, Your Honor.  Hope you have a great day.

25         THE COURT:  All right.  Thank you.

1          MS. WEST:  Good afternoon, Your Honor.

2          MR. BRASHER:  Thank you, Your Honor.

3               (Whereupon the hearing was

4               concluded at 12:02 p.m.)

5

6          **CERTIFICATE OF OFFICIAL COURT REPORTER**

7

8          I, LISA A. MOREIRA, RDR, CRR, do hereby

9    certify that the above and foregoing constitutes a true and

10   accurate transcript of my stenographic notes and is a full,

11   true and complete transcript of the proceedings to the best

12   of my ability.

13     **NOTE:**  This hearing was held remotely by Zoom or some

14   other virtual platform and is subject to the technological

15   limitations of court reporting remotely.

16          Dated this 26th day of July, 2022.

17

18                         /s/Lisa A. Moreira, RDR, CRR
                          Official Court Reporter
19                        United States Courthouse
                          Room 6718
20                        333 Constitution Avenue, NW
                          Washington, DC 20001
21

22

23

24

25