IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 21-CR-117(KBJ) |
| | : | |
| | : | |
| ALEX HARKRIDER | : | |

**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE**

The Defendant, Mr. Alex Harkrider, by and through his attorney Kira Anne West, in support of this motion, the Defendant asks for a hearing and submits the following:

**BACKGROUND**

The Defendant, Mr. Harkrider, is thirty four years old and a Texan, a father, a brother, an uncle, and a son. He is also a proud American. He has one brother and one sister. He is a graduate of Carthage High School. He also did one semester at St. Phillips in San Antonio, Texas. At the time of his arrest on January 18, 2021, he was a full time volunteer serving as a search and rescue volunteer for a non-profit started by his co-defendant, Mr. Nichols. A veteran, having served twice in both Iraq and Afghanistan for four years, he is 100% disabled from the Marine Corps. He was honorably discharged. He lives only on his military disability check, which is less than the monthly lawn service fees for many Washington, D.C. residences. Mr. Harkrider is also a father to Alex, Jr., who is currently a rising senior in High School. Mr. Harkrider pays child support to his son's mother each and every month and also provides more than what is required of him.

Mr. Harkrider's mental health was affected by certain medical issues suffered as a result of the service to our country but his conditions have been controlled through the use of

medication and his volunteer work which he uses as therapy.

## PROCEDURAL HISTORY

On January 17th, 2021, Mr. Harkrider and Mr. Nichols were charged by criminal complaint with "Conspiracy and unlawful entry with dangerous weapon" pursuant to 18 U.S.C. §§ 1752(a), b(1)(a); Violent Entry and Disorderly Conduct on Capitol Grounds pursuant to 18 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G); and aiding and abetting in violation of 18 U.S.C. § 2(a). On November 10, 2021, Mr. Harkrider was indicted by a superseding indictment and charged with two felonies and 5 misdemeanors. He is clearly the least culpable of the two defendants in this case.

On January 18th, 2021, at about 5:00 o'clock a.m., Mr. Harkrider was arrested at his small home in Carthage, Texas by a large contingent of police officers and federal agents. Mr. Harkrider estimates at least 15-20 officers were present. He was immediately handcuffed. They had a search warrant. They took several items from Mr. Harkrider's home. They took Mr. Harkrider to the local jail and questioned him after repeatedly lying to him. *See infra*. He was "in custody." After discussion and advisement of his rights, Mr. Harkrider cooperated with the officers and gave a recorded but not videotaped statement.

## STATEMENT OF FACTS

The facts outlined in Mr. Harkrider's motion for detention appeal are incorporated in this motion. *See* ECF No. 16. As the Court knows, Mr. Harkrider suffers from PTSD and is on permanent disability. Yet he never dreamed that standing in a window at the Capitol would merit a FBI swat team breaking down his door, busting it off the frame, **and** flash banging Mr. Harkrider at 5 a.m. with at least two flashbang grenades. The shock of the situation caused Mr. Harkrider to suffer a flashback of being back in Afghanistan fighting the Taliban. Anxiety and

adrenaline rushed through his system. He thought the Taliban was there to kill him. (The FBI has made all these J6 cases into Jason Bourne moments-arresting people with no criminal history as if they are the Taliban). After he had collected himself and realized what was going on, he realized that he was getting arrested, so he grabbed his dog and went out and showed his hands so he wouldn't get shot. He pleaded with them not to shoot his dog, and the agent told Mr. Harkrider to "shut the fuck up." Mr. Harkrider was dressed only in his underpants. It was January in Texas, and even there it was cold. When Mr. Harkrider walked into the living room, he was immediately handcuffed and the agents brought him outside in his underwear and put him in a state trooper's car. There were armored swat vehicles and approximately 20 agents at the scene. About 10 minutes later, they came outside with a shirt and pants for him. He was taken to the Sheriff's office in Carthage, Texas. They immediately began to question and speak to him without mirandizing him. He was still suffering from the after effects of the flash bangs and was stunned, dazed and confused. Mr. Harkrider was given his Miranda warning but only after a conversation about his activities on January 6. This is commonly known in Texas as "the Texas two-step" method of interrogation. It is a well known tactic of law enforcement.

The interview in Carthage lasted approximately 45 minutes. They then transferred him to the Gregg County jail in Longview, Texas. The agents that interviewed Mr. Harkrider were the ones who drove him to Longview.

The crux of whether or not Mr. Harkrider's waiver of his right to remain silent was voluntary and knowing starts before his questioning. Here, before the questioning even began, Mr. Harkrider had been kept in a freezing car without any clothing for 10 minutes. He was suffering from his PTSD, triggered by from being flash banged. Crucially, Mr. Harkrider was questioned about the case before his Miranda warning was given and when he tried to ask about

3

having a lawyer, the officer interrogating him interrupted him at the crucial point where he asked if he should have a lawyer. *See* exhibit 1, recorded statement, minute 0-4:30. Just a few minutes from his home, a Tyler police officer and an FBI agent interrogated Mr. Harkrider. Before they mirandized him, the agents introduced themselves and asked Mr. Harkrider why he thought he'd been arrested. Mr. Harkrider told them he thought it was because of January 6. Then Detective Mackey(hereinafter "Mackey") said the following:

    Mackey: "I want to explain to you what's going on. Try to get your side of the story. All I am, I'm just a fact finder. All this happened up in D.C. It's not for me to decide the arrest warrant part. There was an arrest warrant issued for you out of Washington, D.C. and they sent it to us. That's why we're down here this morning. They have their side of the story, I'd like to get your side of the story of what happened. Are you willing to talk to us? "
    Mr. Harkrider: yes.

    Mackey: you understand you are under arrest. I understood because of that I have to read you your rights.
    Mr. Harkrider: I understand

    (rights are read).

    Mackey: If you decided to answer without a lawyer you could stop answering at any time. All that, still willing to talk to us? I'd like to get your side of the story.

    Mr. Harkrider:  (unintelligible)..I don't know if I should have a lawyer present, I don't really know…

    At this point Mackey cuts off Mr. Harkrider from asking any further questions and says:

    Mackey: Ok that's completely your choice, my job is as a fact finder, like I said, we got the warrant from DC. This is kinda your time to give us your side of the story.

    Mr. Harkrider:  I don't feel like I have anything to hide so I'm willing to cooperate.

    (paperwork is being signed).


    Mackey: It's a federal offense …any false statement is a felony. Any questions on that part?
    Mr. Harkrider: Do I get to make a phone call?

4

Mackey: I don't have a means to get you a phone call right now, when we're done we'll take you to Gregg County jail and you can make phone calls over there.

Mackey: you've been tagged a lot on social media-that's all they have to judge on what happened.[1]

Law: statements

The Supreme Court has determined that the Fifth and Fourteenth Amendment's prohibition against compelled self-incrimination requires that custodial interrogation be preceded by advice to the Defendant that he has the right to remain silent and the right to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Miranda warnings are required before custodial interrogation begins. *Id*. at 444-45.  Before it can use any statements produced through custodial interrogation, the government has the burden to show that. "the defendant 'voluntarily, knowingly and intelligently' waived [these] rights." *J.D.B. v. North Carolina*, 564 U.S. 261, 269-70 (2011).  Moreover, the Government must show the statements were obtained without coercion or improper inducement. *Colorado v. Connolly*, 479 U.S. 157 (1986). Should a defendant make a statement, a court must examine the voluntariness of the particular statement and test whether the statement was freely given under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also, Malloy v. Hogan*, 378 U.S. 1, 6- 7 (1964) (the constitutional inquiry is not whether the conduct of the law enforcement officers in obtaining the confession was shocking, but whether the confession was free and voluntary); *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). The government bears the burden of proving by a preponderance of the evidence that a statement allegedly made by a defendant was voluntary, or fits into exceptions to this general rule. *Lego v. Twomey*, 404 U.S.

---

[1] This transcription is not verbatim but it hits the important parts.

477, 489 (1972); *United States v. Garcia*, 780 F. Supp. 166, 171 (S.D.N.Y. 1991). Without a valid Miranda waiver, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions. *Pennsylvania v. Muniz,* 496 U.S. 582, 601-02 & n. 14. Accordingly, the questioning here by law enforcement officers did serve to elicit incriminatory admissions. The government bears the burden to demonstrate a knowing and intelligent waiver of the privilege against self-incrimination when a defendant raises a colorable claim of coercion. *See Miranda* 384 U.S. at 475; 18 U.S.C. § 3501(b) (setting forth criteria for determining when a confession is "voluntary" or "coerced.") And when determining voluntariness of a statement, the "totality of the circumstances" must be examined, including the defendants individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview. *United States v. Elie*, 111 F. 3d 1135, 1143-44, (4th Cir. 1997); *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987). *Accord United States v. Van Metre*, 150 F 3d 339, 348-49 (4th Cir. 1998).

Most importantly, failure to give Miranda warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. *Missouri v. Siebert*, 124 S.Ct. 2601, 2602 (2004). This "question first" strategy by law enforcement was summarily struck down by the Court. *Id*.

**ARGUMENT**

First, this confession was obtained by improper inducement. Mr. Harkrider did graduate from high school, is permanently disabled, and has had little contact with the criminal justice system.

6

Detective Mackey started questioning Mr. Harkrider before any warning was given. Second, Mackey telling Mr. Harkrider he was simply a factfinder, that DC only had his social media to go on, and that he simply needed to get Mr. Harkrider's information to balance it against what DC had is false. Mackey's job is to obtain evidence, and they had much more evidence at the time than Mr. Harkrider's social media and getting Mr. Harkrider's "side of the story" as if he, Mackey, was somehow separate from DC was completely false. Crucially, when Mr. Harkrider asked if he should get a lawyer and tried to make more statements, Mackey cut him off so that he could not. This was carefully orchestrated and planned by Mackey. Thus, Mr. Harkrider was coerced into making statements. Part of this plan was to also "forget" to give Mr. Harkrider the paperwork regarding making a false statement to law enforcement until after the interview had been completed. *See* exhibit 2, 1001 waiver form.

<u>Motion to suppress evidence:</u>

<u>Facts:</u>

Mr. Harkrider is alleged to have taken a piece of wood, possibly part of a piece of furniture from the Capital. Pursuant to the search warrant, *see* Exhibit 3 filed under seal, officers took this piece of wood from his home. There is no probable cause in the warrant that connects that piece of wood to Mr. Harkrider and nothing in the warrant that supports that law enforcement would find such an item in the home of Mr. Harkrider. *See United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017).

The government obtained a snapchat photo allegedly of Mr. Harkrider making a statement. There is no evidence of where that came from. Detective Gregory Harry testified for the government at the detention hearing in Texas. He testified about a snapchat photo depicting Mr.

7

Harkrider, yet said "I'm not sure exactly which place we got this from." See transcript of detention hearing @ 8, describing exhibit 9, already in evidence. When asked about a title typed on the screenshot, he said "I actually think we recovered this from another source, as well, but I am not sure as I sit here." *Id*. at 9. When asked about a piece of wood he said "well, the testimony ended up being that it was taken from the Capitol, but I'm not sure exactly where it came from." *Id.* at 13.

Law:

As a general matter, in order to make out probable cause for a warrant to conduct a search, law-enforcement agents seeking the warrant must establish that "there is a fair probability that contraband or evidence of a crime will be found in [the] particular place [to be searched]." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). In order to establish probable cause for a search, a nexus must be shown to exist between the item to be searched and the criminal activity under investigation. *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967); *Groh v. Ramirez,* 540 U.S. 551, 568 (2004). This is in keeping with the fact that the "manifest purpose of th[e] [Fourth Amendment's] particularity requirement was to prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Indeed, the Fourth Amendment's particularity requirement is to "ensure that [a] search will be carefully tailored to its justifications, and will not take the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.* Non-public posts made to social media platforms are protected by the Fourth Amendment. *United States v. Chavez*, 423 F.Supp.3d 194, (W.D.N.C. 2019) (defendant has legitimate expectation of privacy in non-public Facebook posts because such posts are not directed to Facebook, thus rendering the third-party doctrine inapplicable*); see*

*also United States v. Allen,* No. 16-10141-01-EFM, slip op. at 5-10, 16-17 (finding that Fourth Amendment was technically violated by a search of defendant's Facebook account but also finding that exclusionary rule was inapplicable because issuing magistrate judge had only made technical error in finding probable cause); *United States v. Whit*t, No. 1:17cr060, slip op. at 1 (S.D. Ohio January 17, 2018) (assuming that "Defendant has a certain expectation of privacy in non-public portions of his Facebook account, such that the seizure of evidence at issue triggers the Fourth Amendment"); *Commonwealth v. Carrasquillo,* 179 N.E.2d 1104, 1117-20 (Mass. 2022) (finding that a person can retain a legitimate expectation of privacy in posts he makes to Snapchat if he takes steps to keep posts private).

There were videos taken during the time that the events at the Capitol on January 6 were ongoing by someone who may have been inside the building. Accordingly, the best that can be said of it is that it merely established a possibility that those Facebook and Instagram accounts might contain evidence of criminal activity, but not by Mr. Harkrider. But this is quite obviously not the same thing as establishing probable cause that those accounts do in fact contain such evidence. *See* exhibit 4, FB warrant, filed under seal.

Accordingly, to the extent the law-enforcement agents used the Warrant to obtain from Facebook, Inc. data from the non-public portions of those Facebook and other social media accounts, the law-enforcement agents violated Mr. Harkrider's Fourth Amendment rights.

Mr. Harkrider stands on his position that his statements made to law enforcement officers (1) were not voluntarily given by him, and/or (2) the Miranda waiver was improperly taken by law enforcement officers. In this regard, Mr. Harkrider is asking this court to find that his subsequent waiver was not voluntary,

knowing, and intelligent "under the totality of the circumstances," *See United States v. Straker*, 800 F.3d 570, at 624-25 (D.C. Cir. 2015). Mr. Harkrider also asks the court to suppress physical evidence found on social media, guns from Mr. Harkrider's home,[2] and an alleged piece of furniture found in his home pursuant to a search warrant.

Respectfully submitted,

KIRA ANNE WEST

By: _____/s/_____
Kira Anne West
DC Bar No. 993523
712 H Street N.E., Unit 509
Washington, D.C. 20002
Phone: 202-236-2042
kiraannewest@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify on the 29th day of July, 2022, a copy of same was delivered to the parties of record, by email pursuant to the Covid standing order and the rules of the Clerk of Court.

_____/S/_____

Kira Anne West

---

[2] This is also covered in the motion in limine.