IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:21-cr-117 (TFH) |
| ALEX KIRK HARKRIDER  (02) | |

**GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTIONS TO DISMISS**

The government respectfully submits this opposition to defendant Alex Harkrider's Motion to Dismiss Counts Six and Eight of the Indictment (Dkt. 94) ("Motion" or "Mot."). Counts Six and Eight of the Superseding Indictment charge the defendant with Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon and Disorderly in violation of 18 U.S.C. § 1752(a)(1), and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. § 1752(a)(2).

The defendant seeks dismissal of these counts contending that Section 1752 is unconstitutionally vague; that the United States Secret Service did not restrict the Capitol or its grounds on January 6, 2021, and that Vice President Pence was not "temporarily visiting" the Capitol on January 6, 2021.  The defendant's contentions lack merit.  "This case is one of many arising out of the events at the United States Capitol on January 6, 2021, and all of the legal challenges [defendant] raises in her motions have been considered and rejected by other courts in

this district." *United States v. Williams*, No. CR 21-0618 (ABJ), 2022 WL 2237301, at *1 (D.D.C. June 22, 2022).[1]

This Court has previously rejected some of the arguments advanced by Harkrider here. *See United States v. Sargent*, No. 21-cr-258 (TFH), 2022 WL 1124817, at *9 (D.D.C. Apr. 14, 2022). As explained herein, this Court should deny the Motion for the reasons articulated in *Sargent* and for additional reasons articulated by other courts in this district, which have rejected the same arguments the defendant advances here.

## FACTUAL BACKGROUND

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress convened in the United States Capitol building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over erected barricades. The crowd, having breached police officer lines, advanced to the exterior façade of the building. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol. At approximately 2:20 p.m., members of the United States

---

[1] *See United States v. Griffin*, 549 F. Supp. 3d 49, 52–58 (D.D.C. 2021) (denying motion to dismiss charge of violating 18 U.S.C. § 1752(a)(1)); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891, at *8–13 (D.D.C. Dec. 21, 2021) (18 U.S.C. § 1752(a)(1)); *United States v. Nordean*, 21-cr-175 (TJK), 2021 WL 6134595, at *4–12, *14–19 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 1752(a)(1)); *United States v. Andries*, 21-cr-93 (RC), 2022 WL 768684, at *3–17 (D.D.C. Mar. 14, 2022) (18 U.S.C. §§ 1752(a)(1) and (a)(2)); *United States v. Puma*, 21-cr-454 (PLF), 2022 WL 823079, at *4–19 (D.D.C. Mar. 19, 2022) (18 U.S.C. § 1752(a)(1) and (a)(2)); *United States v. Bingert*, 21-cr-91 (RCL), 2022 WL 1659163, at *3–11, *12–15 (D.D.C. May 25, 2022) (18 U.S.C. § 1752(a)(1)).

House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

Believing that the 2020 presidential election had been fraudulently decided, Harkrider and his co-defendant, Ryan Nichols, traveled from Texas to Washington, D.C. for the "Stop the Steal" rally.  On January 6, Harkrider, armed with a tomahawk axe and wearing camouflaged body armor, walked from the "Stop the Steal" rally to the U.S. Capitol building, where he eventually made his way to the to the inauguration stage which was in the process of being constructed on the Capitol's lower west terrace and where law enforcement battled to protect an entrance to the building referred to as "the tunnel."  Harkrider led Nichols up the steps into the tunnel, where Harkrider joined the mob pushing against the line of officers protecting the doors at the end of the tunnel.  Later, Harkrider and Nichols entered the Capitol Building through a broken window next to the tunnel into room ST2M, where they remained for several minutes before exiting.  After exiting, Harkrider reentered the Capitol through the broken window and can be seen shouting to the crowd of rioters, "cut their heads off" while drawing his hand across his neck in a slashing motion.



## **LEGAL STANDARD**

A defendant may move to dismiss an indictment or count thereof for failure to state a claim prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Hamling v. United States*, 418 U.S. 87, 117 (1974) (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)) (indictment charging a violation of 18 U.S.C. § 1461 did not define "obscene"). "[T]o be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same

offense." *Verrusio*, 762 F.3d at 13 (indictment charging accepting of illegal gratuities was not deficient because it did not "allege precisely how Verrusio contemplated influencing [amendments to a federal highway bill]"); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) ("It was enough for the indictment [charging an attempt to violate the unlawful reentry statute, 8 U.S.C. § 1326(a)] to point to the relevant criminal statute and allege that respondent "intentionally attempted to enter the United States … at or near San Luis … Arizona" "[o]n or about June 1, 2003.").

## ARGUMENT

I. **The Court Should Deny Harkrider's Motion to Dismiss Counts Six and Eight, Alleging Violations of 18 U.S.C. § 1752**

Counts Six and Eight of the Superseding Indictment charge violations of Section 1752 of Title 18, which prohibits the unlawful entry into and disruptive or disorderly conduct in a "restricted buildings or grounds." A "restricted building or grounds" is a "posted, cordoned off, or otherwise restricted area … where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

Harkrider advances three principal arguments in seeking to dismiss Counts Six and Eight: (1) only the United States Secret Service, not the Capitol Police, can designate "restricted areas" under the statute, and the Government does not allege that the Secret Service restricted the Capitol Grounds on January 6, 2021 (Mot. at 15-18, 27-28); (2) Section 1752 is unconstitutionally vague as applied to Harkrider (Mot. at 18-27); and (3) Section 1752 is not applicable because former Vice President Pence was not "temporarily visiting" the Capitol Building on January 6, 2021 (Mot. at 28-29). Each of these arguments lack merit.

When Harkrider entered the U.S. Capitol on January 6, 2021, the Vice President, who was protected by the Secret Service, was present, which is all the statute requires to render the

Capitol a restricted area. Harkrider's conduct accordingly falls within the Section 1752's plain sweep because he unlawfully entered a restricted building while the Vice President was "temporarily visiting," as alleged in the indictment.

### A.   18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction.

Harkrider argues that because the Capitol Police, not the Secret Service, barricaded the area around the Capitol, he should not be charged with violating 18 U.S.C. § 1752(a)(1) and (2). Courts in this district have rightly rejected this contention. *See United States v. Griffin*, 549 F. Supp. 3d 49, 45-57 (D.D.C. 2021); *Mostofsky*, 2021 WL 6049891, at *12–*13; *Nordean,* 2021 WL 6134595, at *18; *McHugh,* 21-cr-453, ECF No. 51, at 38–40; *United States v. Bingert*, 21-cr-91, 2022 WL 1659163, *15 (D.D.C. May 25, 2022) (Lamberth, J).

Subsection 1752(c) defines the phrase "restricted buildings or grounds" as

> any posted, cordoned off, or otherwise restricted area—
>
> of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c)(1). It then defines the term "other person protected by the Secret Service" as "any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection." 18 U.S.C. § 1752(c)(2).

By its plain terms, then, Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off area where "a person protected by the Secret Service is or will be

temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd* 831 F. App'x 513 (D.C. Cir. 2021). Section 1752, in other words, "focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting." *Griffin*, 549 F. Supp. 3d at 54-55. That straightforward analysis has a straightforward application here: a protected person (the Vice President) was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted, making it a "restricted building or grounds" under § 1752(c)(1). By engaging in prohibited conduct on those premises, the defendant violated 18 U.S.C. § 1752.

Harkrider nonetheless urges the Court to import an extra-textual requirement that the Secret Service be required to designate the restricted area. That is so, Harkrider claims, because it is the Secret Service who protects the President and others, so it is the Secret Service who must make the designation of a restricted area.

That theory, in addition to finding no support in the text, fails for another obvious reason: Section 1752 is directed not at the Secret Service, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668–69 (2006). "Indeed, the only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting." *Griffin*, 549 F. Supp. 3d at 54-55; *see also Mostofsky*, 2021 WL 6049891 at *13 ("The text plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area."). "If Congress intended a statute designed to safeguard the President and other Secret Service protectees to hinge on who outlined the safety perimeter around the

principal, surely it would have said so." *Griffin,* 549 F. Supp. 3d at 57.  Harkrider's reading would have the Court create a "potentially massive procedural loophole" from the statute's "silence." *McHugh,* 21-cr-453, ECF No. 51, at 40. The Court should not do so.

The statute's history also undercuts the defendant's argument.  *See Griffin,* 549 F. Supp. 3d  at 55-56 (explaining how Congress has consistently "*broadened* the scope of the statute and the potential for liability").  While the earlier version of Section 1752 also did not say who must restrict a building or grounds, it did incorporate regulations promulgated by the Department of the Treasury (which at the time housed the Secret Service) governing restricted areas.  *Id*.  Harkrider erroneously conflates the Treasury's Department's authority to promulgate certain regulations with a requirement that the Secret Service cordon off areas.  Even so, Congress subsequently struck subsection (d) and did not replace it with language limiting the law enforcement agencies allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006).  Eliminating reference to the Treasury Department (without replacing it with the Department of Homeland Security, which currently houses the Secret Service) indicates that the statute no longer depends (if it ever did) on whether the Secret Service has defined an area as "restricted."  Moreover, Harkrider's reading of the statute, which would require the Secret Service to "cordon off" a private residence, "no matter how secure the location or how imposing the preexisting walls," leads to "pressing absurdities."  *Griffin*, 549 F. Supp. 3d at 57.

### B.      18 U.S.C. § 1752 Is Not Unconstitutionally Vague.

The defendant argues that, if the Court adopts the government's interpretation of Section 1752, then Section 1752 is unconstitutionally vague as applied to him, and that both the rule of lenity and novel construction principle require dismissal of Counts Six and Eight.  The defendant is wrong, and his argument borders on the frivolous.  *See United States v. Caputo*, 201 F. Supp.

3d 65, 68 (D.D.C. 2016) (argument that Section 1752(a)(1) is void for vagueness "border[s] on the frivolous" because "the unlawfulness of entering the White House grounds without permission is unambiguous to the average citizen").

"§ 1752 is clear, gives fair notice of the conduct it punishes, and does not invite arbitrary enforcement." *United States v. Bozell*, No. 21-CR-216 (JDB), 2022 WL 474144, at *9 (D.D.C. Feb. 16, 2022) (cleaned up). Likewise, prosecuting Harkrider for entering the U.S. Capitol Building through a broken window after trying to force his way through a door before being turned back by police in riot gear, does not unexpectedly broaden the statute. *Id.*

### C. The Vice President can "temporarily visit" the U.S. Capitol

Contrary to Section 1752's plain terms, purpose, and structure, Harkrider argues that Vice President Pence could not have "temporarily visited" the U.S. Capitol on January 6, 2021, because he had an office there on that day. He is wrong. In *United States v. Griffin,* 21-cr-92 (D.D.C. Mar. 22, 2022), Judge McFadden denied a motion for judgment of acquittal where a defendant claimed that the Vice President was not temporarily visiting the Capitol on January 6, 2021. And five other judges in this district have now concluded that the Vice President was temporarily visiting the Capitol that day. *See Puma*, 2022 WL 823079, at *16-*19 (Friedman, J.); *Andries*, 2022 WL 768684, at *16-*17 (Contreras, J.); *McHugh*, 2022 WL 296304, at *20-*22 (Bates, J.); *Bingert*, 2022 WL 1659163, at *15 (Lamberth, J.); *United States v. Williams*, 21-cr-168, 2022 WL 2237301, *19-20 (Jackson, J.) (D.D.C. June 22, 2022).

The "ordinary meaning" of "temporarily visit" unambiguously includes a trip to one's office. *Andries*, 2022 WL 768684, at *16 (it is "quite natural to say that a person 'temporarily visits' a place where she has an office."). The term "temporary" means "[l]asting for a time only; existing or continuing for a limited time; transitory." *Temporary*, Black's Law Dictionary (11th ed. 2019). The verb "visit" means, *inter alia*, "to go to see or stay at (a place) for a

particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee." *See* https://www.merriam-webster.com/dictionary/visit.  Putting these definitions together, "someone is 'temporarily visiting' a location if they have gone there for a particular purpose, be it 'business, pleasure, or sight-seeing,' and for a limited time, which could be 'brief' or 'extended' while nonetheless remaining 'temporary.'" *McHugh*, 2022 WL 296304, at *20. People commonly go to their offices for one particular purpose (business), and for a limited time, often returning home at the end of the day.  They may return the following day, but there is no reason why one cannot repeatedly "temporarily visit" the same location.  One can "temporarily visit" a place where one has an office.

Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber.  While not specifically alleged in the indictment, two other Secret Service protectees (members of the Vice President's immediate family), also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings.  Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification.  Given the presence of the Vice President (and his family members), the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

Harkrider emphasizes Section 1752's use of the term "temporarily" and cites cases where either the President or Vice President were "traveling *outside* of the District of Columbia 'visiting' that area for a 'temporary' purpose."  (Mot. at 28-29.)  Section 1752, however, does not impose a requirement that the location being temporarily visited be outside of the District of Columbia. Second, the visit to the U.S. Capitol *was* temporary: Vice President Pence (and his

**Government's Opposition to
Defendant's Motions to Dismiss—Page 10**

family) had traveled to the U.S. Capitol to oversee and attend the Joint Session of Congress, a proceeding of limited duration. At the close of the proceeding, they left, confirming the "temporary" nature of their visit. *See McHugh*, 2022 WL 296304, at *20-21 (citing various dictionary definitions of "temporary" as "for a limited time" and finding that the Vice President can "temporarily visit" the U.S. Capitol).

Harkrider offers two further observations, both irrelevant. First, he notes that Vice President Pence "lived and worked" in the District of Columbia. (Mot. at 28.) But Section 1752(c)(1)(B) defines the restricted area by reference to "buildings or grounds," not municipal borders. That Vice President Pence lived and worked in Washington, D.C. does not detract from the fact that he "temporarily visit[ed]" the U.S. Capitol on January 6. "Simply being in the visitor's hometown does not mean a place cannot be 'visited.'" *McHugh*, 2022 WL 296304, at *22.

Second, Harkrider stresses that Vice President Pence had a permanent U.S. Capitol office. (Mot. at 28.). Section 1752(c)(1)(B), however, defines the restricted area by reference to the location of the protectee, not his office. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]." Moreover, the U.S. Capitol is not the Vice President's regular workplace; even if "there is some carveout in § 1752 for where a protectee normally lives or works, it does not apply to Vice President Pence's trip to the Capitol on January 6, 2021." *McHugh*, 2022 WL 296304, at *22.

Such a "carveout," taken to its logical end, would undermine the government's ability to protect the President and Vice President by deterring and punishing individuals who seek

**Government's Opposition to
Defendant's Motions to Dismiss—Page 11**

unauthorized access to the President's or Vice President's location. It would restrict Section 1752(c)(1)(B)'s application to only locations outside the District of Columbia—on the view that any visit by the President or Vice President to a location within municipal limits cannot be "temporary" because they reside in the District of Columbia. Second, under Harkrider's construction, Section 1752(c)(1)(B) would not apply where the President or Vice President temporarily stayed at their permanent residences in Delaware or California—on the view that such a trip would not qualify as "visiting." Nor would it apply to Camp David, where there is a presidential cabin and office. In another strange scenario, a restricted area could exist when, as here, the Vice President's family visits the Capitol (because they are Secret Service protectees without an office there), but not when the Vice President does, affording a higher level of protection for the family of the elected official than to the elected official himself (or herself). No support exists for Harkrider's effort to insert such large and irrational exceptions into the statute's sweep. *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical").

Harkrider's position also defies Section 1752's clear purpose. In drafting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. 1752(c)(1)(A); and also any other "building or grounds" where they (or other protectees) happen

**Government's Opposition to**
**Defendant's Motions to Dismiss—Page 12**

to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B). Reading Sections 1752(c)(1)(A) and 1752(c)(1)(B) together protects the President and Vice President in their official homes and wherever else they go. Interpreting the statute as Harkrider suggests would create a gap in Section 1752's coverage by removing areas, such as the U.S. Capitol, from protection. It could expose the leaders of the Executive Branch even as they perform their official duties. That gap is both illogical and contrary to the statutory history of Section 1752, where, "at every turn," Congress has "*broadened* the scope of the statute and the potential for liability." *Griffin,* 2021 WL 2778557, at *5 (D.D.C. July 2, 2021).

All the relevant metrics—plain language, statutory structure, and congressional purpose—foreclose the defendant's crabbed reading of Section 1752(c)(1)(B). This Court should reject it. Harkrider's cited cases, involving either an arrest or conviction under Section 1752, do not discuss the "temporarily visiting" language. (Mot. at 29–30 (citing *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005); *United States v. Junot,* 1990 WL 66533 (9th Cir. May 18, 1990) (unpublished); *Blair v. City of Evansville, Ind.,* 361 F. Supp.2d 846 (S.D. Ind. 2005)).

## CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss Counts Six and Eight of the Superseding Indictment should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

 */s/ Douglas B. Brasher*
DOUGLAS B. BRASHER
Assistant United States Attorney
Texas State Bar No. 24077601
Federal Major Crimes – Detailee
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone:  214-659-8604
douglas.brasher@usdoj.gov

SARAH W. ROCHA
Trial Attorney
D.C. Bar No. 977497
219 S. Dearborn Street, Fifth Floor
Chicago, Illinois 60604
Telephone:  202-330-1735
sarah.wilsonrocha@usdoj.gov