# Exhibit A

## DECLARATION OF THOMAS A. DIBIASE

I, Thomas A. DiBiase, have personal knowledge of the following facts and will testify to them, if called to do so:

1.  I am the General Counsel for the United States Capitol Police[1] (hereinafter, "USCP"), and have served in that position since August 2020. As part of my duties with USCP, I am responsible for reviewing and approving the release of Closed Circuit Video (hereinafter, "CCV") from the United States Capitol Buildings and Grounds.

2.  I hereby incorporate by reference previously declarations that I have attested to and have been filed in *United States v. Timothy Hale-Cusanelli*, 21-cr-37 (TNM), ECF No. 67, Attachment 1, *United States v. William Pope*, 21-cr-128 (RC), ECF No. 71, Attachment 1, and ECF No. 88, Attachment 1, and *Advance Publication Inc. v. Executive Office for U.S. Attorneys et al*., 23-cv-1014 (APM), ECF No. 13, Attachment 4. They are attached as Exhibits 1 – 4.

3.  Consistent with prior declarations, the USCP has previously provided the U.S. Department of Justice all the USCP footage from the Capitol Complex, with the exception of the Library of Congress, for the hours of 12:00 p.m. to 8:00 p.m. on January 6, 2021. This footage totals more than 14,000 hours. In connection with a separate investigation, USCP provided the Department of Justice a few select clips from January 5, 2021.

4.  Of the footage that was provided to the Department of Justice, the Capitol Police Board designated 17 hours of that footage as "security information" pursuant to 2 U.S.C. § 1979, as it showed evacuation routes that members of Congress, congressional staff, or official

---

[1] The USCP is a distinct and separate entity from both the United States House of Representatives and the United States Senate, any committees or subcommittees thereof, and any member or leader of either House of Congress.

visitors used on January 6, 2021. Subsequently to this initial designation, USCP designated that footage showing sensitive infrastructure or footage showing sensitive office areas such as Sensitive Compartmented Information Facilities should be excluded from production. At this time, the aggregate of the CCV footage is treated as "security information" under 2 U.S.C. § 1979 because of the risk that bad actors, including those who previously sought to subvert the democratic process on January 6, 2021, could use the aggregation of such footage to learn the security vulnerabilities and weakness of the Capitol Building or Grounds. See *Pope*, 21-cr-128 (RC), ECF No. 88, Attachment 1, at ¶¶ 6-7; *see also Advance Publications*, 23-cv-1014 (APM), ECF No. 13, Attachment 4, ¶ 14.

5.   In January and February 2021, the USCP provided House Impeachment Managers with approximately 15 selected clips.

6.   Distinct from what was provided to the U.S. Department of Justice, USCP separately provided this same eight hours of footage, which included all exterior cameras and interior cameras from the Capitol and the Capitol Visitor's Center, to the House Select Committee to Investigate the January 6 Attack (hereinafter, "the Select Committee. However, upon a further request from the Select Committee, USCP provided the Select Committee with footage from all Capitol, Cannon, Longworth, and Rayburn interior cameras for January 3, 4, and 5, 2021, from 7:00 a.m. to 10:00 p.m. The Select Committee also received all footage from 6:00 a.m. to 12:00 p.m. on January 6, 2021, from all Capitol, Cannon, Longworth, and Rayburn cameras, as well as all footage from interior cameras in the Capitol Visitors Center from 7:00 a.m. to 10:00 p.m. *See Pope*, 21-cr-128, ECF No. 88, Attachment 1, n. 1. This additional footage is 28,386 hours in length. In February and March 2023, pursuant

to a request from the Committee on House Administration[2] (hereinafter, "CHA") in their oversight capacity, USCP provided them with access to three Genetec terminals and four hard drives containing the totality of the materials that we provided to the Select Committee as described above in this paragraph.

7. The USCP does not know the extent to which any congressperson, committee, subcommittee, or other congressional entity has provided access to the CCV footage to any member of the public, journalist, attorney, person charged in connection with riot at the United States Capitol on January 6, 2021, or anyone else.[3] We further do not know the extent to which any person has accessed or reviewed footage through the CHA's new access policy. In other words, while the USCP appreciates the scope of the materials provided, the USCP has no insight into the CHA's process of what has been, will or might be provided to a future or current third party.

8. While the USCP does not know the basis or reason for the request by the Select Committee or the CHA for the CCV previously provided to Congress, the materials provided to Congress include many cameras that capture buildings and areas that did not capture rioters or the riot on January 6, 2021. This also includes footage outside of the time frame during which the riot occurred. In other words, based on USCP's assessment, there is no reason to believe that there is any evidentiary value relevant to a January 6 riot prosecution

---

[2] The CHA is responsible for oversight of the USCP. Consistent with our rules and regulations, we can and will provide footage to the CHA—or any Congressional body—when requested, in light of their oversight responsibilities.

[3] USCP is aware of what material has been provided to persons charged in connection with January 6, 2021, through the discovery portals that the Department of Justice established to assist with discovery production in these cases, such as Evidence.com.

captured on cameras outside of the hours of the riot, and in buildings or areas that were unaffected by the riot.

9.  In late August 2023, the CHA announced that, beginning in September 2023, it would allow access to terminals by representatives of U.S. news outlets, qualifying non-profit organizations, defendants charged in connection with the events charged of January 6 and their counsel, and individuals who were physically harmed on January 6 at the Capitol and their counsel. This access is subject to security restrictions, such as requiring viewers to leave their phones in a separate location while viewing the footage. Access will also be both time limited and controlled by CHA staffers. The U.S. Capitol Police is not a party to this process and does not have authority or access to control what is provided by the CHA to third parties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Thomas DiBiase_

Thomas A. DiBiase
General Counsel
United States Capitol Police

4

# Exhibit 1

## DECLARATION OF THOMAS A. DIBIASE

I, Thomas A. DiBiase, have personal knowledge of the following facts and will testify to them, if called to do so:

1.  I have been the General Counsel for the United States Capitol Police ("USCP" or "Department") since August of 2020. From October 2019 to August of 2020, I served as the Acting General Counsel, and from April of 2010 to October of 2019, I served as the Deputy General Counsel. Between 1991 and 2010, I also worked as a litigator at a New York-based law firm and a District of Columbia law firm, and, between those positions, served for 12 years as an Assistant United States Attorney at the United States Attorney's Office for the District of Columbia.

2.  As part of my duties at the USCP, I have authorized the release of camera footage from the Department's extensive system of cameras on U.S. Capitol Grounds ("Grounds"). These cameras, part of a sophisticated closed circuit video (CCV) system, are resident both inside and outside the buildings including the U.S. Capitol itself and the other Congressional office buildings on the Grounds. This CCV system provides the backbone of the security for the U.S. Capitol Grounds. The CCV system is monitored by sworn police officers 24-7 in our Command Center and is relied upon to provide real time information regarding any incident occurring on the Grounds. The first step whenever an incident occurs is for the Command Center to pull up the CCV cameras closest to the incident. This enables the Department to have a real-time view of the incident and provides an additional layer of safety for our officers when responding to any incident.

3.  Access to this CCV system is strictly limited. Because the system is a closed circuit, access to the cameras only occurs from dedicated workstations and monitors located in a handful of

Case 1:21-cr-00037-TNM   Document 67-1   Filed 03/29/22   Page 2 of 6

locations on the Grounds. Our system is not "in the cloud" and may not be monitored or

hacked by anyone not connected via a dedicated workstation and monitor.

4. The disclosure of any footage from these cameras is strictly limited and subject to a policy

that regulates the release of footage. Per Department Directive 1000.002, Retrieval of

Archived Video (see Attachment 1), the release of *any* footage from the Department's CCV

system must be approved by the Assistant Chief of Police for Operations, the Department's

second highest sworn officer.  The Directive notes that, "[t]he Capitol Police Board [which

oversees the USCP] directed that cameras would only be used for matters related to national

security and legitimate law enforcement purposes (e.g., serious crimes). The [Assistant Chief

of Police for Operations] is the sole authority for the approval of any and all requests for

archived video footage…." The Directive goes on to note that, "[v]ideo footage received

through an approved request shall not be delivered, copied, or transmitted to anyone other

than necessary parties (e.g., court, General Counsel) without approval from the [Assistant

Chief of Police for Operations]."

5. There is a specific Department form, a CP-411 (Attachment 2), which must be completed and

signed by several officials including the Assistant Chief of Police for Operations before any

camera footage can be released.

6. As part of my duties as General Counsel and my prior duties as the Deputy General Counsel,

I have often been consulted regarding the release of camera footage. The Office of the

General Counsel has consistently taken a restrictive view of releasing camera footage in

cases other than serious crimes or national security. We regularly deny footage to civil

plaintiffs who may have been involved in accidents on the Grounds unless they involved

serious injuries or death. (Even in those cases, I have only approved an attorney or

investigator coming to the USCP and viewing the footage in our offices with a USCP employee present.) We are also often asked for camera footage related to non-USCP administrative investigations, and we generally do not provide that footage. We will, however, allow investigators from agencies with which we regularly work, such as the Architect of the Capitol, to view such footage in the presence of a USCP employee. Even a member of Congress looking to view footage of our officers' interactions with his staff had to come to our office and view the footage with our employees present.

7. In 2014, the USCP, with the assistance of the District of Columbia's Office of the Attorney General (OAG), litigated the release of USCP camera footage in Driving under the Influence ("DUI") cases. The Department successfully argued that any footage of a DUI defendant, including arrest footage and footage of the defendant being processed in our prisoner processing area, should be subject to a protective order. Since 2015 the Department provides any relevant DUI arrest footage to the OAG who in turn provides it to the defendant subject to a protective order. (A sample protective order in a DUI case along with a sample motion is attached as Attachments 3 and 4.) As noted in this protective order, an attorney for a DUI defendant "may only show the street video to the defendant and any investigators working on this case and shall not share street video nor show it to any other person not directly affiliated with this case…." (Attachment 3 at 1.) The order further notes that the attorney for a DUI defendant may not "reproduce, share, disseminate, nor discuss with any person not named in this Order, the depictions shown in the video; and … must return the street video to the [OAG] after the later of a plea, trial or sentencing in the above-entitled case." *Id.*

8. As noted in the motion for these protective orders, the OAG argues that:

> Here, the release of Capitol security street videos could compromise USCP's ability to protect the Capitol. The USCP's primary mission is to police the United

Case 1:21-cr-00037-TNM   Document 67-1   Filed 03/29/22   Page 4 of 6

States Capitol Buildings and Grounds,  and it has the power to enforce the laws of the District of Columbia pursuant to 2 U.S.C. §1961.  As part of its policing responsibilities, the USCP maintains and controls a series of video surveillance cameras throughout the Capitol Grounds.  The purpose of the cameras is to assist in the maintenance of national security by detecting threats to U.S. Congressmen, their staff, and constituents, deterring and preventing terrorism, and providing for the safety and security of the Capitol Buildings and Grounds.  The cameras are generally not used to collect evidence in criminal matters.

(Attachment 4 at 3.)

9.  It is my understanding that these protective orders are regularly signed by District of

Columbia Superior Court judges, and the USCP has provided hundreds of videos pursuant to

these orders since 2015.

10. Pursuant to 2 U.S.C. § 1979, USCP information designated as "security information" may

only be released with the approval of the Capitol Police Board. Security information is

defined as information that:

> (1) is sensitive with respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds; and

> (2) is obtained by, on behalf of, or concerning the Capitol Police Board, the Capitol Police, or any incident command relating to emergency response.

11. I understand that, in any trial related to the events of January 6, 2021, the U.S. Attorney's

Office will use as evidence footage obtained from the CCV system. To present such

evidence, the government necessarily must present a general description of where the camera

is located. For example, a camera near the Columbus Doors, facing the Capitol Building's

rotunda, could be described as "facing the rotunda." But allowing the U.S. Attorney's Office

to present—or the defense to ask questions about—exact physical locations of each camera

would severely compromise USCP's ability to police and protect the Capitol Building and

grounds.

12. I am also aware that in order to find relevant footage from the CCV system, one would need to use two maps of the CCV system. One map shows the location of all of the exterior cameras on Capitol Grounds ("exterior map") and a second map that shows the location of the interior cameras inside the U.S. Capitol ("interior map").

13. These maps are "security sensitive" and may only be released to a third party with the approval of the Capitol Police Board pursuant to 2 U.S.C. §1979.

14. It is my understanding that these maps were provided to the FBI shortly after January 6, 2021 in order for the FBI to more efficiently conduct its investigation. In turn, the FBI provided these maps to individual Assistant United States Attorneys working on the prosecution of January 6th defendants.

15. As part of discovery, both maps were provided to defense counsel with the "Highly Sensitive" designation. Under the standard protective orders filed in the January 6th cases, documents or information designated Highly Sensitive are subject to special protections including that they cannot be shared with defendants unsupervised, they cannot be reproduced and they must be maintained in the custody and control of the legal defense team and authorized persons. In addition, Highly Sensitive information may only be used solely in connection with the defense of January 6th cases, may not be disclosed to any persons other than the defendant, the legal defense team, or the person to whom the Highly Sensitive information solely and directly pertains or his/her counsel, without agreement of the United States or prior authorization from the Court. Finally, absent prior agreement by the parties or permission from the Court, no party shall disclose materials designated as Highly Sensitive in any public filing with the Court and such materials shall be submitted under seal, and no

Case 1:21-cr-00037-TNM   Document 67-1   Filed 03/29/22   Page 6 of 6

party shall disclose materials designated Highly Sensitive in open court without agreement by the parties that such materials may be disclosed in open court or prior consideration by the Court.

*     *     *     *     *

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 28th day of March 2022.

Thomas A. DiBiase

Exhibit 2

## DECLARATION OF THOMAS A. DIBIASE

I, Thomas A. DiBiase, have personal knowledge of the following facts and will testify to them, if called to do so:

1.  I have been the General Counsel for the United States Capitol Police ("USCP" or "Department") since August of 2020.  From October 2019 to August of 2020, I served as the Acting General Counsel, and from April of 2010 to October of 2019, I served as the Deputy General Counsel.  Between 1991 and 2010, I worked as a litigator at two District of Columbia law firms and served for 12 years as an Assistant United States Attorney at the United States Attorney's Office for the District of Columbia.

2.  As part of my duties at the USCP, I have authorized the release of camera footage from the Department's extensive system of cameras on U.S. Capitol Grounds ("Grounds"). These cameras, part of a sophisticated closed circuit video (CCV) system, are resident both inside and outside the buildings including the U.S. Capitol itself and the other Congressional office buildings on the Grounds. This CCV system provides the backbone of the security for the U.S. Capitol Grounds. The CCV system is monitored by sworn police officers 24-7 in our Command Center and is relied upon to provide real time information regarding any incident occurring on the Grounds. The first step whenever an incident occurs is for the Command Center to pull up the CCV cameras closest to the incident. This enables the Department to have a real-time view of the incident and provides an additional layer of safety for our officers when responding to any incident.

3.  Access to this CCV system is strictly limited. Because the system is a closed circuit, access to the cameras only occurs from dedicated workstations and monitors located in a handful of locations on the Grounds. Our system is not "in the cloud" and may not be monitored or

hacked by anyone not connected via a dedicated workstation and monitor.

4.  The disclosure of any footage from these cameras is strictly limited and subject to a policy that regulates the release of footage. Per Department Directive 1000.002, Retrieval of Archived Video (see Attachment 1), the release of *any* footage from the Department's CCV system must be approved by the Assistant Chief of Police for Operations, the Department's second highest sworn officer.  The Directive notes that, "[t]he Capitol Police Board [which oversees the USCP] directed that cameras would only be used for matters related to national security and legitimate law enforcement purposes (e.g., serious crimes). The [Assistant Chief of Police for Operations] is the sole authority for the approval of any and all requests for archived video footage…." The Directive goes on to note that, "[v]ideo footage received through an approved request shall not be delivered, copied, or transmitted to anyone other than necessary parties (e.g., court, General Counsel) without approval from the [Assistant Chief of Police for Operations]."

5.  There is a specific Department form, a CP-411 (Attachment 2), which must be completed and signed by several officials including the Assistant Chief of Police for Operations before any camera footage can be released.

6.  As part of my duties as General Counsel and my prior duties as the Deputy General Counsel, I have often been consulted regarding the release of camera footage. The Office of the General Counsel has consistently taken a restrictive view of releasing camera footage in cases other than serious crimes or national security. We regularly deny footage to civil plaintiffs who may have been involved in accidents on the Grounds unless they involved serious injuries or death. (Even in those cases, I have only approved an attorney or investigator coming to the USCP and viewing the footage in our offices with a USCP

employee present.) We are also often asked for camera footage related to non-USCP administrative investigations, and we generally do not provide that footage. We will, however, allow investigators from agencies with which we regularly work, such as the Architect of the Capitol, to view such footage in the presence of a USCP employee. Even a member of Congress looking to view footage of our officers' interactions with his staff had to come to our office and view the footage with our employees present.

7. In 2014, the USCP, with the assistance of the District of Columbia's Office of the Attorney General (OAG), litigated the release of USCP camera footage in Driving under the Influence ("DUI") cases. The Department successfully argued that any footage of a DUI defendant, including arrest footage and footage of the defendant being processed in our prisoner processing area, should be subject to a protective order. Since 2015 the Department provides any relevant DUI arrest footage to the OAG who in turn provides it to the defendant subject to a protective order. (A sample protective order in a DUI case along with a sample motion is attached as Attachments 3 and 4.) As noted in this protective order, an attorney for a DUI defendant "may only show the street video to the defendant and any investigators working on this case and shall not share street video nor show it to any other person not directly affiliated with this case…." (Attachment 3 at 1.) The order further notes that the attorney for a DUI defendant may not "reproduce, share, disseminate, nor discuss with any person not named in this Order, the depictions shown in the video; and … must return the street video to the [OAG] after the later of a plea, trial or sentencing in the above-entitled case." *Id.*

8. As noted in the motion for these protective orders, the OAG argues that:

> Here, the release of Capitol security street videos could compromise USCP's ability to protect the Capitol. The USCP's primary mission is to police the United States Capitol Buildings and Grounds, and it has the power to enforce the laws of the District of Columbia pursuant to 2 U.S.C. §1961. As part of its policing

3

responsibilities, the USCP maintains and controls a series of video surveillance cameras throughout the Capitol Grounds. The purpose of the cameras is to assist in the maintenance of national security by detecting threats to U.S. Congressmen, their staff, and constituents, deterring and preventing terrorism, and providing for the safety and security of the Capitol Buildings and Grounds. The cameras are generally not used to collect evidence in criminal matters.

(Attachment 4 at 3.)

9. It is my understanding that these protective orders are regularly signed by District of

   Columbia Superior Court judges, and the USCP has provided hundreds of videos pursuant to

   these orders since 2015.

10. I am familiar with the production of camera footage related to the attempted insurrection at

   the U.S. Capitol on January 6, 2021. Soon after the events of January 6, the Department

   knew that its footage of the riots would be essential to both the criminal prosecutions arising

   out of the events as well as to assist Congress and possibly other entities to understand how

   such a vast breach of security could occur. The Department immediately preserved all the

   footage from that date, starting at noon and continuing until 8:00 p.m.[1] This footage[2] was

   then provided to two distinct groups: Congressional entities and non-Congressional entities.

11. The two main Congressional entities that requested the eight hours of footage were the

   Senate Rules Committee ("Rules") and the Committee on House Administration ("CHA").

   Rules and CHA are the primary oversight bodies of the USCP, and the Department provided

   the total footage from the eight-hour period to them.[3] In addition, in response to a request

   from the House of Representatives General Counsel, the Department provided numerous

---

[1] Without affirmative preservation, all Department footage is automatically purged within 30 days.

[2] The total of footage provided is over 14,000 hours.

[3] In response to later requests from both committees, the Department provided footage from the entire 24-hour period for January 6, 2021.

4

clips from our footage to the House Impeachment Managers who were prosecuting the case against former President Donald J. Trump.

12. The Department also provided the complete footage from the eight-hour period to two non-Congressional entities, the Federal Bureau of Investigation ("FBI") and the D.C. Metropolitan Police Department ("MPD"), to assist in the investigation and prosecution of the cases arising out of the events of January 6, 2021.[4] It is our understanding that it is this footage for which the United States now seeks a protective order. When the Department provided its CCV camera footage to the FBI and MPD, it did so subject to several restrictions. The footage was: (a) to remain in the legal control of the USCP; (b) not to be subject to the Freedom of Information Act; and (c) to be returned to the USCP at the conclusion of any investigation. These restrictions did not apply to any footage used as "evidence or discovery as part of any prosecution of any criminal offense." (Attachment 5 at 1, and Attachment 6 at 1.)

13. The Department has not provided this footage to any other entity other than those listed above. Any public release of this footage, to the extent there has been, is not because of any authorized release by the USCP. (Note that the use of footage by the House Impeachment managers during the trial was permitted since, as a part of the Legislative Branch, the House Impeachment managers have a right to use footage from our cameras for impeachment processes similar to what would be show in a court of law.)  It is important to note the wealth of publicly available footage that comes from non-USCP sources such as social media posts, footage recovered from indicted or arrested insurrectionists and footage from body worn cameras from other police departments that responded on January 6, 2021. Notably,

---

[4] The Department has provided a very limited number of video clips to the U.S. Attorney's Office for the District of Columbia for an investigation related to potential January 5th incidents.

published footage that contains sound is not from USCP, as our CCV system does not record
sound. Further, USCP officers do not wear body cameras, and thus any published body-worn
camera footage is from other police departments.

14. The Department has significant concerns with the release of any of its footage to defendants
in the Capitol attack cases unless there are safeguards in place to prevent its copying and
dissemination. The Department is aware of efforts made before January 6, 2021, by such
defendants and others, to gather information regarding the interior of the U.S. Capitol,
including references to the tunnels below the Grounds and maps of the building's layout,
which information is generally not publically available.[5] Our concern is that providing
unfettered access to hours of extremely sensitive information to defendants who have already
shown a desire to interfere with the democratic process will result in the layout,
vulnerabilities and security weaknesses of the U.S. Capitol being collected, exposed and
passed on to those who might wish to attack the Capitol again.

15. Pursuant to 2 U.S.C. § 1979, USCP information designated as "security information" may
only be released with the approval of the Capitol Police Board. Security information is
defined as information that:

> (1) is sensitive with respect to the policing, protection, physical security,
> intelligence, counterterrorism actions, or emergency preparedness and
> response relating to Congress, any statutory protectee of the Capitol Police,
> and the Capitol buildings and grounds; and

> (2) is obtained by, on behalf of, or concerning the Capitol Police Board, the
> Capitol Police, or any incident command relating to emergency response.

16. At this juncture, the Department in consultation with the Capitol Police Board, has
designated only a small subset, consisting of less than 17 hours of footage, as "security

---

[5] Indeed, the Architect of the Capitol treats its "blueprints" of the Capitol as "security information" under 2 U.S.C.
§1979, *see below.*

6

information," as that footage relates to evacuation of Members from their respective chambers on January 6. In addition, the Department is concerned that defendants may be provided access to large sections of footage or even all of the footage, and would deem such information, in the aggregate, to constitute "security information" under 2 U.S.C. § 1979. The ability of the defendants to copy or disseminate such footage would provide the defendants or others to whom it is released with a clear picture of the interior of the Capitol, including entry and exit points, office locations, and the relation of the crucial chambers and offices (such as the Speaker's Office or Majority Leader's Office) to other areas of the Capitol.[6]

\*     \*     \*     \*     \*

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 17th day of March 2021.

Thomas A. DiBiase

---

[6] The aggregating of information as creating a national security risk is known as the Mosaic Theory. See, https://en.wikipedia.org/wiki/Mosaic_theory_of_intelligence_gathering, last accessed March 2, 2021.



UNITED STATES CAPITOL POLICE · 1828

## Directive

# Retrieval of Archived Video

| | | | |
|---|---|---|---|
| Directive #: | 1000.002 | Effective Date: | 02/06/2015 |
| Initiating Unit: | Security Services Bureau | Review Date: | 1st February |
| CALEA: | N/A | | |

# Contents

Authority and Coverage ................................................. 1
Definition(s) .................................................................. 1
General Policy ............................................................... 1
   *Requesting Archived Video Footage* ........................ 2
   *Accessing Archived Video Footage* ......................... 2
Responsibilities/Procedures ......................................... 2
   *Security Services Bureau* .......................................... 2
Additional Information .................................................. 2
Cancellation ................................................................. 2
Appendices ................................................................... 2

# Authority and Coverage

The Chief of Police is the chief executive officer of the United States Capitol Police (USCP) and is responsible for the day-to-day operation and administration of the USCP.

This policy may be revised at the discretion of the Chief of Police, consistent with applicable law, rule, and regulation.

# Definition(s)

***CP-411 Request for Copy/Review of Video Recordings.*** A form created by the USCP to document and control the request and dissemination or archived video footage.

# General Policy

The Department must maintain appropriate internal controls on the use and duplication of archived video footage to ensure the chain of custody for all copied video footage. In support of national security and legitimate law enforcement purposes, the Department adjudicates any and all requests for recorded security camera video footage to include the dissemination of footage through established channels. Prescribed law enforcement purposes for the CP-411 include: required for court, subpoena, Office of Professional Responsibility (OPR), or training, but may include any authorized investigation. This policy will identify the parties that are able to request video (USCP sworn officials or their civilian equivalent) and the role of the Security Services Bureau (SSB) and Chief of Operations (COO) in assuring that any request for disseminating archived video follows an appropriate business purpose.

The USCP was tasked by its statutory oversight committees to expand the video retrieval capabilities of the Capitol Complex. The design, installation, and maintenance of this system are delegated to the SSB. The Capitol Police Board directed that cameras would only be used for matters related to national security and legitimate law enforcement purposes (e.g., serious crimes). The COO is the sole authority for the approval of any and all requests for archived video footage, with the exception of the Office of the Inspector General (OIG) which has the ability to duplicate archived video footage for its own investigations.

In addition, this policy identifies the expectations for accessing and using video footage. This policy does not apply to the use of video as an operational aid (e.g., supporting the USCP Command Center Operations during an incident). Instead, this policy is intended to safeguard against the transfer of archival video for non-operational activities (e.g., as an aid to officers in filing reports). Video footage received through an approved request should not be delivered, copied, or transmitted to anyone other than necessary parties (e.g., court, General Counsel) without approval from the COO.

The USCP, through SSB, maintains a sophisticated closed circuit television system (CCTV) system that includes cameras strategically placed throughout the Capitol Complex to provide situational awareness to

USCP personnel, supporting national security, and legitimate law enforcement purposes.

### Requesting Archived Video Footage

The CP-411 must be routed through the chain of command and ultimately approved by the COO. A requesting official must also have signed the signature sheet acknowledging they have received and reviewed this policy and relevant standard operating procedures. Requests for archived video footage via the CP-411 must be made at least at the level of Sergeant (or their civilian equivalent) and should be reviewed and approved by the relevant Deputy Chief (or civilian equivalent) before it is sent to the Office of the COO for official approval. The COO will forward the request to the SSB upon approval.

### Accessing Archived Video Footage

Workstations, as well as the requisite access privileges for access to archived video footage from the Video Management System (VMS), are issued by the SSB to officials (mostly at the rank of Captain and above) in the Operational Bureaus. In addition, the SSB provides access privileges to any individual in organizations that frequently require video footage for operational purposes, including the USCP Command Center, Communications, the Criminal Investigations Section, OGC, OPR, OIG, and SSB. Archived video can be used for operational activities, including supporting Command Center Operations during an incident or supporting USCP investigation. USCP personnel should not use or reference archived video in their reports which are used in court proceedings unless they have written approval from the COO.

Retrieving, using, or duplicating archived video footage in cases not related to national security or significant law enforcement operations (e.g., traffic stops, accident reporting), could expose the location of our CCTV cameras or identify our surveillance tactics. This presents a threat to national security, as making this information public could be utilized by a potential adversary.

Video footage should be used only in the prescribed manner documented in the CP-411 within the strict controls outlined in this policy. If the reason for a request or usage of the video footage changes, another CP-411 form should be completed and provided through the proper chain of command to amend the initial CP-411.

# Responsibilities/Procedures

## Security Services Bureau

SSB is responsible for the following:

1. Process an approved request and schedule a time for the requesting official to pick-up the video footage. Only the requesting official or an alternate designated in writing by the requesting official may pick up the video.

2. Assign a request tracking number to ensure accountability and proper internal controls and record all video requests and custody transfers with the assigned tracking number in an approved location. Any changes to the original request will require a new CP-411.

3. Stores video footage for 30 days per system capabilities. Officials should be aware that system maintenance or malfunctions may make video unavailable prior to the 30 days. For this reason, video retrieval requests should be made promptly. SSB will maintain an archive of any approved video footage requests.

# Additional Information

Retrieval, use, or duplication of archived video footage would not be in compliance with the intent of Congress when it established the VMS.

# Cancellation

None.

# Appendices

None.

**Kim C. Dine**
**Chief of Police**

**UNITED STATES CAPITOL POLICE**

CP-411
(10/16)

## REQUEST FOR VIDEO RECORDINGS

**(Please Type or Print Legibly)**

| TO BE COMPLETED BY REQUESTING EMPLOYEE |||
|---|---|---|
| **1. TYPE OF RECORDING** | ❏ REVIEW   ❏ CD/DVD   ❏ PHOTO/SNAPSHOT ||
| **2. REASON FOR REQUEST** | ❏ COURT   ❏ SUBPOENA   ❏ TRAINING   ❏ OPR   ❏ OGC/OEC<br><br>❏ OTHER (explain)<br>_____ ||

| **3. REQUEST DATE** | | **4. DATE NEEDED** | |
|---|---|---|---|

| **4. TYPE OF EVENT** | **5. EVENT DATE AND TIME** | **6. LOCATION OF EVENT** | **7. CAMERAS** |
|---|---|---|---|
| | | | |

| **8. VIDEO START DATE** | | **10. VIDEO END DATE** | |
|---|---|---|---|
| **9. VIDEO START TIME** | | **11. VIDEO END TIME** | |

| **12. CFN** | | **13. CCN** | |
|---|---|---|---|

| **14. NAME AND UNIT OF OFFICER(S) INVOLVED** | **15. UNIT** |
|---|---|
| | |

| **16. REQUESTING OFFICIAL** | **17. UNIT** |
|---|---|
| | |

| **18. OFFICE PHONE** | | **19. CELL PHONE** | |
|---|---|---|---|
| **20. DESIGNATED ALTERNATE (PICK-UP)** | | **21. UNIT** | |
| | | | |

| **22. OFFICE PHONE** | | **23. CELL PHONE** | |
|---|---|---|---|

| CHIEF OF OPERATIONS APPROVAL |||
|---|---|---|
| **24. SIGNATURE** | **25. PRINTED NAME** | **26. DATE** |
| | | |

| TO BE COMPLETED BY SYSTEM OPERATIONS SECTION (SOS) ||
|---|---|
| **27. SIGNATURE** | **28. PRINTED NAME** |
| | |
| **29. VIDEO REQUEST TRACKING NUMBER** | **30. DATE COMPLETED** |
| | |

| TO BE COMPLETED BY EMPLOYEE RECEIVING VIDEO |||
|---|---|---|
| **WARNING: UNAUTHORIZED USE, DUPLICATION OR DISSEMINATION OF INFORMATION CONTAINED ON THIS CD/DVD MAY RESULT IN APPROPRIATE ADVERSE ACTION** |||
| **31. EMPLOYEE SIGNATURE** | **32. EMPLOYEE PRINTED NAME** | **33. DATE** |
| | | |

Exhibit 3

## DECLARATION OF THOMAS A. DIBIASE

I, Thomas A. DiBiase, have personal knowledge of the following facts and will testify to them, if called to do so:

1. I have been the General Counsel for the United States Capitol Police ("USCP" or "Department") since August of 2020. From October 2019 to August of 2020, I served as the Acting General Counsel, and from April of 2010 to October of 2019, I served as the Deputy General Counsel. From 1991 to 1995, I also worked as a litigator at a New York-based law firm and then from 2007 to 2010 at a District of Columbia law firm. From 1995 to 2007, I served as an Assistant United States Attorney at the United States Attorney's Office for the District of Columbia.

2. As part of my duties at the USCP, I have authorized the release of camera footage from the Department's extensive system of cameras on U.S. Capitol Grounds (Grounds). These cameras, part of a sophisticated closed circuit video (CCV) system, are resident both inside and outside the buildings including the U.S. Capitol itself and the other Congressional office buildings on the Grounds. This CCV system provides the backbone of the security for the U.S. Capitol Grounds. The CCV system is monitored by sworn police officers 24-7 in our Command Center and is relied upon to provide real time information regarding any incident occurring on the Grounds. The first step whenever an incident occurs is for the Command Center to pull up the CCV cameras closest to the incident. This enables the Department to have a real-time view of the incident and provides an additional layer of safety for our officers when responding to any incident.

3. Access to this CCV system is strictly limited. Because the system is a closed circuit, access to the cameras only occurs from dedicated workstations and monitors located in a handful of

locations on the Grounds. Our system is secured, and may not be monitored or hacked by anyone not connected via a dedicated workstation and monitor.

4. The disclosure of any footage from these cameras is strictly limited and subject to a policy that regulates the release of footage. Per Department Directive 1000.002, Retrieval of Archived Video (see Attachment 1), the release of *any* footage from the Department's CCV system must be approved by the Assistant Chief of Police for Operations, the Department's second highest sworn officer. The Directive notes that, "[t]he Capitol Police Board [which oversees the USCP] directed that cameras would only be used for matters related to national security and legitimate law enforcement purposes (e.g., serious crimes). The [Assistant Chief of Police for Operations] is the sole authority for the approval of any and all requests for archived video footage…." The Directive goes on to note that, "[v]ideo footage received through an approved request shall not be delivered, copied, or transmitted to anyone other than necessary parties (e.g., court, General Counsel) without approval from the [Assistant Chief of Police for Operations]."

5. There is a specific Department form, a CP-411 (Attachment 2), which must be completed and signed by several officials including the Assistant Chief of Police for Operations before any camera footage can be released.

6. As part of my duties as General Counsel and my prior duties as the Deputy General Counsel, I have often been consulted regarding the release of camera footage. The Office of the General Counsel has consistently taken a restrictive view of releasing camera footage in cases other than serious crimes or national security. We regularly deny footage to civil plaintiffs who may have been involved in accidents on the Grounds unless they involved serious injuries or death. (Even in those cases, I have only approved an attorney or

2

investigator coming to the USCP and viewing the footage in our offices with a USCP employee present.) We are also often asked for camera footage related to non-USCP administrative investigations, and we generally do not provide that footage. We will, however, allow investigators from agencies with which we regularly work, such as the Architect of the Capitol, to view such footage in the presence of a USCP employee.

7. The primary, but not exclusive, reason for these restrictions is to protect the physical security of the Capitol compound and the safety of those who work in or visit the Capitol. Allowing less restricted access to the CCV system could present a dire safety risk to the Capitol and its inhabitants; even a knowledge of, for example, the location of each CCV camera might enable a bad actor to exploit vulnerabilities in the system.

8. Pursuant to 2 U.S.C. § 1979, USCP information designated as "security information" may only be released with the approval of the Capitol Police Board. Security information is defined as information that:

> (1) is sensitive with respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds; and

> (2) is obtained by, on behalf of, or concerning the Capitol Police Board, the Capitol Police, or any incident command relating to emergency response.

9. That same statute also provides an exemption to the above restrictions for certain Congressional entities to obtain security information from the Capitol Police:

> (c) Rule of construction

> Nothing in this section may be construed to affect the ability of the Senate and the House of Representatives (including any Member, officer, or committee of either House of Congress) to obtain information from the Capitol Police regarding the operations and activities of the Capitol Police that affect the Senate and House of Representatives.

10. On February 8, 2023, I received a request from the Majority Staff Director from the Committee on House Administration (CHA), one of the four oversight committees of the Capitol Police. The Director requested that CHA be given the same access to the USCP footage that had been provided to the January 6 Select Committee (Select Committee)[1]. (This verbal request was followed by a formal letter with the same request from the Chairman of CHA on February 9, 2023.) Within days of the request, the Capitol Police installed three Genetec terminals in a House Office Building and provided to CHA the four hard drives I received from the Select Committee when it had completed its work. The USCP also provided one CHA staffer with a password to sign into the system. At no time was I nor anyone else from the Capitol Police informed that anyone other than personnel from CHA would be reviewing the camera footage.

11. On February 20, 2023, through a report from the media, the Capitol Police learned that access to the footage had been granted to members of the Tucker Carlson Show. That access was not previewed with the Capitol Police nor was the Capitol Police informed before that access was granted. I was informed that personnel from the Tucker Carlson Show were allowed to view whatever footage they wanted while supervised by staff from CHA but that no footage had been physically turned over to the show.

12. On February 27, 2023, the Staff Director requested a list of excluded Capitol Police cameras (Sensitive List) which I provided on March 1, 2023. This list was of cameras that the Capitol

---

[1] The Select Committee had access to all Capitol Police cameras from all exterior cameras, and all interior Capitol and Capitol Visitor's Center (CVC) cameras from January 6 at 1200-2000 hours which is estimated to be 12,671 hours of video. The Capitol Police later provided the Select Committee, at its request, with footage from all Capitol, Cannon, Longworth, and Rayburn interior cameras for January 3, 4, and 5 at 0700-2200 hours, January 6 at 0600-1200 hours and footage from all CVC interior cameras for January 5 at 0700-2200 hours. This is an additional 28,386 hours of video.

Police deemed to contain sensitive information such as evacuation routes or sensitive infrastructure or offices such as Sensitive Compartmented Information Facilities. It is substantially the same as the list provided to the prosecutors.

13. During numerous conversations with the Staff Director over several weeks, I emphasized the Capitol Police's desire to review every footage clip, whether it was on the Sensitive List or not, if it was going to be made public. I informed the Staff Director that this was the same process followed by the Select Committee and the prosecutors in all of the criminal cases: that we were shown and had to approve of every clip before it was made public. This was followed in all cases by both the Select Committee and the prosecutors.[2]

14. Of the numerous clips shown during the Tucker Carlson show on March 6 and 7, 2023, I was shown only one clip before it aired, and that clip was from the Sensitive List. Since that clip was substantially similar to a clip used in the Impeachment Trial and was publicly available, I approved the use of the clip. The other approximately 40 clips, which were not from the Sensitive List, were never shown to me nor anyone else from the Capitol Police.

15. Finally, I have read media reports that the Capitol Police footage may be shown to defendants facing charges related to January 6th. I have been told by the Staff Director of CHA that, as of last week, no footage has been shown to any defendant or defense counsel but that defense counsel have reached out to CHA seeking to review the footage.

\*      \*      \*      \*      \*

---

[2] There were a series of clips from Capitol Police cameras that were shown during the second impeachment trial of President Donald J. Trump in February of 2021. None of those approximately 15 clips (some from the Sensitive List) were shown to the Capitol Police beforehand, the impeachment managers simply requested the clips and they were provided.

I declare under the penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Executed on this $\underline{16}$ day of March 2023.

_____

Thomas A. DiBiase

Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADVANCE PUBLICATIONS, INC., *et al*.,

               Plaintiffs,

    v.

EXECUTIVE OFFICE FOR U.S.
ATTORNEYS, *et al*.,

               Defendants.

Civil Action No. 1:23-cv-01014

## DECLARATION OF THOMAS A. DIBIASE

I, Thomas A. DiBiase, declare as follows:

1.      I have been the General Counsel for the United States Capitol Police ("USCP")

since August of 2020.   From October 2019 to August of 2020, I served as the Acting General

Counsel, and from April of 2010 to October 2019, I served as the Deputy General Counsel.

From 2007 to 2010 I worked as a litigator at a law firm in the District of Columbia, and from

1995 to 2007, I served as an Assistant United States Attorney at the United States Attorney's

Office for the District of Columbia.   I worked as a litigator at a New York-based law firm from

1991 to 1995.

2.      As part of my duties as General Counsel and my prior duties as the Deputy

General Counsel, I review access and release requests for camera footage from the USCP's

extensive system of surveillance cameras on the U.S. Capitol Grounds.   Through the exercise of

my official duties, I have become familiar with this civil action and the underlying FOIA request

seeking camera footage recorded on January 6, 2021, in the possession of the United States

Attorney's Office for the District of Columbia ("USAO-DC").

3. I submit this declaration in support of the Executive Office for United States

Attorneys' ("EOUSA") motion for summary judgment, to be filed by the United States

Department of Justice in this proceeding. I also incorporate by reference my three prior

declarations submitted in several criminal prosecutions arising out of the events of January 6,

2021, including *United States v. Timothy Louis Hale-Cusanelli*, No. 21-cv-00037, ECF No. 67-1

and *United States v. William Pope, et al.*, No. 21-cv-00128, ECF Nos. 71-1, 88-1. These three

declarations are attached hereto as Exhibits A-C.

4. I make the following statements based upon my personal knowledge and

information made available to me in my official capacity.

5. The primary mission of the USCP is to protect the United States Congress,

including its Members, employees, visitors, and the U.S. Capitol Building and Grounds

("Grounds"), and it has the power to enforce the laws of the United States and the District of

Columbia pursuant to 2 U.S.C. § 1961. The USCP is part of Congress and the Legislative

Branch. *See* 2 U.S.C. §§ 1901, 1901a, 1961. The backbone of the USCP's security and

policing operations is the Department's extensive system of cameras located throughout the

Grounds. These cameras, as I have previously explained, are part of a sophisticated closed

circuit video ("CCV") system that reside both inside and outside the buildings on the Grounds,

including the U.S. Capitol itself and the other Congressional office buildings located on the

Grounds. The CCV system is monitored by USCP personnel 24-7 in the USCP Command

Center and is relied upon to provide real time information regarding any incident occurring on

2

the Grounds. Per USCP Directive 1000.002, CCV footage may only be used for matters related to national security and legitimate law enforcement purposes (e.g. serious crimes).

6. As relevant here, the USCP provided CCV footage recorded January 6, 2021, beginning at approximately noon and continuing through approximately 8:00 p.m., to the Federal Bureau of Investigation ("FBI") to assist in the investigation and prosecution of matters arising out of the events of January 6, 2021. The CCV footage from this approximately eight-hour period totals roughly 14,000 hours of video. I understand the FBI subsequently transferred the CCV footage it received from the USCP to the USAO-DC to facilitate those prosecutions.

7. Prior to the USAO-DC using any clip from the CCV footage in a criminal proceeding, the USCP reviews the clip and authorizes its use in the proceeding and, by extension, its public dissemination. This review and authorization process remains ongoing as the USAO-DC continues to prosecute individuals related to the events of January 6, 2021.

8. As I explained in my previous declarations, the USCP also provided CCV footage recorded on January 6, 2021, to several congressional entities, including the Committee on House Administration ("CHA"). The USCP is required to comply with requests of the CHA and its other oversight committees. *See, e.g.*, 2 U.S.C. § 1979(c). The CHA received CCV footage for the entire 24-hour period recorded on January 6, 2021, which totals over 41,000 hours. The USCP installed three Genetec computer terminals in a House Office Building and provided CHA with one user ID and password to facilitate the CHA's access to the footage. In addition, the USCP provided CHA with four hard drives containing the CCV footage.

9. The USCP is not able to determine whether members of media organizations, including staffers of the Tucker Carlson Show, or other individuals not associated with the CHA

3

viewed or downloaded the CCV footage provided to the CHA.   I understand that the CHA
provided staffers of Tucker Carlson's show access to one or more Genetec terminals.   The
USCP, however, is only able to audit the Genetec terminals by user ID, and, as I discuss above,
the CHA was provided a single user ID.   As a result, any CHA Member or staff member, or any
member of a media organization, or any other individual that may have been provided access to a
Genetec terminal by CHA, would have used the same user ID.   Indeed, I understand that at
times, the user ID and password assigned to CHA was being used on multiple terminals
indicating that multiple individuals were viewing the CCV footage at the same time.   The
USCP, therefore, cannot identify the individuals who viewed a particular segment of CCV
footage on a Genetec terminal, be it a Member of Congress, a CHA staff member, a member of a
media organization, or another individual.   Further, the USCP has no ability to audit the four
hard drives it provided to CHA to determine which portions of the CCV footage contained on the
hard drives have been viewed, let alone to identify the individuals who viewed the footage or to
ascertain whether any footage was downloaded.

     10.    I understand that Tucker Carlson's show aired approximately 25 clips of the CCV
footage.   Of the approximately 25 clips that aired, the CHA asked me to review only a single
clip.   I approved the public dissemination of that single clip because the clip had been used
during the Second Impeachment Hearings of President Donald J. Trump.   I was not shown the
other approximately 24 clips before they aired on Tucker Carlson's program.   My office
subsequently confirmed that the USAO-DC requested and received authorization to use the other
approximately 24 clips in their prosecutions of individuals charged with crimes related to the
events of January 6, 2021.

11.     The USCP strongly opposes the public release of any of its CCV footage from

January 6, 2021, outside of the criminal prosecutorial process, particularly the public release of

thousands of hours of footage in the aggregate.   Although the CHA provided Tucker Carlson

and his staff members access to the CCV footage, the scope of that access is unknown and only a

small number of discrete segments of the CCV footage have been placed in the public domain.

Publicly releasing the entirety of CCV footage from an approximately eight-hour period would

present a dire safety risk to the Capitol Grounds and its inhabitants.   Indeed, the USCP is aware

of efforts made before January 6, 2021, including by those who participated in the events of

January 6, 2021, to gather information regarding the interior layout of the U.S. Capitol, including

references to the tunnels below the Capitol Grounds and maps of the Capitol Building's layout—

information that is generally not available.   Providing unfettered access to thousands of hours of

extremely sensitive information will result in the layout of the Capitol Building and Grounds,

including entry and exit points, evacuation routes, office locations, locations of Sensitive

Compartment Information Facilities, and the relation of the crucial chambers and offices (such as

the Speaker's Office and Majority Leader's Office) to other areas of the Capitol being exposed.

Further, given that the physical locations of many CCV surveillance cameras are not publicly

known or facially obvious, release of the CCV footage, in the aggregate, will also enable

potential bad actors to identify the location of each CCV camera, assess the angle and span of

each camera and harness that information to exploit vulnerabilities, such as dead or blind spots,

in the CCV system and other security weaknesses.

5

12.     Pursuant to 2 U.S.C. § 1979, USCP information designated as "security

information" may only be released with the approval of the Capitol Police Board.   Security

Information is defined as information that:

> (1) is sensitive with respect to the policing, protection, physical security,
> intelligence, counterterrorism actions, or emergency preparedness and
> response relating to Congress, any statutory protectee of the Capitol Police,
> and the Capitol buildings and grounds; and
>
> (2) is obtained by, on behalf of, or concerning the Capitol Police Board, the Capitol
> Police, or any incident command relating to emergency response.

13.     In 2021, the USCP, in consultation with the Capitol Police Board, designated

approximately 17 hours of the CCV footage from January 6, 2021, as "security information,"

because the footage relates to the evacuation of Members of Congress from their respective

chambers, and reveals evacuation routes, as well as evacuation techniques and methods.

14.     The USCP treats the collective CCV footage recorded on January 6, 2021, as

"security information" under 2 U.S.C. § 1979, and is currently in discussions with the Capitol

Police Board about officially designating the CCV footage, in the aggregate, as such.[1]   As

discussed above, public disclosure of thousands of hours of CCV footage in the aggregate would

reveal the layout of the Capitol Buildings and Grounds and the locations of the CCV cameras—

information that could be harnessed to expose and exploit security vulnerabilities and

weaknesses.   This knowledge could be used by prospective bad actors to plan and execute future

---

[1] The USCP's decision to treat, in the aggregate, the CCV footage recorded on January 6, 2021 as "security information" under 2 U.S.C. § 1979 is consistent with the Architect of the Capitol's decision to treat "blueprints" of the Capitol as "security information" under 2 U.S.C. § 1979.

breaches of the Capitol Building or other criminal activity, risking the physical safety of not just the Capitol compound but also Members of Congress, Congressional employees, and visitors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 15th day of July 2023.

Thomas A. DiBiase

7