# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Case No.: 21-CR-117 (RCL)** |
| v. | : | |
| ALEX KIRK HARKRIDER, | : | *Let this be filed.*<br>*Royce C. Lamberth*<br>*U.S.D.J. 1/2/24* |
| Defendant. | : | |

## STATEMENT OF FACTS AND
## ELEMENTS FOR STIPULATED TRIAL

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Alex Kirk Harkrider, with the concurrence of his attorney, hereby submit the elements for each count in the indictment and the stipulated statement of facts for the requested bench trial in this action.

### Elements of the Offenses

A. *Count One: Civil Disorder And Aiding And Abetting*

The essential elements of the offense of civil disorder, in violation of 18 U.S.C. §231(a)(3), each of which the government must prove beyond a reasonable doubt, are as follows:

1. The defendant knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers;

2. At the time of the defendant's actual or attempted act, the officers were engaged in the lawful performance of their official duties incident to and during a civil disorder;

3. The civil disorder, in any way or degree, obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.[1]

The essential elements of the offense of aiding and abetting others to commit the offense of civil disorder, in violation of 18 U.S.C. § 231, each of which the government must prove beyond a reasonable doubt, are as follows:

1. That others committed civil disorder by committing each of the elements of the offense charged, as I have explained above.

2. That the defendant knew that civil disorder was going to be committed or was being committed by others.

3. That the defendant performed an act or acts in furtherance of the offense.

4. That the defendant knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of civil disorder.

5. That the defendant did that act or acts with the intent that others commit the offense of disorder.

B. *Count Two: Obstruction of an Official Proceeding and Aiding and Abetting*

The essential elements of the offense of obstruction of an official proceeding, in violation of 18 U.S.C. § 1512, each of which the government must prove beyond a reasonable doubt, are as follows:

1. The defendant attempted to or did obstruct or impede an official proceeding;

---

[1] A "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof.

2.  The defendant intended to obstruct or impede the official proceedings;

3.  The defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceedings; and;

4.  The defendant acted corruptly.

The essential elements of the offense of aiding and abetting others to commit the offense of obstruction of an official proceeding, in violation of 18 U.S.C. § 1512, each of which the government must prove beyond a reasonable doubt, are as follows:

1.  That others committed obstruction of an official proceeding by committing each of the elements of the offense charged;

2.  That the defendant knew that obstruction of an official proceeding was going to be committed or was being committed by others;

3.  That the defendant performed an act or acts in furtherance of the offense;

4.  That the defendant knowingly performed an act or acts for the purposes of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of obstruction of an official proceedings; and

5.  That the defendant did that act or acts with the intent that others commit the offense of obstruction of an official proceeding.

C. *Count Four: Theft of Government Property*

The essential elements of the offense of theft of government property, in violation of 18 U.S.C. §641, each of which the government must prove beyond a reasonable doubt, are as follows:

1. The defendant knowingly stole, took, embezzled, purloined, or converted to his own use a piece of wood from a chair;

2. The stolen piece of wood was property of some value belonging to the United States or any of its department or agencies; and

3. The defendant intended to deprive, without right, the United States government of the use or benefit of the chair.

D. *Count Six: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon*

The essential elements of the offense of entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A), each of which the government must prove beyond a reasonable doubt are as follows:

1. The defendant entered or remained in a restricted building or grounds without lawful authority do so; and,

2. The defendant did so knowingly.

3. The defendant knowingly carried a deadly or dangerous weapon, that is a tomahawk axe, during and in relation to the offense.

E. *Count Eight: Disorderly and Disruptive Conduct in a Restricted Building or Ground with a Deadly or Dangerous Weapon*

The essential elements of the offense of disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §1752(a)(2) and (b)(1)(A), each of which the government must prove beyond a reasonable doubt, are as follows:

1. The defendant engaged in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds.

2. That such conducted occurred when, or so that, such conduct, in fact, impeded or disrupted the orderly conduct of Government business or official functions; and,

3. The defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions.

4. The defendant knowingly carried a deadly or dangerous weapon, that is a tomahawk axe, during and in relation to the offense.

F. *Count Nine: Disorderly Conduct in a Capitol Building*

The essential elements of the offense of disorderly conduct in the Capitol buildings or grounds thereof, in violation of 40 U.S.C. § 5104(e)(2)(D), each of which the government must prove beyond a reasonable doubt, are as follows:

1. The defendant engaged in disorderly or disruptive conduct in any of the United States Capitol buildings;

2. The defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and,

3. The defendant acted willfully and knowingly.

H. *Count Eleven: Parading, Demonstrating, or Picketing in a Capitol Building.*

The essential elements of the offense of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G), each of which the government must prove beyond a reasonable doubt, are as follows:

1. The defendant paraded, demonstrated, or picketed in any of the United States Capitol buildings; and,

2. The defendant acted willfully and knowingly.

**Statement of Stipulated Facts**

*The Attack at the U.S. Capitol on January 6, 2021*

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 p.m.. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 p.m., the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to

perform the federally protected function of protecting Vice President Pence and the USCP's ability

to protect the United States Capitol Building and Grounds and Congressional members and staff.

5.     At approximately 12:54 p.m., certain individuals in the crowd forced their way

through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd

advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police

Department were called to assist officers of the USCP who were then engaged in the performance

of their official duties. The crowd was not lawfully authorized to enter or remain in the building

and, prior to entering the building, no members of the crowd submitted to security screenings or

weapons checks as required by USCP officers or other authorized security officials.

6.     At such time, the certification proceedings were still underway, and the exterior

doors and windows of the Capitol were locked or otherwise secured. Members of the USCP

attempted to maintain order and keep the crowd from entering the Capitol; however, at

approximately 2:13 p.m., individuals in the crowd forced entry into the Capitol, including by

breaking windows.  Individuals in the crowd assaulted members of law enforcement on the West

Front of the Capitol.  Others in the crowd encouraged and assisted those acts. The riot resulted in

substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for

repairs.

7.     Shortly thereafter, at approximately 2:20 p.m., members of the House of

Representatives and of the Senate, including the President of the Senate, Vice President Pence,

were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United

States Congress, including the joint session, were effectively suspended until shortly after 8:00

p.m. on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to

the Capitol—including the danger posed by individuals who had entered the Capitol without any

security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### Alex Harkrider's Participation in the January 6, 2021, Capitol Riot

8.     On January 5, 2021, Harkrider traveled from Texas to Washington, D.C., with his friend and co-defendant, Ryan Taylor Nichols.  Nichols and Harkrider exchanged text messages in the preceding days, planning and organizing for the trip.  Harkrider went on the trip to show support and solidarity for the former president and because he thought "the election was rigged."

9.     On December 31, 2020, Nichols sent Harkrider a photograph of body armor and pricing, stating that the body armor would protect against various bullets.  On January 1, 2021, Nichols sent Harkrider several messages including, "We're going to need first aid kits and tourniquets,"; "I need to speak with you in person"; "Everything is ok. Just need to gameplan lol"; "We need to speak in person lol"; "what I'm about to relay can't be done over the phone."

10.     On January 3, 2021, Nichols and Harkrider had the following text message conversation:

Nichols: I've got goodies for the trip.
Nichols: Goodies you've requested before but never got..
Harkrider: [GIF file that says "Take acid and see reality."]
Harkrider: Could it be?! Haha
Nichols: Still some other stuff we have to talk about before we leave
Nichols: The Line in the sand
Nichols: Dad and I are building a gun container in the truck today
Nichols: Just know I have intel that Washington will be a warzone
Nichols: Big possibility that actual battle goes down

Harkrider: I'm looking forward to it

Nichols: I know how to get guns legally into DC now

Nichols: It's called transporting

Harkrider: I'll bring every freedom blaster I own then

Harkrider: We're stopping in Kentucky on the way for those plate carrier too right?

Nichols: Do you have any 10 round mags for an AR?

Harkrider: I do not

Nichols: Damn. I'd rather go with those so it's fully legal. 30 round mags are not

Harkrider: Surely we can find some

11.     Nichols and Harkrider each brought two firearms with them on their trip, transporting and storing them in a box that Nichols and another individual specifically constructed in the back of Nichols' truck for the trip.  Harkrider denies that the firearms were brought into the District of Columbia.

12.     On the night of January 5, 2021, Nichols and Harkrider attended a rally on the streets of Washington, D.C.  At one point, while Harkrider was standing next to Nichols, Nichols shouted, "Cops don't know what's going on.  Too many of us, not enough of them."  Later, again while Harkrider was standing next to Nichols, Nichols shouted, "Those people in the fucking Capitol building are our enemy."  In another verbal altercation with police, Nichols shouted, "We had your fucking back but now we ain't got your no more. […] You better have our back or we're going to fucking show you."

13.     On January 6, 2021, Nichols and Harkrider attended a rally in support of then-President Trump near the Ellipse, before marching with others to the Capitol building.  Nichols and Harkrider both wore ballistic plates in carriers, as alluded to in their earlier text messages. Nichols was armed with a crowbar and Harkrider was armed with a tactical tomahawk axe.

14.    Nichols and Harkrider were present for and witnessed the former president's speech

to the rally at the Ellipse. Nichols and Harkrider both heard various speakers at the rally, including

the former president.

15.    During their march to the Capitol, sometime after 2:24 p.m., President Trump

tweeted that, "Mike Pence didn't have the courage to do what should have been done to protect

our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the

fraudulent or inaccurate ones which they were asked to previously certify. USA demands truth!"

Nichols then stated, while standing behind and to the side of Harkrider:

> I'm telling you what I'm hearing, that Pence, I'm hearing that Pence
> just caved. […] I'm hearing reports that Pence caved. I'm telling
> you if Pence caved, we're gonna drag motherfuckers through the
> streets. You fucking politicians are going to get fucking drug
> through the streets. Because we're not going to have our fucking
> shit stolen. We're not going to have our election, our country stolen.
> If we find out you politicians voted for it, we're going to drag your
> fucking ass through the streets. Because this is the second fucking
> revolution and we're fucking done. I'm telling you right now, Ryan
> Nichols said it. If you voted for fucking treason, we're going to drag
> your fucking ass through the streets. So let us find out, let the patriots
> find out that you fucking treasoned this country. We're gonna drag
> your fucking ass through the street. I'll fucking choke him myself.
>
> You think we're here for no reason? You think we patriots are here
> for no reason? You think we came just to fucking watch you run
> over us? No. No. You want to take it from us, motherfucker we'll
> take it back from you. Because I tell you what, we're not gonna go
> to the military and be told to fight for fucking freedom, were not
> going to be told to fight for fucking voting, were not going to be told
> to be go peacefully and then have it taken from us and the courts
> won't hear us and think that we won't fucking do something about
> it.
>
> So we're going to fucking fight and we're going to take back what
> is ours. And if you are patriot, then get on board and if you're not
> then get the fuck out of my way, because I'll drag your fucking ass
> through the street. You want it? You fucking got it. So let me find
> out Pence let me find out myself that you treasoned the country,
> we'll fucking drag your ass too. We're tired of it. […] You either
> do the right thing, or we're going to make you do the right thing.

Folks if you give up your liberty right now, it's gone. It's gone forever. If you give it up right now, it's gone. And the only people allowing that are you. […]

And if you think Ryan is fucking crazy, well then you must think all these patriots are crazy. I don't feel, I'm not going to explain myself to people anymore, If you're a patriot you're done explaining yourself to people. You already heard the evidence, so when they say 'where's the evidence?' motherfucker, you heard the evidence. At this point you just don't want to hear it. And we're done with it. So take it from me, an angry business owner, American veteran, that we're fucking done. Ryan's not crazy, if you don't think so, you're fucking crazy. These patriots are not crazy. We're tired of being shut down, shut up, and told to fucking roll over and take it. We ain't taking it no more. So you want to take it from us, well we're here to take it back from you.

At this point, Harkrider interjected, "Cut their freaking head off! You can do it." Harkrider

made the statement in an exaggerated Cajun accent and appeared to be loosely quoting actor Rob

Schneider's character in *The Waterboy*, a 1998 film starring Adam Sandler.

Nichols continued:

Cut their head off!

Hey, Republican protestors are trying to enter the House right now at the Capitol, is the word that I'm getting. So if that's true, then get up in there. If you voted for treason, we're going to drag your ass through the streets. […] Everybody here ain't here to fight. I am. You do the right thing or we're going to force you to do the right thing. […]

You see the battle drums? I told you all, I said this was a war cry, January 6th. You don't have General Flynn out here. Who do generals rally? Generals rally troops. You hear the war cry? You hear the war drums? You think we're marching for nothing? You're gonna do the right thing. […]

Alright folks, my battery is almost dead. I'm at 10%. I gotta save a little bit of it and I'll probably be back live later, but know that Ryan and Alex are here in Washington, D.C. marching on the Capitol, apparently Pence just caved and if Pence caved we're going to fucking take it back, because we're not going to let it be stolen. So we're up here fighting. What are you doing to fight for your country today? Are you at home? At work? Chilling? Thinking everything

is all good? We're going to take care of it for you? Or are you fucking fighting too? Because you need to be fighting too. There's no excuse. If you're a patriot, if you're an American, you better be fighting today. Because today's it. If you let it go today, today's it.

16.    After arriving at the Capitol grounds, Nichols and Harkrider joined a large crowd of rioters that had gathered in front of an arched entrance to the Lower West Terrace doors, which, in the context of the January 6, 2021, attack, has colloquially become known as the "tunnel" due to its location in relation to the partially constructed inaugural stage. U.S. Capitol Police and Metropolitan Police Department officers guarded this entrance to the Capitol as rioters tried to force their way in.

17.    At approximately 3:56 p.m., Nichols and Harkrider pushed with the crowd against the officers in synchronized movements.

18.    At approximately 3:57 p.m., Harkrider took hold of a red canister, held it above his head for more than ten seconds, and passed it to other members of the crowd. The canister was a stolen MPD-issued MK-46 canister of O.C. spray. Nichols and Harkrider then continued to push with the crowd against the officers, rocking back and forth, as the crowd chanted, "Heave! Ho!"

19.    At approximately 4:13 p.m., Nichols observed another rioter trying to break a window to the Capitol with a stolen canister of police pepper spray. Nichols and Harkrider then entered the Capitol through a broken window, specifically entering Room ST-2M. Before entering the Capitol, Harkrider pumped his fist in the air.

20.    At approximately 4:18 p.m., Nichols and Harkrider emerged from Room ST-2M and stood on the window ledge. Nichols held his crowbar in one hand and a bullhorn in the other. Harkrider had his tactical tomahawk axe secured in a holster under his jacket, but it was still partially visible. Using a bullhorn, and with Harkrider standing immediately next to him, Nichols

shouted, "Get in the building, this is your country, get in the building, we will not be told 'No'," "This is the second revolution," and "This is not a peaceful protest."

21.     At approximately 4:21 p.m., Nichols repeatedly shouted through the bullhorn, "If you have a weapon, you need to get your weapon!" and "Pedo Pence, Pedo Pence!" Harkrider, upon hearing Nichols chanting, joined in these chants.

22.     At approximately 4:25 p.m., Nichols and Harkrider crawled back into Room ST-2M through the broken window.

23.     At approximately 4:30 p.m., as the crowd outside the Capitol was finishing singing the National Anthem, Harkrider leaned his upper body out of the broken window of Room ST-2M, drew his hand across his throat in a slashing motion.

24.     At approximately 4:35 p.m., Nichols and Harkrider exited the Capitol building through the broken window in Room ST-2M.

25.     As he was leaving, Harkrider picked up a broken piece of government furniture from the Capitol.  Specifically, he picked up a wooden arm support from a broken dining or office chair.

26.     Harkrider took the broken piece of government furniture home to Texas and possessed it until it was recovered from his nightstand by law enforcement agents during the execution of a search warrant on January 18, 2021. The broken piece of government furniture was found next to the hat that Harkrider wore to the Capitol, and Harkrider admitted that the took the item as a souvenir.

27.     Harkrider knew at the time that he entered the Capitol that he did not have permission to enter the building. Harkrider knew that he did not have permission or authority to remove the piece of broken government furniture from the Capitol.

28.    The parties stipulate and agree that if the Court finds the existence of the above facts beyond a reasonable doubt, this evidence would establish each and every element of Counts One, Four, Six, Eight, Nine, and Eleven as charged against Harkrider in the Superseding Indictment.

29.    With respect to Count Two of the Superseding Indictment, which charges the defendant with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Harkrider reserves the right to appeal those charges if the Court finds sufficient facts to convict him under the current interpretation of the statute as set forth in *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 2003 WL 8605748 at *1 (U.S. Dec. 13, 2023) (No. 23-5572), and *United States v. Robertson*, No. 22-3062 (D.C. Cir. Oct. 20, 2023), prior to any decision by the Supreme Court in *Fischer*.  The defendant agrees that, in light of the Court's ruling on his motion to dismiss Count Two and without waiving objection to the Court's ruling on the motion to dismiss that Count (see ECF No. 95 and Court's oral ruling December 21, 2023), the Court may find that the government has met its burden of establishing all of the elements of 18 U.S.C. § 1512(c)(2) and may find the defendant guilty on Count Two.  Harkrider admits that his conduct falls within the current interpretation of the statute under *Fischer*.  However, none of the foregoing

[*continued on next page*]

should be construed in any way as a waiver by the defendant of his right to appeal a conviction under 18 U.S.C. § 1512(c)(2) in the event that the Supreme Court reverses the D.C. Circuit's opinion in *Fischer* or any other case consolidated with *Fischer* on appeal.

Respectfully submitted,

**ALEX KIRK HARKRIDER**

**KIRA A. WEST**   12/29/23
*Attorney for Defendant*

**DOUGLAS B. BRASHER**
**SARAH W. ROCHA**
**SEAN P. McCAULEY**
*Attorneys for the Government*