## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 21-CR-117(RCL)** |
| **ALEX HARKRIDER,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Alex Harkrider, through his attorney, Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that she has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the PSR with Mr. Harkider, a few objections remain. For the reasons set forth herein, Mr. Harkrider requests that this Honorable Court impose a sentence of time served, 120 hours of community service and $2,000 restitution to account for:

1.    The fact that he doesn't need incarceration;

2.    His long history of a strong work ethic and volunteer service, which includes service to our country as a Marine, which has allowed him to be productive member of society; and

1

3.      His peaceful, non-destructive and non-violent behavior that day

both outside and inside the Capitol building.

## I.   __Background__

Mr. Harkrider comes before the Court having appeared before the Court for

a stipulated bench trial on January 2nd, 2024.   The Court found him guilty of all

charges. The guideline sentence according to the probation officer and the

government is 18-24 months. Mr. Harkrider insists that he be given three points

off, not just two, as that was the agreement with the government before he agreed

to the stipulated bench trial.[1] Thus, the correct guideline range is 15-21 months.

Mr. Harkrider signed a detailed statement of offense in which he admitted his

conduct. He gave a truthful statement to police when they stormed his home at 6

am with flash bangs and left him in a police vehicle, in his underpants, in January.

(It was Texas, but it was cold). He completely and truthfully cooperated with law

enforcement when asked to do so.

## __Media reports of stolen election__

After the presidential election, Donald Trump (hereinafter "Trump") and his

inner circle began spreading the word that the election was "stolen" from him by

Democrats and others.   https://www.washingtonpost.com/politics/trump-election-

---

[1] Undersigned counsel can provide the email to the Court under seal. The email was provided in part to the probation officer. The defendant did not put the government to the test with a trial as the Probation Officer suggests. We were in and out of court in a couple of hours rather than a couple of weeks.

voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html.

False claims  by President Trump that the election was rigged were made on media

sources, as well as by the President himself, that the election system had been

corrupted and that the integrity of the election should be questioned. Trump

refused to concede. He showed himself willing to undermine confidence in the

democratic process and in time, managed to convince nearly three-quarters of his

supporters (to include Mr. Harkrider) that the loser was actually the winner.

         As the January 6th committee hearings show, Donald Trump and his

advisers knew that he had in fact lost the election but despite this knowledge they

engaged in a massive effort to spread false and fraudulent information to

convince huge portions of the U.S. population that fraud had stolen the election

from him.  .

         According to a Washington Post Article from June 13, 2022, many in

Trump's inner circle, including  his White House Counsel, informed Trump that

there was no basis for overturning the election results but that Trump ignored those

voices.  While most of these high profile lawyers and advisers to the President

testified to the January 6th committee that they told the President personally the

facts about the election results and their discomfort with his claims that the election

had been stolen, most did not "correct the public record on the issue or speak out

against Trump's false claims." https://www.washingtonpost.com/national-

security/2022/06/13/jan-6-committee-hearings-live/  When these government advisors  failed to correct the narrative, it left a huge informational void that was filled with the likes of conspiracy theorists, online extremists and Trump loyalists willing to manipulate public opinion for their own purposes.  People like Mr. Harkrider  stood no chance at truly grasping the gravity or reality of the situation, let alone know what the facts truly were before January 6, 2021.

This Court can only understand why Mr. Harkrider came all the way from Texas to D.C. to attend the Trump Rally by taking into account the fact that Mr. Harkrider is a loyal friend.  His fellow Marine and friend, Ryan Nichols was very interested in the outcome of the 2020 election and vocal online and in person about his views.  Alex was not.  Alex is a simple guy working to build his own business and work on his own mental issues.  He suffers from PTSD from his service to our country and his mental health has been an uphill battle for years.  One major turning point for Alex was when his friend Ryan Nichols invited him to be a part of Rescue the Universe.  The sense of purpose that saving others gave Alex is credited as having saved his life.  So, when Ryan Nichols was itching to go to DC for the Rally and hear Trump speak, and asked Alex to go, Alex was there for his friend.  If Ryan Nichols had not gone to DC, Alex would not have been there.

Mr. Harkrider had similar beliefs that the election was stolen, but mostly based on what he had seen falsely reported in the media and heard from Ryan Nichols.   This court is aware of the online posts and live streaming by Mr. Nichols that clearly showed he had strongly held beliefs that the election had been stolen.   Alex can be seen on government exhibits walking silently behind Ryan with little to no reaction to the extreme views held by his friend.   But when a friend who has saved your life makes stupid statements in public, you don't tell them to shut up.   You just put up, and that is what Alex did.

After the two men saw Trump's speech on the Ellipse, Mr. Nichols activated his go-pro video to interview Alex.   In that video, which was an exhibit at the stipulated trial, Alex is asked how he feels by Ryan.   Alex responds that his back hurts, his legs are numb and he doesn't feel well.   Plain and simple, Alex was in pain and wanted to go back to the hotel and sit down.   The figure below is a screengrab from the go pro recording showing how uncomfortable Alex felt at the time he expressed his feelings of pain to Ryan.



*Figure 1*

But there was no way Ryan was having that happen and Alex knew it. He tried to give his friend an indication of his state of mind, but Ryan ignored it. Alex regrets to this day not just heading back to the hotel by himself. However, given what we know about Marines, Alex was never going to leave his friend behind. This decision is why Alex is here before this Court.

A video released by the New York Times demonstrates that on January 6, there were two types of protestors there in the crowd that day. https://www.nytimes.com/2022/06/17/us/politics/proud-boys-jan-6.html There were ones initially who waited outside barricades and peacefully assembled with the intent just to exercise their First Amendment rights and others there with a plan to incite the crowd and to breach the Capitol building. The regular folks, like Mr. Harkrider were referred to by some of the planners, including the Proud Boys, as

the "normies."  The "normies" were used as unwitting pawns in the plans of the

Proud Boys and others that day.  The plan depended on  creating chaos and

whipping up the "normies" into a patriotic frenzy.   The groundwork for this frenzy

had been laid in the weeks before January 6th by the Trump propaganda about

election fraud and had been fueled by Trump himself at the rally on the mall.  The

Proud Boys intended to use the large crowd to distract and overwhelm as they went

to work of breaking into the Capitol.

   Mr. Harkrider had no idea he was being used as a pawn in a game far more

sophisticated and complex than anyone could imagine.  Alex is a hard working

American and a person who loves our country, but he is no sophisticated strategist.

How could Mr. Harkrider, or any "normie" that day have known what was to

happen?    He did not obscure his face.  He was not armed in the traditional sense,

yet he did carry a tomahawk (only for his own defense against counter protesters)-

one that he made sure was a legal size for the District. (4inch blade or less).   He

wore normal clothing but wore a plate carrier in the event he was attacked by

Antifa. He did not carry anything such as a flag or sign.  He came with one friend,

not as part of a group.  Mr. Harkrider committed no violent actions.   He did not

destroy anything. Unfortunately, he now understands that going into the Capitol

that day was way beyond a peaceful protest and he sincerely regrets his actions.

## THE TRIP TO THE CAPITOL AND JANUARY 6, 2021

### A.  Mr. Harkrider's trip to D.C. and his walk to the Capitol

Mr. Harkrider did believe what he read on the internet and heard from his friend Ryan Nichols and the President himself - that the election had been stolen. He also believed that he should accompany his friend to DC to show his support for the soon to be former President by attending his rally scheduled for January 6, 2021, at the Ellipse on the Mall.   At no time did he ever think he was going to the Capitol, let alone inside the Capitol. Not until Trump's speech, and the invitation to the crowd to march to the Capitol, did he have any intention of  going anywhere other than the Ellipse area.  Not being from the area or having attended a protest before, Alex no real sense of where things were in relation to each other or how far the walk would be.  As the day unfolded, he never planned or envisioned entering the U.S. Capitol.  Alex had no real understanding of what was even happening there that day except that Trump had asked everyone to March down and show support.

He followed his friend and the large crowd there that day with no intention of doing anything violent.   They took photos in front of the lawn when then arrived like tourists.  They did not rush to the front of the crowd or try to fight their way inside.  Many people did do that, but Ryan and Alex took their time walking to the Capitol with the large crowd and peacefully made their way up to the

8

inaugural stage area where people had already assembled.  It is unfortunate that Ryan Nichols posted photos of himself and Alex outside the Capitol that day with all sorts of rhetoric that Mr. Harkrider neither approved or adopted.  One such post is below in figure 2 below.   Mr. Harkrider did not control Ryan's Facebook posts and did not post anything himself on public social media platforms.  That his friend chose to brag and lie on social media (i.e., they were nowhere near Nancy Pelosi's office) should not be held against Mr. Harkrider.



*Figure 2*

After seeing what really happened that day by watching film on numerous platforms, Mr. Harkrider regrets going into the Capitol and even posing for these photos at all.  He sincerely had no idea that there was to be so much violence that day and that officers and protesters alike would be injured. He never wants to come to DC again.

### B.  Mr. Harkrider's activities inside and outside the Capitol.

For some time, police were able to fend off the crowd, but as we now know, the Proud Boys instigated a push to overwhelm the few, undertrained, under equipped and unprepared  Capitol police.[2] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building.  This breach was what spurred the evacuation of members of Congress.   That breach was also several minutes before Mr. Harkrider and Mr. Nichols even arrived on the West Front of the Capitol.  The photos below in figures 3 and 4 were taken at 2:23pm by Mr. Harkrider and Mr. Nichols.  They show that at that time, when others were marching inside the

---

[2] *See* Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

Capitol through the Senate Wing Doors, these two East Texas boys are taking turns

getting pictures of each other, not rushing to assault police or break in.  In fact,

they have no idea what is happening at the Senate Wing Doors and could not see

beyond the crowds in front of them.  To them it looked like a gathering of

protestors, of all ages and genders, just like what they saw at the Ellipse and all the

way down Constitution Avenue.



*Figure 3*



*Figure 4*

Alex and Ryan walked further up the West Front of the Capitol. By 3:04pm they were perched on a large stage area up on the West Front.  The figure 5 below taken by Mr. Harkrider shows their vantage point at that time.



*Figure 5*

They stood there and watched as people filed into the area waving flags and chanting.  They could not see into the tunnel area nor really get a sense of what

was taking place on the stage.  As they moved down closer to that area they were caught in the crowds crushing forward.  Figure 6 below shows the crush of the crowd against Mr. Harkrider and how he was trying to hold his hat on his head rather than use the force of his hands to push people.  Mr. Harkrider was trying to stay upright as the crowd pushed him up against a hand rail leading up the stairs. At one point he can even be seen on CCTV falling down and losing his footing as the crowd shoves forward.



*Figure 6*

 It was only later in the day, in an attempt to get out of the chaos of the crowd on those steps, that Alex went into a room of the Capitol through a window broken by others in the area.  He regrets that split second decision now.

He was not in this first wave of protesters.   He could not see what was transpiring inside the Capitol. He had no idea of the violence in other parts of the

Capitol. Alex followed his friend towards the west front. The confusion at this point lies between conflating *our epistemic access* of the full scope of events in their entirety with *Mr. Harkrider's knowledge and intention* as the day unfolded. That is, though many others were violent, pushing officers, etc., Mr. Harkrider was not violent, carefully observed the situation around him, and followed his friend. In fact, once inside the Capitol, Mr. Harkrider just looked around, picked up a broken piece of wood, looked out the window a few times and left when his friend did. It's important to remember these two friends are both Marines, and the duty to be loyal and support a fellow Marine is strong, even when you might think that fellow Marine is acting impulsively, speaking nonsense or behaving with little self-control.

At a crucial moment that day, it was Mr. Nichols who climbed to the ledge of that window and picked up a bullhorn and began to speak to the crown spouting inaccuracies and propaganda only fueling the riotous behavior below.  Not Alex. Figure 7 below shows Ryan speaking through the bullhorn and encouraging people to take up their weapons.  Alex did not and could not control Mr. Nichols nor anticipate this action.  Mr. Harkrider should not be held accountable now for the actions of Mr. Nichols.



*Figure 7*

## **Hindsight is 20/20.**

Mr. Harkrider never imagined going inside the Capitol and certainly never thought that violence would follow.   He does not condone the violence and did all he could to get himself  out safely, which he did. Indeed, Mr. Harkrider's aimless following of his friend and the crowd through the Capitol that day is evidence of his lack of intent to do something in the Capitol that day, his lack of understanding where he was in the Capitol, and his herd mentality, rather than a desire to break the law.

## **The Charges and the arrest of Mr. Harkrider**

On January 17,  2021,  a sealed complaint was filed against  Mr. Harkrider. *See* ECF No. 1.  He was arrested on January 18, 2021, at the hands of FBI agents

conducting a raid as if it were a raid on the  Cali Cartel.  There were long guns,

kicking in the door, flash bangs and screaming after Mr. Harkrider had been

arrested. [3] He made his initial appearance before a Magistrate Judge in Texas who

detained him pending trial.   According to reports,   approximately 14-15 officers

came to his home in the early morning hours.   He was immediately handcuffed.

They searched the house while he was being arrested. While the FBI searched his

home,  taking lots of pictures, he willingly spoke to the FBI agents on scene and

gave them permission to search his phone.  These are not actions of a  person

trying to hide anything, but the actions of someone who has told the truth since the

beginning. A criminal information was filed in U.S. District Court for the District

of Columbia charging him with multiple misdemeanor and felony offenses related

to his conduct on January 6.  Judge Hogan set conditions of release, to include

location monitoring,   on April 26, 2021, after undersigned counsel filed an appeal

of his detention. *See* ECF 34.  The location monitoring was lifted by Judge Hogan

on July 30, 2021.

## IV.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain

factors a district court is to consider when sentencing a defendant who has been

---

[3] Undersigned counsel has seen this pattern and practice in many J6 cases and is appalled that the FBI is allowed to terrorize families in the dark early morning hours for defendants with little or no criminal history. As a formal federal prosecutor, undersigned counsel knows that  these types of raids were reserved for the most dangerous and violent criminals, not trespassers.

convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;
2. The need for the sentence imposed;
3. The kinds of sentences available;
4. The kinds of sentence and the sentencing range…;
5. Any pertinent policy statements issued by the Sentencing Commission;
6. The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7. The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).   *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

A. **Nature & circumstances of the Offense & the History and Characteristics of Mr. Harkrider**

First, the defense is not aware of any evidence that defendant's entry into the Capitol was violent in any way.  Second,  Mr. Harkrider did not engage with others while parading in the Capitol, yet he did motion to them while standing on the ledge of the window.  However, he didn't chant "whose house, our house" or "USA, USA" like literally thousands of other protesters.  Third, there is no evidence that he engaged in any violence or questionable conduct towards law enforcement. Fourth, the defense is not aware of any evidence that he destroyed any property from the Capitol. Fifth, based on the Government's investigation, it appears that he remained in the Capitol building for a limited period of time-a few minutes. The defense is not aware of any evidence that he entered the Senate or House Chamber, only the small ante room connected to the window from which he entered.

The government must concede that he committed no violent acts and destroyed no property. His actions within the Capitol have been tracked on the CCTV footage and this demonstrates that while perhaps he was  unlawfully present in the Capitol with no excuse, he did not destroy property, steal property (the defense argued that the broken spoke  was trash) or commit violent acts.   And when he spoke to police officers, it was non-confrontational and respectful.

To his credit, Mr. Harkrider immediately spoke to the officers and  FBI freely when he was arrested.  He fully acknowledged  his misconduct by answering pointed questions by multiple FBI agents, he expressed true and full contrition.  He was relieved by the opportunity to take responsibility for his actions.  He has not one time had any violations of his conditions of release, with one exception of not telling his pretrial officer he went to a city in Texas he thought was within the permissible bounds.   He did not post anything on social media or brag to friends. By the time Mr. Harkrider arrived at the U.S. Capitol after 2:00 p.m., many of the barriers that had been erected along the perimeter of the building were no longer present. Mr. Harkrider met no resistance in his walk to and inside the Capitol. At the time,  Mr. Harkrider didn't dream he'd be charged for going into the Capitol.

Mr. Harkrider's background, life and employment history are laid out in the PSR and thus will not be repeated here. He is a father, son, Texan and Marine. What stands out is the strong character of Mr. Harkrider and the many, many letters of support. *See* Exhibit 1. This has been a tough road for Mr. Harkrider.  He's been untruthfully maligned in the press. His spends his "free time" doing Texas barbecue for bands that perform in Texas, many of them bands from overseas.   He has a very limited criminal history, which he takes complete responsibility for and it was a long time ago. At that time, it was his friend and co-defendant Ryan Nichols who literally saved Mr. Harkrider from himself. He was drinking heavily, and Ryan suggested

that he volunteer with his non-profit "save the universe. He has volunteered since being on pretrial release.  *See* Exhibit 2. His passion for helping others grew and his drinking became non-existent. His personal history is best explained by the many letters his friends and family have written. Like another defendant that this Court sentenced, Mr. Harkrider was given an option by the government to plead guilty to a 231 felony. But supervisors once again derailed this agreement between the "line" lawyers. He still decided to take responsibility and do a stipulated trial, thus saving valuable judicial resources. It is of utmost importance to Mr. Harkrider  that this Court understand that he is incredibly remorseful for his actions on January 6, 2021. None of his actions will be erased from the internet. It's there forever.  No matter what is decided in *Fischer,* he will have the 231 felony conviction.[4] He has fully accepted responsibility for his bad judgement in entering the Capitol building.  He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished.  Yet Mr. Harkrider has been a model for pretrial release.

Mr. Harkrider  does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he did no harm and

---

[4] Undersigned counsel can think of few things worse than having your right to carry a firearm taken away from you.

intended no harm.    His recent past behavior and his post arrest behavior show that

he is capable of being a very productive citizen and the Court can rely on that as a

basis to sentence  him  to a term of probation considering the 3553 factors.  Judge

Hogan was right to give him a bond when undersigned counsel asked for it. Alex

has proven that he can follow the Court's orders.

## B. Need for the Sentence imposed

### 1.  General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general

deterrence, specific deterrence, and incapacitation. In this case, there appears to be

no need for incapacitation, specific deterrence or rehabilitation.  He has already

been  punished in several ways as noted *supra*.  The public will be adequately

deterred by the sentences meted out against those who perpetrated the violence and

mayhem at the Capitol and the negative publicity and collateral consequences

attendant to even a misdemeanor conviction for those involved. Those who would

not be deterred by these consequences are likely not deterrable. And, a sentence

that leaves a person unable to work when other reasonable alternatives exist would

not promote respect for the law. Indeed, unnecessarily harsh sentences imposed

upon those who were less culpable will not encourage respect for the law or

promote just punishment, but are likely to  be counterproductive, and labeled as

political posturing.  A sentence of  time served, perhaps with a period of home

confinement as a condition,  does constitute punishment  and  it will deter others as

one's liberty interests are curtailed by travel restrictions, reporting obligations, and

limitations on one's personal freedoms. He has been on pretrial release for more

than three years  with many restrictions.[5]  The National Institute of Justice,

Department of Justice, issued a summary of the current state of empirical research

stating that "prison sentences are unlikely to deter future crime," and "increasing

the severity of punishment does little to deter crime."  U.S. Dep't of Justice, Office

of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence*

(July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*,

42 Crime & Justice in America 199 (2013)), available at

https://ncjrs.gov/pdffiles1/njj/247350.pdf.

### 2.  Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Mr. Harkriders's  likelihood of recidivism is really non-existent. He has

expressed genuine remorse and contrition.   His acceptance of responsibility was

complete and without reservation.  Research has consistently shown that while the

certainty of being caught and punished has a deterrent effect, "increases in severity

of punishments do not yield significant (if any) marginal deterrent effects."

Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28

---

[5] During much of this time he was on house arrest.

(2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given Mr. Harkrider's  current age  and other issues consistent with what is mentioned above, the likelihood that he would ever re-offend is as close to zero as one might come. A punishment of any additional jail time in this case is going to have the exact opposite effect than what is in the interest of justice.  The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice.  Mr. Harkrider urges the Court to impose a sentence of time served, with perhaps a period of home confinement,  in  this case

23

in light of his health considerations noted in the PSR, his sincere and complete remorse,  his non-violent conduct at the Capitol, and his early and consistent acceptance of responsibility, and the lack of a need to further deter him.

## C.  The kinds of sentences available

A sentence of  additional incarceration would result in sentencing disparity with other individuals who were similarly charged and behaved similarly. *See infra*.[6]

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's financial condition is modest as outlined in the PSR and he respectfully submits that he cannot pay any significant fine.   Considering the value of his home, the fact that there is an outstanding mortgage, and that he has a son he hopes to send to college, counsel respectfully requests that the Court not impose a fine.

## D. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than probation, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this Court. The PSR adequately states that that median sentence of these types of offenses is 12 months, but does not account for Mr. Harkrider's PTSD.  The probation officer

---

[6] This does not include every case, just a sampling.

suggests that a downward departure would be appropriate. If the Court is inclined to give Alex more time, the defense requests home confinement.

Comparatively,  Mr. Harkrider's conduct would not justify a sentence of incarceration and such disparate treatment. The courts have sentenced some January 6 misdemeanor cases to incarceration, but the nature and circumstances of those offenses, as well as the history and characteristics of the defendants in those cases, can be distinguished.  For example, the Court in *United States v. Colbath*, 21 CR 650 (RMD), sentenced the defendant to 30 days of home detention where he took video in the Capitol, re-entered the Capitol and was on the grounds for two hours. Also in *United States v. Jackson*, Judge Moss  sentenced the defendant to 90 days in a halfway house when the defendant took videos and pictures in the Capitol, entered several different parts of the Capitol, lacked remorse, and shouted "oathbreakers" to police officers.   Other judges in this district have done the following: In *United States v. Weisbecker*, 21 CR 682(TFH) Judge Hogan  ordered 30 days of intermittent confinement as a condition of 24 months' probation.  Mr. Weisbecker's conduct and treatment towards law enforcement was much more severe than the instant case. He entered the Speaker's suite of offices, he posted multiple videos and photos on Facebook and other media cites, and berated federal border patrol officer at checkpoints multiple times with such foul language that

even as a criminal defense attorney, undersigned counsel had never heard the like before.

In *United States. v. Baker*, 21 CR 273(TFH), Judge Hogan sentenced the defendant to 9 days intermittent incarceration "when he chose to remain in the Capitol despite watching police attempt to expel rioters from the building", ECF #34, p.2, he live streamed the event and also dictated what was happening in real time and staying in the building even though police told the crowd to leave the Rotunda. These are factors more aggravating than that of Mr. Harkrider.

In *United States v. Carlton*, 21 CR 247 (TFH), Judge Hogan sentenced the defendant to 36 months' probation. Mr. Carlton was a prison guard, and his conduct was much more egregious than  Mr. Harkrider's. As the government pointed out in their sentence memo, Mr. Carlton: (1) made two separate entries into the Capitol; (2) chose to enter the Capitol Building after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower West Terrace, where rioters were clashing with law enforcement; (3) initially lied to law enforcement officials about his activity on January 6, 2021; (4) admitted he "may have" deleted some texts related to January 6; (5) filmed the chaos around him rather than choosing to leave; (6) has not expressed since remorse for his crimes on January 6, and (7) as a corrections officer, Carlton should have recognized the dangers that he and his fellow rioters' presence at the

Capitol posed to public safety. *See  Gov't sent. Memo,* ECF No. 47, p. 2. Mr.

Harkrider engaged in none of this conduct.

In *United States v. Youngers*, 21 CR 640 (TFH) Judge Hogan again gave a

probationary sentence despite that defendant's conduct as outlined by the

government:

Aware that he was facing arrest, Youngers scaled a wall to reach the Capitol
Building, filmed a confrontation between rioters and police, and entered through
the Senate Wing Door within ten minutes of the initial breach. After filming
himself declaring "this is what a revolution motherfucking looks like," and
collecting a souvenir piece of broken glass, he and codefendant George Tenney
proceeded to the Rotunda Doors, which had not yet been breached. Tenney opened
the door for rioters, instigating the breach of the Capitol from the east side.
Youngers tried to open one of the doors too, encouraged entering rioters, and
swatted at a police officer, but then took some steps to assist the now-outnumbered
police, untangling an officer's radio from a bench and temporarily keeping some
rioters away from that officer. Before leaving the area, Youngers filmed another
video celebrating the breach of the Capitol. Back at a hotel, he filmed a video
denying that there was violence at the Capitol and gave an interview wearing a
full-face mask to conceal his identity.

*See* ECF No. 55, Gov't sent. memo at p. 2.

All told, the facts of the offense conduct and characteristics of the

defendants who garnered incarceration and were only charged with misdemeanors

were starkly different than Mr. Harkrider's conduct and characteristics. His actions

fall on the low-end of the spectrum that day and his culpability appears to be

minimal in contrast with rioters who posted hateful messages, destroyed or stole

government property and assaulted or threatened the law enforcement officers on

that date.  While Mr. Harkrider accepts responsibility for his actions, he was

guided and urged every step of the way by no less of an authority than the former President of the United States.

This Court should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; *through a broken after many others had breached the Capitol* (2) whether the defendant encouraged violence; *absolutely not.*  (3) whether the defendant encouraged property destruction; *none* (4) the defendant's reaction to acts of violence or destruction; *he never once celebrated the violence* (5) whether during or after the riot, the defendant destroyed evidence; *none* (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; *not far and about 15 minutes*; (7) the defendant's statements in person or on social media; *none on social media, sparse in person* (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; *cooperated at the Capitol and at his home*(9) whether the defendant demonstrated sincere remorse or contrition; and the defendant's conduct after January 6, 2021. *Yes, he has demonstrated remorse. See*  letter  forthcoming from Mr. Harkrider, Defense Exhibit 3.[7]   While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

## VI. CONCLUSION

---

[7] The defense has also provided electronically a short video of Harkrider's statement of remorse along with other statements.

Considering all the applicable factors the Court will consider,  Mr. Harkrider respectfully moves this court to impose a sentence of time served,  120 hours of community service,  and $2,000 restitution.  This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Harkrider as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

By:      /s/
Kira Anne West
DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify on the 2nd  day of May, 2024 a copy of same was delivered to the parties of record, by email  pursuant to the  rules of the Clerk of Court.
                        *Kira Anne West*     /S/
Kira Anne West