## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-117-RCL** |
| **ALEX KIRK HARKRIDER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court depart or vary upwards to sentence Alex Kirk Harkrider to 36 months' incarceration, 3 years of supervised release, restitution in the amount of $2,000, and special assessment fees totaling $445.

## I.    INTRODUCTION

The defendant, Alex Harkrider, a 36-year-old caterer and United States Marine Corps veteran, aggressively participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

1

As explained herein, the government's recommended sentence is appropriate in this case because Harkrider: (1) planned and prepared with co-defendant Ryan Nichols for violence by gathering weapons and conducting reconnaissance; (2) equipped himself on January 6 with body armor (a carrier vest with ballistic plate) and a weapon (a tomahawk axe); (3) encouraged his co-defendant and other rioters to "Cut their freaking head[s] off" (referring to the members of Congress participating in the certification vote) as rioters marched towards the Capitol; (4) was part of the mob of rioters who used the force of their bodies to push against vastly outnumbered police officers inside "the tunnel" on the Upper West Terrace of the Capitol building as the mob chanted, "Heave! Ho!;" (5) helped pass a canister of OC spray to other rioters to facilitate their assault of officers in the tunnel; (6) entered a private office in the Capitol through a small broken window twice; (7) stole a broken piece of furniture; and (8) stood in a ledge outside of that office and drew his hand across his throat in a slashing motion to the roar of the crowd gathered in the West Plaza.

The government recommends that the Court sentence Harkrider to 36 months of incarceration for his convictions of violating 18 U.S.C. §§ 231(a)(3) and 2 (Count 1), 1512(c)(2) and 2 (Count 2), 641 (Count 4), 1752(a)(1) and (b)(1)(A) (Count 6), 1752(a)(2) and (b)(1)(A) (Count 8) and 40 U.S.C. §§ 5104(e)(2)(D) (Count 9) and 5104(e)(2)(G) (Count 11). An upward departure or variance to a 36-month sentence of imprisonment reflects the gravity of Harkrider's

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

conduct.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts and Elements for Stipulated Trial filed in this case, ECF 291, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Harkrider's Role in the January 6, 2021 Attack on the Capitol

*Planning and Preparation in Advance of January 6*

In the days leading up to January 6, Harkrider planned extensively with co-defendant Ryan Nichols for their trip from Texas to Washington, D.C. Reveling in the possibility of violence, they communicated at length about what weapons to bring to D.C., restrictions on doing so, and how to transport them.

On December 31, 2020, Nichols sent Harkrider a photograph and pricing of body armor, stating that it would protect against various kinds of bullets. The messages were replete with evidence of their understanding that what they were planning on January 6 was illegal and possibly violent. For instance, on January 1, 2021, Nichols sent Harkrider several messages including, "We're going to need first aid kits and tourniquets"; "I need to speak with you in person"; "Everything is ok. Just need to gameplan lol"; "We need to speak in person lol"; and "what I'm about to relay can't be done over the phone."

On January 3, 2021, Nichols and Harkrider had the following text message conversation:

Nichols: I've got goodies for the trip.

Nichols: Goodies you've requested before but never got..

**Harkrider: [GIF file that says "Take acid and see reality."]**

**Harkrider: Could it be?! Haha**

Nichols: Still some other stuff we have to talk about before we leave

Nichols: The Line in the sand

Nichols: Dad and I are building a gun container in the truck today

Nichols: Just know I have intel that Washington will be a warzone

Nichols: Big possibility that actual battle goes down

**Harkrider: I'm looking forward to it**

Nichols: I know how to get guns legally into DC now

Nichols: It's called transporting

**Harkrider: I'll bring every freedom blaster I own then**

**Harkrider: We're stopping in Kentucky on the way for those plate carriers too right?**

Nichols: Do you have any 10 round mags for an AR?

**Harkrider: I do not**

Nichols: Damn. I'd rather go with those so it's fully legal. 30 round mags are not

**Harkrider: Surely we can find some**

They did not just talk about bringing weapons. Although Harkrider denies that firearms were brought into the District of Columbia, it is undisputed that Nichols and Harkrider each brought two firearms with them on their trip from Texas, transporting and storing them in a box that Nichols and his father constructed in the back of Nichols' truck.

They also conducted reconnaissance and walked the streets of Washington, D.C. on the night of January 5, 2021 in preparation for the next day's events.   At one point, while Harkrider was standing next to Nichols, Nichols shouted, "Cops don't know what's going on.   Too many of us, not enough of them."   Exhibit A at 00:10-18. Later, while Harkrider was again standing next

4

to Nichols, Nichols shouted, "Those people in the fucking Capitol building are our enemy." *Id.* at 00:59-END. In another verbal altercation with police while Harkrider was present, Nichols shouted, "We had your fucking back but now we ain't got your back no more.… You better have our back or we're going to fucking show you. Heads will fucking roll!" Exhibit B at 0:48-1:30.

### *Calls for Violence During Approach to the Capitol*

On January 6, 2021, Nichols and Harkrider attended a rally in support of then-President Trump near the Ellipse, where they witnessed his speech before marching to the Capitol with thousands of others.  Nichols and Harkrider both wore body armor – ballistic plates in carrier vests, as alluded to in their earlier text messages. Image 1, below, is a photo Nichols posted to Facebook tagging Harkrider.



*Image 1: Harkrider, right, and Nichols, left, wearing ballistic plate carriers in photo posted to Facebook with caption "Time to take the country back!"*

Nichols was also armed with a crowbar, while Harkrider was armed with a tactical tomahawk axe.

Sometime after 2:24 p.m., while Nichols and Harkrider were walking from the Ellipse to the Capitol, President Trump tweeted that, "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands truth!"   As shown in Exhibit C, Nichols then stated, while standing behind and to the side of Harkrider:

> I'm telling you what I'm hearing, that Pence, I'm hearing that Pence just caved.…   I'm hearing reports that Pence caved.   I'm telling you if Pence caved, we're gonna drag motherfuckers through the streets. You fucking politicians are going to get fucking drug through the streets.   Because we're not going to have our fucking shit stolen.   We're not going to have our election, our country stolen.   If we find out you politicians voted for it, we're going to drag your fucking ass through the streets. Because this is the second fucking revolution and we're fucking done.   I'm telling you right now, Ryan Nichols said it. If you voted for fucking treason, we're going to drag your fucking ass through the streets. So let us find out, let the patriots find out that you fucking treasoned this country. We're gonna drag your fucking ass through the street.   I'll fucking choke him myself.…
>
> We're tired of being shut down, shut up, and told to fucking roll over and take it.   We ain't taking it no more.   So you want to take it from us, well we're here to take it back from you.

At this point, Harkrider interjected, "Cut their freaking head off!   You can do it." Exhibit C at 12:45.



*Image 2: Still from Exhibit C at 12:45 showing Harkrider standing behind Nichols during their march to the Capitol.*

Harkrider made the statement in an exaggerated Cajun accent and appeared to be loosely quoting actor Rob Schneider's character in *The Waterboy*, a 1998 film starring Adam Sandler.

Nichols continued:

> Cut their head off! [repeating Harkrider]
>
> Hey, Republican protestors are trying to enter the House right now at the Capitol, is the word that I'm getting.  So if that's true, then get up in there.  If you voted for treason, we're going to drag your ass through the streets.…  Everybody here ain't here to fight.  I am.  You do the right thing or we're going to force you to do the right thing.…
>
> You see the battle drums? I told you all, I said this was a war cry, January 6th…
>
> Alright folks, my battery is almost dead.  I'm at 10%. I gotta save a little bit of it and I'll probably be back live later, but know that Ryan and Alex are here in Washington, D.C. marching on the Capitol, apparently Pence just caved and if Pence caved we're going to fucking take it back, because we're not going to let it be stolen….  If you're a patriot, if you're an American, you better be fighting today.   Because today's it.   If you let it go today, today's it.

***Harkrider's Participation in the Attack on Police Officer in the Tunnel***

After arriving at the Capitol grounds, Nichols and Harkrider joined a mob of rioters who had gathered in front of an arched entrance to the Lower West Terrace doors, which, in the context of the January 6, 2021, attack, has become known as the "tunnel" due to its location in relation to the partially constructed inaugural stage. U.S. Capitol Police (USCP) and Metropolitan Police Department (MPD) officers guarded this entrance to the Capitol as rioters tried to force their way in.   From their position in the crowd of rioters, the officers in the tunnel were clearly visible to Nichols and Harkrider.

At approximately 3:56 p.m., Harkrider and Nichols marched up the stairs towards the tunnel, lowered their heads and shoulders, and joined the mob of rioters heaving against the line of officers in synchronized movements such that the officers in the tunnel had to resist the entire weight of the mob pushing against them at once. Exhibit D.



*Image 3: Still from Exhibit D at 00:09 showing Harkrider, indicated by red arrow, waving crowd forward and pushing against officers. Nichols, circled in yellow, is behind him.*

At approximately 3:57 p.m., Harkrider grabbed a stolen MPD-issued MK-46 canister of O.C. spray, held it above his head for more than ten seconds, and passed it to other rioters who then used the spray against officers in the tunnel.   Exhibit E.



*Image 4: Still from Exhibit E at 00:17 showing Harkrider holding up canister of O.C. spray (circled in yellow) for fellow rioters to take and use against officers.*

Nichols and Harkrider then continued to push with the mob against the officers, rocking back and forth and shouting, "Heave! Ho!"

### *Harkrider Enters Capitol Via Broken Window, Steals Piece of Furniture*

At approximately 4:13 p.m., Nichols observed another rioter trying to break a window to the Capitol with a stolen canister of police pepper spray.

Harkrider, followed by Nichols, then entered Room ST-2M of the Capitol through a broken window. Exhibit F. Before entering the Capitol, Harkrider pumped his fist in the air.



*Image 5: Still from Exhibit G at 00:00 showing Harkrider inside Room ST-2M.*

At approximately 4:18 p.m., Nichols and Harkrider emerged from Room ST-2M and stood on the window ledge. Nichols held his crowbar in one hand and a bullhorn in the other. Harkrider had his tactical tomahawk axe secured in a holster under his jacket, but it was still partially visible.



*Image 6: Harkrider, right, wearing body armor and carrying tomahawk axe in holster.*

Using a bullhorn, and with Harkrider standing immediately next to him, Nichols shouted, "Get in the building, this is your country, get in the building, we will not be told 'No'," "This is the second revolution," and "This is not a peaceful protest."

At approximately 4:21 p.m., Nichols repeatedly shouted through the bullhorn, "If you have a weapon, you need to get your weapon!" and "Pedo Pence, Pedo Pence!" Harkrider, upon hearing Nichols' chanting, joined in these chants.

At approximately 4:25 p.m., Nichols and Harkrider crawled back into Room ST-2M through the broken window.

At approximately 4:30 p.m., to the roar of the crowd as they finished singing the National Anthem, Harkrider leaned his upper body out of the broken window of Room ST-2M, and pumped his fist, as shown in Image 7. Exhibit I at 3:50-4:15.

11



*Image 7: Still from Exhibit I at 04:08 showing Harkrider leaning outside Capitol window.   The woman next to him, Yvonne St. Cyr, is serving a 30-month sentence following a trial conviction on six counts, including two violations of 18 U.S.C. § 231.*

He then drew his hand across his throat in a slashing motion and pumped his fist again.

At approximately 4:35 p.m., Nichols and Harkrider exited the Capitol building through the broken window in Room ST-2M.  As he was leaving, Harkrider picked up a broken piece of government furniture from the Capitol building: a wooden arm support from a broken dining or office chair.

Harkrider took the arm support home to Texas and possessed it until it was seized from his nightstand by FBI agents during the execution of a search warrant on January 18, 2021.   The arm support was found next to the hat that Harkrider wore to the Capitol, and Harkrider admitted that the took the item as a souvenir.



*Image 8: Part of arm to government chair found on Harkrider's nightstand next to baseball cap he wore on January 6.*

Harkrider knew at the time that he entered the restricted Capitol grounds and Capitol building that he did not have permission to enter either.   Harkrider also knew that he did not have permission or authority to remove the piece of broken government furniture from the Capitol.

### *Harkrider's Interview with the FBI*

On January 18, 2021, Harkrider gave a voluntary post-arrest interview to the FBI. Exhibit J. He admitted he traveled to Washington with Nichols because he "believe[d] the election was rigged." Exhibit J at 5:15-5:27.

Harkrider acknowledged that they both brought weapons with them on their trip. He admitted to bringing a 9-millimeter pistol and a lever action .30-.30 rifle. *Id.* at 14:35-16:05. Harkrider told the agents he did not bring the guns into the District of Columbia and left them at their hotel. Harkrider also admitted to wearing body armor (with a plate carrier). He described the

tomahawk axe he admitted to carrying as a "tactical stick." *Id.* at 22:45-23:01. Harkrider described walking around the evening of January 5 to "check out the area" with Nichols. *Id.* at 16:55-17:35.

Harkrider acknowledged that he entered the Capitol building on January 6 and that he knew he did not have permission to enter. He stated that "crawling through the window was fucking stupid" and "As soon as I crawled through that window that was broken, that's when I really fucked up." *Id.* at 27:16-22; 33:30-43.

However, Harkrider attempted to minimize his conduct in talking with the agents. He claimed he "was in the crowd . . . that's all there was to it." *Id.* at 5:45-54. He denied taking anything from the Capitol. *Id.* at 29:01-06. He also falsely denied handling the canister of OC spray, stating "No. Never. I didn't touch one of those at all." *Id.* at 35:05-26. In the stipulated statements of facts, Harkrider has now conceded that those statements were false.

## III.  THE CHARGES AND STIPULATED TRIAL

Harkrider was first charged by criminal complaint on January 17, 2021. On November 10, 2021, a federal grand jury returned a superseding indictment against Harkrider and Nichols, charging Harkrider with seven counts: (1) Count One—civil disorder in violation of 18 U.S.C § 231; (2) Count Two—obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); (3) Count Four—theft of government property (less than $1,000), in violation of 18 U.S.C. § 641; (4) Count Six—entering a restricted building or grounds while using and carrying a deadly and dangerous weapon (tomahawk axe) in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); (5) Count Eight—engaging in disorderly and disruptive conduct on restricted ground while using and carrying an deadly and dangerous weapon (tomahawk axe), in violation of 18 U.S.C. § 1752(a)(2)

and (b)(1)(A); (6) Count Nine—disorderly and disruptive conduct in the Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D); and (7) Count Eleven—parading, picketing, and demonstrating in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). Superseding Indictment, ECF No. 59. On January 2, 2024, Harkrider was convicted of those offenses as the result of a stipulated trial.

## IV.    STATUTORY PENALTIES

Harkrider now faces sentencing on the above seven counts. Page two of the Presentence Report issued by the U.S. Probation Office identified the statutory maximum sentences for each of the counts of conviction. Counts 1, 2, 6, and 8 are felonies carrying a special assessment of $100 (totaling to $400). For the Class A misdemeanor (Count 4), there is a special assessment of $25. Finally, for the Class B misdemeanors (Counts 9 and 11), there is a special assessment of $10 (totaling $20).   Altogether, those special assessment fees total $445.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The U.S. Probation Office calculated Harkrider's criminal history score as one and criminal history category as I, which is not disputed. PSR ¶ 98. The government also agrees with the total adjusted offense level calculated by Probation. Accordingly, based on Harkrider's total adjusted offense level, after acceptance of responsibility, at 15, Harkrider's Guidelines imprisonment range is 18 to 24 months' imprisonment.

However, the government notes three issues with the Guidelines calculations set out in the PSR: (1) the PSR does not include a Guidelines analysis for all Counts of conviction;[2] (2) the PSR mistakenly applies the 2A2.2 Guideline as "the guideline for 18 USC § 111(a)(1) offenses" Counts One and Eight, when Counts One and Eight are actually an 18 U.S.C. § 231(a)(3) charge and an 18 U.S.C. § 1752(a)(2) and (b)(1)(A) charge, which in this instance use the 2A2.4 Guideline (*see* PSR ¶ 75); and (3) the PSR does not group Counts Two (18 U.S.C. § 1512(c)(2)) and Six (18 U.S.C. § 1752(a)(1) and (b)(1)(A)) with Count Eight (18 U.S.C. § 1752(a)(2) and (b)(1)(A)) (*see* PSR ¶ 65-66), which should all be grouped because they all have the same victim – Congress. As noted above, these issues do not impact the offense level computation and Guidelines calculation.

Because the PSR does not include a Guidelines analysis for all other Counts of conviction, the Government sets out the full calculations for all Counts below and asks this Court to conduct a full analysis of the Guidelines calculations before imposing sentence.

### A.  Analysis for each count

### Count One:  18 U.S.C. § 231(a)(3)—Obstructing or Impeding Officers During a Civil Disorder and Aiding and Abetting

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

---

[2] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If the offense involved physical contact …   increase by 3 levels."<br><br>Harkrider used his body weight to push other rioters against the police officers in the "tunnel" connecting the Capitol Building to the inaugural stage.   Thus, his conduct "involved" physical contact. Physical contact need not be direct and encompasses indirect uses of force.  *See, e.g.*, *United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (specific offense characteristic properly applied where inmate threw a cup of urine into a prison guard's face); *United States v. Shelton*, 431 F. Supp. 2d 675, 675-77 (E.D. Tex. 2006) (defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd*, 230 F. App'x 457 (5th Cir. 2007).   Courts have held that the specific offense characteristic applied to a defendant who worked in concert with a codefendant who made indirect contact with the victim. *See United States v. Beltran-Higuera*, 642 F. App'x 780, 782–84 (9th Cir. 2016).<br><br>This enhancement has been applied to other January 6 defendants who participated in efforts to break the police line in the Tunnel.  *See, e.g., United States v. Baugh*, 22 Cr. 313 (JEB). |
| Total | 13 | |

**Count Two:   18 U.S.C. § 1512(c)(2) and 2—Obstruction of an Official Proceeding and Aiding and Abetting[3]**

The Statutory Appendix lists one guideline for a Section 1512(c) offense, U.S.S.G. §2J1.2 (Obstruction of Justice).

| Base Offense Level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|

---

[3] The government notes the D.C. Circuit recently decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024), which held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id*. at *8. However, as described below departures, such as those under Chapter 5, Part K, may nonetheless be appropriate, or a variance from the applicable guidelines range may be warranted.

| Total | 14 | |
|---|---|---|

## Count Four:   18 U.S.C. § 641—Theft of Government Property

The Statutory Appendix lists two guidelines for a Section 641 offense, U.S.S.G. §2B1.1 (Theft) and §2B1.5 (Theft of Cultural Heritage Resources). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. See §1B1.2 n.1. Here, the most applicable guideline is § 2B1.1.

| Base Offense Level: | 6 | U.S.S.G. §2B1.1(a)(2) |
|---|---|---|
| Specific Offense Characteristic | No increase | U.S.S.G. §2B1.1(b)(1)(A) – loss less than $1,000 |
| Specific Offense Characteristic | +2 | U.S.S.G. §2B1.1(b)(16)(B) – possession of a dangerous weapon |
| Subtotal | 8 | |
| | 14 | U.S.S.G. §2B1.1(b)(16)(B) – if offense involved possession of a dangerous weapon and the resulting offense level is less than level 14, increase to 14.<br><br>A dangerous weapon means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument or (II) the defendant used the object in a manner that created the impression that the object was such an instrument. U.S.S.G. §1B1.1 app. n.1(E). The defendant carried a tomahawk axe while in and around the Capitol and committing the relevant theft, and a tomahawk axe is either "capable of inflicting death or serious bodily injury" or "closely resembles such an instrument." |
| Total | 14 | |

18

**Count Six: 18 U.S.C. § 1752(a)(1) and (b)(1)(A)—Entering or Remaining in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct."   Here, U.S.S.G. § 2B2.3, which applies to trespass offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(1), which is essentially a trespass offense.

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) (trespass) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted buildings or grounds."   On January 6, 2021, the U.S. Capitol and its grounds were restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(2): the defendant possessed a dangerous weapon. |
| Cross-Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above."<br><br>As described above, Harkrider entered the restricted area of the Capitol building for the purpose of committing multiple felonies, including obstructing the official proceeding, in violation of 18 U.S.C. § 1512(c)(2). |
| Base Offense Level (adjusted) | 14 (from Count Two) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br>As described above, Harkrider entered the restricted area of the Capitol building for the purpose of obstructing the official proceeding, in violation of 18 U.S.C. § 1512(c)(2), thus the substantive offense is Count Two and the § 2J1.2 guideline should be used.<br><br>*See* discussion for Count Two. |
| Total | 14 | |

19

**Count Eight: 18 U.S.C. § 1752(a)(2) and (b)(1)(A)—Disorderly or Disruptive Conduct in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2A2.4, which applies to impeding officers, is the most appropriate guideline for 18 U.S.C. § 1752(a)(2), which prohibits "disorderly or disruptive conduct" and involves more than mere trespass (making § 2B2.3 an inappropriate guideline for the offense conduct).

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) (Obstructing or Impeding Officers) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If the offense involved physical contact …   increase by 3 levels." <br><br> *See* discussion for Count One above. |
| Total | 13 | |

**Counts Nine and Eleven: 40 U.S.C. § § 5104(e)(2)(D) and (G)—Disorderly or Disruptive Conduct in a Capitol Building and Parading, Demonstrating, or Picketing in a Capitol Building**

Because these offenses are Class B misdemeanors, the Guidelines do not apply to them. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

## B.  Grouping Analysis

Under U.S.S.G. §3D1.2, "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction … [or] (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline appliable to another of the counts."   Harkrider's counts of conviction should be placed into three groups:

- Group One—consists of Counts Two, Six, and Eight, charging violations of 18 U.S.C. §§ 1512(c)(2), 1752(a)(1) and (b)(1)(A), and 1752(a)(2) and (b)(1)(A), because the victim of each of these counts is Congress.  *See* U.S.S.G. §§ 3D1.2(a) and (b). The adjusted

offense level for Group One is 14.

- Group Two—The victim of Count One, civil disorder, in violation of 18 U.S.C. § 231(a)(3), is law enforcement. Count One is in its own group, with an offense level of 13.

- Group Three—The victim of Count Four, theft of government property, in violation of 18 U.S.C. § 641, is the Architect of the Capitol.   Count Four is its own group, with an offense level of 14.

Pursuant to U.S.S.G. § 3D1.4(a), because the adjusted offense levels for Groups One and Three are both equally serious with an adjusted offense level of 14, and the adjusted offense level for Group Two is 1 level less serious with an adjusted offense level of 13, one unit is added for each Group. Based on the chart in § 3D1.4, this adds three additional offense levels.   Thus, the combined offense level is 17.

### C.  Acceptance of Responsibility

Based on Harkrider accepting responsibility by agreeing to a stipulated trial, in which he agreed to relevant facts in the Statement of Facts and Elements for Stipulated Trial filed in this case, ECF 291, Harkrider is currently entitled to a two-level decrease in his offense level after grouping.   *See* 3E1.1(a).   Accordingly, his offense level after acceptance of responsibility would be 15.

### D.  Estimated Guidelines Range

Accordingly, based on the government's calculation of Harkrider's total adjusted offense level, after acceptance of responsibility, at 15, Harkrider's Guidelines imprisonment range is 18 to 24 months' imprisonment.

### E.  Upward Departure or Variance

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Following *Brock*, the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply. But that decision does not undercut the severity of Harkrider's crime – assaulting the Capitol in an attempt to stop Congress from certifying the election. *See Brock*, 2024 WL 875795, at *15 ("interference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work"). In order to impose a just and fair sentence in this case, the Court should either (1) impose a four-level upward departure pursuant to U.S.S.G. § 5K2.7, resulting in a Guidelines range of 30 to 37 months' imprisonment, or (2) vary upwards to sentence Harkrider to 36 months' imprisonment, above his current Guidelines range but still below the bottom end of the pre-*Brock* Guidelines range.[4]

A "district court's authority to impose a departure emanates from 18 U.S.C. § 3553(b)(1) and, in turn, in Chapter 5, Part K of the Guidelines." *United States v. Jacobs*, 635 F.3d 778, 781–82 (5th Cir. 2011). This part of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure. U.S.S.G. § 5K2.0(a)(2)(A).

---

[4] Applying the enhancements in U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) to the instant case would result in a total offense level of 23.   (Group One would have an offense level of 25 (base offense level of 14, plus 8 for U.S.S.G. §§ 2J1.2(b)(1)(B), and plus three for U.S.S.G. §§ 2J1.2 (b)(2)), Groups Two and Three would be disregarded because their adjusted offense levels are 9 or more levels less serious, making a combined offense level of 25 pursuant to § 3D1.4.   After acceptance of responsibility pursuant to § 3E1.1(a), the offense level would be decreased two levels and would be 23.   Accordingly, the Guidelines range would have been 46-57 months' imprisonment.

One such circumstance is when an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[5] A departure under this guideline is warranted in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense. *Id*. In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

Although the general rule is that § 5K2.7 does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on January 6, 2021 is the exact type of unusual circumstance that the Sentencing Commission could not have predicted and that warrants an upward departure. Those who obstructed the administration of justice that day targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy. They were part of a mob that injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. Defendants like Harkrider "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *Brock*, 2024 WL 875795, at *15. It was an unprecedented day in American history. But, following *Brock*, the seriousness of the crimes committed for defendants like Harkrider is not adequately captured by the applicable Guideline, § 2J1.2, because the Sentencing Commission did not contemplate that an event like January 6 could happen when it wrote the Guidelines. At least one Judge of this Court has already applied § 5K2.7 in a January 6 case. *See*

---

[5] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence."  *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

*United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"). In these highly unusual circumstances, a four-level upward departure under § 5K2.7 is appropriate to reach the same offense level that would have applied to Harkrider if the § 2J1.2 enhancements applied.

If the Court decides not to apply § 5K2.7, an upward variance is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).

Here, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense. As just discussed, Harkrider's obstruction of justice on January 6 was a serious offense that attacked the fundamentals of American democracy. The only reason that Harkrider is not subject to enhancements in § 2J1.2 is because the Sentencing Commission did not imagine that a day like January 6 could occur. As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, *I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding…* [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87 (emphasis added).

In the specific facts and circumstances of Harkrider's case (discussed in more detail below), an upward variance to 36 months' incarceration is appropriate considering the bottom of the Guidelines range if U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) had applied (46 months). *See United States v. Reffitt,* 21-cr-87 (DLF), Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'); *United States v. Fonticoba*, 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *Fonticoba*, 4/11/2024 Mem. Order at 4-5 (denying motion for release pending appeal and agreeing that certification proceeding was "far more important" than "any run-of-the-mill" judicial or quasi-judicial proceeding). Accordingly, the government requests that the Court vary upwards and sentence Harkrider to 36 months' imprisonment, in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Harkrider's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Harkrider equipped himself to be ready for violence on January 6 and "look[ed] forward to" what Nichols predicted would be an "actual battle," and Harkrider followed through on his preparations. He pushed against officers in the tunnel, assisted rioters spraying officers with OC spray, and led his co-defendant into a private office in the Capitol through a broken window where he stole a broken piece of furniture. He encouraged other rioters to behead lawmakers at two different times on January 6 – first in a livestream video to Facebook as he marched to the Capitol and then when he stood on a ledge near the tunnel and made a throat-slitting gesture to the crowd. The nature and circumstances of Harkrider's offenses were of the utmost seriousness, and fully support an upward departure or variance and the government's recommended sentence of 36 months.

### B.  Harkrider's History and Characteristics

As set forth in the PSR, Harkrider, a 36-year-old male, served in the United States Marine Corps from 2008 to 2012 and was deployed to Iraq and Afghanistan. PSR ¶ 111, 128. He also volunteered in disaster search and rescue operations. PSR ¶ 132. Harkrider's military and community service is laudable, and the government has considered that when fashioning its recommendation to the Court. However, it is also worth noting that as a former Marine, and as evidenced by his ferocious exclamations, he knew that his decision to storm a guarded government

26

building with the knowledge that police who were attempting to stop the riot were totally outnumbered and unable to prevent the breach created a grave risk of personal injury, property damage, and worse. His veteran status and relief efforts are thus have aggravating as well as mitigating effects on the sentencing calculus.

Moreover, his crimes on January 6 were not an isolated event in an otherwise law-abiding life. In September 2011, Harkrider was sentenced to 24 hours' confinement (credit with time served), 11 months and 29 days' probation, 40 hours' community service and a $300 fine for Driving Under the Influence of Alcohol in Douglas County State Court in Douglasville, Georgia. PSR ¶ 98. Shortly after his probation term ended in Georgia, in December 2012, Harkrider drove a Chevrolet pickup truck into a ditch in Panola County, Texas. PSR ¶ 103. Officers dispatched to the scene smelled the strong odor of alcohol, and Harkrider failed field sobriety tests. *Id.* He claimed "that a vehicle defect had caused the accident" but later "admitted that he was drinking prior to the crash and . . . had been in the ditch for several hours." *Id.* He was charged with Driving While Intoxicated – 2nd degree. For reasons not explained in the PSR, the charges were dismissed in 2015. PSR ¶ 103.

Harkrider also failed to comply with all the conditions of his pretrial release in this case. In October 2023, pretrial services contacted him to schedule a home visit and he admitted he was out of the district without seeking preapproval or notifying Pretrial Services. PSR ¶ 14. He also had a reporting infraction in June 2023, and he has failed to provide Pretrial Services with information sufficient to confirm he is compliant with physical and mental health treatment. PSR ¶ 13, 15-16.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense
and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of

incarceration. Harkrider's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out

of the violent riot at the Capitol.

*Specific Deterrence*

Harkrider's actions planning and preparing for January 6, his conduct on January 6, as well

as his lack of remorse, demonstrates the need for specific deterrence in the form of a lengthy term

of incarceration for this particular defendant. For example, when he saw the extensive property

damage in private office space, Harkrider's response was to take a piece of broken furniture as a

trophy or memento of his criminal conduct. The government expects he will continue to minimize

his conduct and claim, as he did in response to the PSR, that he believed the item was "trash." The

government is troubled by that disingenuous argument for several reasons. First, it defies logic that

he would transport something he believed to be rubbish from the Capitol to his home and place it

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

on his nightstand next to his bed, where the item was found during execution of the search warrant. Moreover, the comment shows his lack of remorse for the millions of dollars in damages to the Capitol building, which functions as both a monument to democracy and a working office building maintained by the Architect of the Capitol's skilled craftspeople.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and

consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same unique facts as Harkrider's or the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The Court should consider principally compare Harkrider with the conduct of co-defendant Ryan Nichols. Nichols received a sentence of 63 months, at the top of his Guidelines range. Harkrider is less culpable than Nichols and their distinct Guidelines calculations and the difference in the government's recommendations (36 months for Harkrider as compared to 83 months for Nichols) reflects the difference in their conduct. However, Harkrider did not merely follow Nichols on January 6. As their text messages show, Harkrider jointly planned with Nichols to gather weapons in preparation for violence. And on January 6, Harkrider did more than stand in Nichols' shadow. When the two pushed with the crowd against the officers, Harkrider was in front and closest to the officers in the tunnel. Harkrider led the two into the Capitol, and only Harkrider stole the piece of broken furniture. When Harkrider stuck his body outside the window to encourage the crowd by making the gesture to "cut their heads off," echoing the statement he made earlier in the day as they walked toward the Capitol, he did so by himself. Therefore, although Harkrider's conduct is not as extensive as Nichols, his conduct supports a significant period of incarceration.

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Sentences imposed for other comparable sentences also demonstrate that a sentence of 36 months imprisonment would properly account for Harkrider's behavior.

In *United States v. Yvonne St. Cyr*, 22-cr-185-JDB, the court imposed 30 months' incarceration for a defendant convicted after trial of two counts of violating 18 U.S.C. § 231(a)(3) and misdemeanor offenses. Like Harkrider, St. Cyr, shouted encouragement to rioters on her approach to the Capitol and during the attacks. She also crawled through a broken window to enter the same private office space – Room ST-2M. Although St. Cyr testified falsely at her trial, Harkrider's conduct was more aggravating than St. Cyr's. Unlike St. Cyr, Harkrider extensively planned for violence, wore body armor (a plate carrier), carried a tomahawk axe, and stole a broken piece of a chair from the Capitol building.

In *United States v. George Tenney*, 21-cr-640-TFH, the defendant pleaded guilty to 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1512(c)(2) and was sentenced to 36 months. Like Harkrider, Tenney sent text messages with other rioters in anticipation of the violence on January 6, and he entered the Capitol building. Tenney's criminal conduct took place in a different part of the Capitol—he forced open the Rotunda Doors—but both he and Harkrider encouraged other rioters to confront law enforcement and invade the Capitol. Both also participated in violence against officers, although Tenney directly shoved and pushed officers, while Harkrider pushed and shoved officers as part of the larger mob in the tunnel. However, Harkrider also held up the O.C. spray canister for other rioters to grab and inflict injury on officers, he carried a dangerous weapon and wore body armor, traveled to the area with guns and ammunition, and he stole a broken piece of a chair.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Harkrider was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because Harkrider engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Harkrider responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v.*

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

*Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Harkrider to pay $2,000 in restitution for his convictions on Counts 1, 2, 6, and 8. This amount fairly reflects Harkrider's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 36 months' incarceration, 3 years of supervised release, restitution in the amount of

$2,000, and a special assessment of $445.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:  */s/ Sarah W. Rocha*
SARAH W. ROCHA
Trial Attorney
D.C. Bar No. 977497
601 D Street, NW
Washington, DC 20530
sarah.wilsonrocha@usdoj.gov

DOUGLAS B. BRASHER
Assistant United States Attorney
Texas State Bar No. 24077601
Federal Major Crimes – Detailee
1100 Commerce Street, Third Floor
Dallas, TX 75242
douglas.brasher@usdoj.gov

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
601 D Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov